Douglas T. SMITH, et al., Plaintiffs,

v.

BOARD OF SCHOOL COMMISSIONERS OF MOBILE COUNTY, et al., Defendants.

Douglas T. SMITH, et al., Plaintiffs,

v.

George C. WALLACE, Governor of Alabama, et al., Defendants.

Civ. A. Nos. 82–0544–BH, 82–0792–BH.

United States District Court, S.D. Alabama, S.D.

March 4, 1987.

As Corrected March 9 and March 19, 1987.

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAND, Chief Judge.

### History of Case

For one to have a reasonable understanding of the present posture of this lawsuit, some attention should be given to its history.

### Original Case

On May 28, 1982 Ishmael Jaffree, individually, and as father and next friend of his three children, brought an action against the Board of School Commissioners of Mobile County, its Superintendent, various principals and teachers seeking a declaratory judgment and restraining order against the defendants from maintaining or allowing the maintenance of regular religious prayer services or other forms of religious observances in the Mobile public schools. Jurisdiction was invoked pursuant to Title 28, § 1343(3) and (4) and §§ 2201 and 2202. The cause of action, it was alleged, arose under the First and Fourteenth Amendments to the United States Constitution and pursuant to Title 42, §§ 1983 and 1988.

In June the action was amended in order to claim class action privileges.

The original complaint was answered on June 25, 1982.

On June 30, 1982 the plaintiffs filed their second amended complaint "intending to augment the original, not supplanting it," by adding as defendants the Governor of the State of Alabama, the Attorney General, the individual members of the State Board of Education, and the Superintendent of the State Board of Education.

The stated purpose of this amendment was to attack certain Alabama Code sections and to enjoin implementation of Senate Bills 61 and 8, adopted by the legislature in 1982, which dealt with prayer in the classroom. The plaintiffs contended that the practices mandated by these enactments violated both the Establishment Clause and the Free Exercise Clause of Article I, § 3 of the Constitution of Alabama and the First Amendment to the United States Constitution.[1]

On July 30, 1982, a motion to intervene was filed by Douglas T. Smith and others alleging that their free exercise of religion would be abridged or terminated by a decision of this Court granting the plaintiffs' motion for injunctive relief. Intervenors contended that if plaintiffs' relief was granted, it would violate their rights guaranteed by the First Amendment of the United States Constitution, by the provisions of Title 42, United States Code, §§ 1983 and 1988, and by the Alabama Constitution, the preamble and Articles 1, §§ 1 and 3.

The cause was subsequently bifurcated, separating the Governor and the State School System from the original action.[2] On September 30, 1982, the defendant-intervenors, Smith and others, filed a pleading entitled "Request for Alternate Relief" in which defendant-intervenors requested that if the plaintiffs obtained their requested injunction, that the injunction be expanded to include the religions of secularism, humanism, evolution, materialism, agnosticism, atheism and others. The defendant-intervenors requested that they be permitted to demonstrate that the aforementioned constitute religious activity which the Mobile public schools and the state School Board foster.

---

1. No useful purpose is served in recounting under historical fact all the many pleadings and rulings that were evoked by this lawsuit, save insofar as they may be germane to the present posture of the lawsuit.

2. The court of appeals subsequently reconsolidated these cases.

Again, on October 22, 1982, the defendant-intervenors, Smith and others, moved to allow additional names to be added as defendant-intervenors, bringing the total to better than 600.

The matter was heard in November of 1982. It should be noted that the only parties objecting to the intervention were the plaintiffs. The basis of the objection by Jaffree was that plaintiffs were capable of representing a class which would include the defendant-intervenors. However, the defendant-intervenors pointed out graphically the differences that would preclude this. In any event, no class was established.

On January 14, 1983, the Court entered its opinion. *Jaffree v. Board of School Commissioners of Mobile County, et al.*, 554 F.Supp. 1104 (1983). As expressed in that order, the Court held that it had no jurisdiction to hear the complaint of the plaintiffs inasmuch as the Constitution had not been amended to incorporate the first amendment to the states. Therefore, there was no jurisdictional basis for any action by this Court. This being so, the Court did not reach the merits of the case. The Court stated that the entire matter was one cognizable under the state constitution or laws and should be litigated in the state courts, if at all.

In the same opinion the Court noted that in the event the appellate courts disagreed with this conclusion, the Court reserved the right to again look at the record and consider the positions raised by the defendants and the defendant-intervenors.[3] On appeal, the Eleventh Circuit Court of Appeals reviewed the historical background surrounding the Establishment Clause of our Constitution and concluded that, relying upon the law of *stare decisis*, the Supreme Court has held that the fourteenth amendment incorporated the proscriptions of the first amendment to the states. This being so, the district and circuit courts are bound to adhere to these controlling decisions, concluding that if the Supreme Court errs, no other court may correct that error. It further went on to observe that judicial "precedence serves as the foundation of our federal judicial system. Adherence to it results in stability and predictability." For these and other stated reasons the Eleventh Circuit Court of Appeals reversed and remanded this case to this district court. *Jaffree v. Wallace*, 705 F.2d 1526 (11th Cir.1983). On further appeal to the Supreme Court, *Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), it was observed by that court that trial of the various issues became unnecessary when the district court held that the establishment clause does not apply to the states. (105 S.Ct. at p. 2506). However, the Supreme Court went on to affirm the application of the first amendment proscriptions to the actions of a state. In so doing, it too, relied on the doctrine of *stare decisis*.[4]

### Remand

It was and is the opinion of this Court that upon the affirmance by the Supreme Court of the Eleventh Circuit opinion, the mandate of the Eleventh Circuit became the instruction to this Court. The cause was remanded, and upon remand this Court was directed, among other things, to issue and enforce an order enjoining the statutes and activities held by the Court to be unconstitutional.

### Further Proceedings

On remand, having reserved jurisdiction for further rulings not inconsistent with opinions already reached, this Court, by order of August 15, 1985, also reconsolidated the cases and realigned the defendant-intervenors, Smith and others, as parties plaintiff in light of the relief they had requested. Adjudication of these claims is not inconsistent with the mandate. No one

---

3. See 554 F.Supp. 1104, 1129 and excerpts from footnote 41, Appendix A.

4. The appellate findings do not alter the opinion of this Court that the sole right to amend the Constitution lies with the peoples of these United States, for the Constitution is their compact with the government, and not that of the courts. However, this point will not be labored longer for, if any change is to occur, it is now probably one for political resolution.

privy to the litigation had had the opportunity to challenge the request for relief posited by them.

In the August 15, 1985 order, the Court gave all parties the opportunity to file memoranda in support of any position that they wished to take. It also extended to the original parties plaintiff, Jaffree, et al., the right to withdraw if they so desired. A motion to this effect was filed and granted on September 11, 1985. On September 16, 1985, the original defendant-intervenors, now plaintiffs, in compliance with the Court's order, filed a comprehensive brief stating their position. On October 2, 1985, the state defendants moved for a scheduling conference.

Upon the scheduling of such a conference, the present defendant-intervenors filed a motion to intervene, which was granted. These new intervenors consisted of several parents and teachers who expressed opposition to the position advanced by the realigned parties plaintiff. Subsequently, the Governor and the Mobile County School Board defendants filed consent judgments confessing the plaintiffs' claim.

### Jurisdiction

The defendant-intervenors did not raise jurisdictional questions when they petitioned for leave to intervene. Indeed, they nor the state raised this issue until the trial, when the pretrial instrument was filed.

It would appear that the main thrust of the contention that this Court lacks jurisdiction to realign the parties and to proceed with resolution of the reserved issues is basically that such action exceeds the mandate. It is the contention of the defendants that a final order had been entered by this Court which ended that litigation; therefore, the mandate did not contemplate further proceedings other than to issue appropriate injunctions.[5]

In reversing, the appellate courts left the issue of this Court's retention of jurisdiction undisturbed. In its mandate, the court of appeals specifically stated "We reverse the district court's dismissal of these actions...." It went on to require on remand that this Court issue and enforce an order enjoining the statutes and activities held by the opinion to be unconstitutional. *Jaffree v. Wallace*, 705 F.2d 1526, 1537.

It is and was the opinion of this Court that the parties had expended considerable time, effort, energy and money in presenting issues to this Court concerning their respective rights under the Constitution which have not been addressed. It is and was the opinion of this Court that these parties had the right, and continue to have the right, to have these issues fully determined.

Was this Court's determination to retain jurisdiction wrong? Was the proper procedure to have bifurcated the case as to the intervenors? Did the remand require a dismissal so that the plaintiffs would have had to refile, stating anew their cause of action against the named defendants, something they surely would have done?

Had the plaintiffs done so, jurisdiction would appropriately have lodged to the same extent that it lodged originally in the case filed by Jaffree. It would be passing strange if such a mechanical requirement could and must be used to deny these plaintiffs their present access to this Court. Our procedures are not this wooden. This Court has jurisdiction.

### Complaints

It is revealing to note how the parties plaintiff articulated their complaints for they do so in a variety of ways.

### Original Complaints

As defendant-intervenors in *Jaffree*, plaintiffs stated their position as follows:

*Aaron Tabor*, intervenor, testified that he was offended by the books that he was

---

5. The State School Board defendants contend that they did address this issue by letter to the Court under date of September 11, 1985, but in this letter they indicated that they would await a statement of position by the realigned plaintiffs before they would respond, and, in any event, they wished to present evidence in connection with this case.

forced to utilize as a student wherein they appeared to sanction the taking of the Lord's name in vain, which was contrary to his beliefs. (Orig. Tr. 223).

*Byron Tabor*, intervenor, expressed his concern that the schools are teaching the religion of humanism and leaving God out of the equation. It is necessary, he said, that he re-educate his children relative to the questioned doctrine on a day to day basis after they return from school. His children are made fun of because they believe in creation. He believes that God is a part of the true world and the classroom totally excludes any recognition of God and that this is wrong. (Orig. Tr. 225–29).

*Karen Phillips*, intervenor, a teacher, found that the textbooks that she was required to use as a teacher were offensive and objectionable to her Christian views. Among other things, she disapproved of the philosophy expressed in textbooks that contends that "people in charge," or otherwise called "PICS," are "jerks". A "PIC" could be a parent. The texts further contend that "people poison" are the words of "PICS" who use them to advance their own selfish and personal gains. Such a philosophy, she states, is contrary to her Christian beliefs which teach the authority of God and of the parent, neither of whom she considers "jerks." She also found offensive the effort to teach that it is the attitude of the person involved which determines the outcome of everything one does. (Orig. Tr. 666–74).

*Lynn Nobles*, intervenor, was another teacher who found the curriculum requirements of the school system to be offensive to her religious beliefs. She found especially offensive the teaching that there are no absolutes, such as right and wrong, and that the teacher is not to advise that there are rights and wrongs. She likewise found it offensive that the curriculum promulgated secular humanism. (Orig. Tr. 677–92).

*Linda Evans*, intervenor, also a teacher in the Mobile County system, expressed herself as being offended in her beliefs by the requirement to teach the philosophy of Carl Rogers and Sidney Simon. Though she was not required to attend seminars where these philosophies were advanced, she was encouraged to do so by the school board, and these seminars encouraged the teaching of secular humanism. (Orig. Tr. 699–707).

### Subsequent Complaints

In the reconvened trial, additional complaints were expressed as follows:

*Robert Whorton* testified that his children were experiencing conflicts between the value systems that the family advanced and that advanced by the school and it's curriculum. He stated that on more than one occasion he had observed his children in tears over such conflict. In reviewing some of the textbooks, he observed that what was being taught had an effect of turning the student outside the family structure for solutions to problems, wherein he and his wife, as well as his children, felt that this was the family's role.

In regard to faiths, Mr. Whorton felt that all should be treated equally in the textbooks as well as in the classroom. He advanced the opinion that equal treatment under the law should apply to the religion of humanism as it does to any other religion.

Mr. Whorton expressed his understanding of the religion of humanism as being a nontheistic religion which denies the existence or relevancy of God to any decision making or to anything else that is going on today. As he understands it, secular humanism espouses that there are no moral absolutes and that humans are strictly a result of some biological process and nothing more. He opined that if this is an accepted course of study, then it should be designated as a religion and that the children should be allowed to make their own decisions based on methods of presentation that would give alternatives. (Tr. 375–90).

*Sue Webster* testified that her child was in the academically and intellectually gifted child program and as such, followed a different curriculum, but it nevertheless taught that morality is based on man him-

self and ignores the teachings of the Christian ethic. This created a conflict within her child, albeit such conflict brought the family closer together. She feels that what is being taught to her child is the religion of humanism without concurrent instruction in other faiths. (Tr. 410–25).[6]

*Douglas Smith* testified that he is an instructor in the public schools and has been curtailed by his superiors in what he can say and do relative to his beliefs. He is not permitted to teach that there are conflicting views on subjects such as evolution and on pagan origins for some of the practices that we indulge in today, such as Halloween, etc. He found this offensive because it does not allow the students to make their own determinations. He opined that the teaching effort seemed to advance only one point of view, that of humanism. (Tr. 439–47).

How was this concern of the former defendant-intervenors, now plaintiffs, articulated by the pleadings and other expressions of counsel?

In the original petition for leave to intervene it was averred that the intervenors' free exercise of religion would be abridged or terminated by the decision of this Court or by *stare decisis* if the then plaintiffs' motion for an injunction against all religious activity in the public schools were granted. It was also averred that intervenors' free exercise of religion would be interfered with or terminated if the then plaintiffs were successful in having prayer statutes declared unconstitutional.

Subsequently, by amendment, the plaintiffs stated, alternatively, that should this Court enjoin any activities or teaching from instructional materials designed to encourage a belief in Christian religion, then such injunction should be strictly enforced against the other religions of secularism,

humanism, evolution, materialism, agnosticism, atheism, and others. They also contended that their rights of freedom of speech guaranteed by the first amendment, would be interfered with or abridged if this Court granted the original plaintiffs the relief they sought.

In September of 1985, the plaintiffs Smith filed a position paper, in the form of a brief, contending that the curriculum used in the school system unconstitutionally advanced the religion of humanism, unconstitutionally inhibited Christianity, systematically excluded history of the contributions of Christianity to the American way of life, denied to teachers and students free speech and free exercise of their religion and violated the Code of Alabama, § 16–35–3.[7]

At the commencement of the evidentiary hearing, plaintiffs counsel stated their position in this fashion:

At least half of the original trial dealt with textbooks and, though this was not an issue on appeal, it was an issue squarely presented to the Court. One of the positions the original 624 intervenors, now plaintiffs, took was that humanism is being advanced in the textbooks. It is a religion and therefore should be excluded as have other religious beliefs. In this case the plaintiffs draw a distinction between tenets of faith and facts about religion. Tenets of faith consist of dogma, doctrine and belief and are prohibited from being advanced in the public school classroom. Facts about religion are not. The plaintiffs concede that tenets of faith, dogma and doctrine cannot be advanced in the public school room, but they believe that this restriction should be equally applied to all such. Humanism being such a religion, it should be excluded.

---

**6.** The concerns of the Websters as to the conflict they see existing between the teaching in the school system and their children was the subject of a study by Dr. W.R. Coulson, Psychologist, and is reflected in a report which he made relative to that interview. (Plaintiffs' Exhibit 168, also Plaintiffs' Exhibit 2 to deposition of Dr. Coles). This report reflects the claims and concerns of these parents and children and is set out at length in the appendix because it articulates the basis of their concern and reason for intervention in this litigation. See Appendix B.

**7.** See briefs of Smith plaintiffs filed 9/16/85 for complete articulation of claim. See also Appendix C.

Another area of contention deals with the inhibition of religion. The plaintiffs contend that when tenets of only one faith are advanced it inhibits other religions. When facts about a religion are regularly censored or excluded from textbooks, that equally inhibits that religion. Inhibition of religion can result by statements contained in textbooks that are contrary to the positions of other religions. The plaintiffs contend that they can demonstrate that the textbooks leave out all meaningful discussion of the part that Christianity and Judaism have played in the history of the United States, and when you do this you relegate these religions to a position of insignificance. On the contrary, the textbooks do teach secular humanism, which is a religion, and this emphasizes its importance, all to the detriment of theistic religions.

The plaintiffs go on to say that they are not asking that their beliefs be imposed upon anyone, just the opposite. Taxpayers, including themselves, should not be forced to support a system that works against their efforts to pass on their faith to their children.

The plaintiffs further contend that the state textbook adoption process heavily involves the state in the selection of textbooks to be utilized in the public school system in Alabama. The state statute that requires the utilization of these books inhibits free speech positions of the teachers. These books likewise, by content or lack thereof relative to religions, deny to students their right to receive information. Plaintiffs claim this is the same position advanced by the defendant-intervenors relative to the potential denial of information of a secular nature or a humanistic nature contained in these books. The plaintiffs likewise liken this state denial of the history of religion in the textbooks in a meaningful way to the state activity in denying black history and its contributions in these texts.

The plaintiffs also contend that the textbooks employed in the system teach humanism, sometimes referred to as secular humanism, or atheistic humanism, or religious humanism, and that these teachings constitute the teaching of religion within the meaning of the First Amendment to the Constitution and thus should not be advanced as a dogma, tenet or doctrine or belief. (Tr. 27–40).

*Class Procedure*

Because of the nature and number of parties plaintiff and the problem that was occurring in connection with the discovery processes and the logistics involved in the actual trial of this case, the Court, for the reasons expressed in its opinion, made the determination that the matter should proceed as a class action where the plaintiffs were concerned.[8]

*Answers*

The response of the state defendants to the contention of the plaintiffs is that education in the State of Alabama is not monolithic. The real driving force of education in this state is the local boards of education and it is they who are in fundamental control of the educational process. The Textbook Selection Committee reviews approximately 4,000 volumes in the various areas of education, and of these only 45 or so are found to be defective. In regard to the plaintiffs' claim relative to the free exercise rights of the plaintiffs, the School Board says that the state has adopted no ideological or antagonistic approach to religion of any sort in any of its textbooks. The School Board further contends that there is a clear secular purpose on the part of the state insofar as the curriculum is concerned. And lastly, in balancing the interests of the state against the interests of the plaintiffs it is clear that the state has an abiding interest in the education of its peoples in the least obtrusive manner so as not to effect the plaintiffs' constitutional rights and all the state can do is to select a curriculum course and allow the teachers to utilize these materials, along with their own efforts, to fulfill these ends of the state.

---

**8.** See order of September 22, 1986 and Appendix D.

In addition, there is nothing about the curriculum that compels the plaintiffs or their children to believe the material contained in the textbooks to the exclusion of their otherwise Christian beliefs. As counsel for the state defendants stated it in their post-trial brief and Findings of Fact on page 40, "the task of balancing the legitimate and compelling interest of the state in educating their children against a religious interest of the plaintiffs is not abridged by the actions of the state as reflected by the materials presented in the textbooks because they do not have to believe it and, in any event, exposure to it is not forbidden by their faith."

The state also contended that it could not accommodate different religious interests, for they would radically restrict the operating latitude of the state in the development of a sound curriculum. It is argued that the first amendment's free exercise clause does not prohibit a state from using textbooks merely because those textbooks contain ideas that may be contrary to someone else's religious reliefs.

The state does admit that a lack of reference to the importance of historical contributions and roles of religion in the development of this country represents poor scholarship, and agrees that it is appropriate that the state superintendent take steps to correct this deficiency. For this reason, these omissions of historical fact in the textbooks cannot be a legitimate basis for the granting of any relief. Any default by the state simply by omitting certain facts from its books cannot be found to create a burden on the free exercise of the plaintiffs' religion.

The state defendants further contend that the evidence will not show the establishment of any religion by the actions of the state when you apply the *Lemon v. Kurtzman* tests. 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Secondarily, they argue that secular humanism is not a religion and, if in fact it is, it is a religion established by the Constitution itself. (State Board and State Superintendent Proposed Findings of Fact, p. 51 and case cited). (Tr. 41–43).

## Intervenors' Answers

The defendant-intervenors are parents of students attending the Mobile County public school system. It is stated that they joined this case to defend the textbooks against the charges of the plaintiffs that these books unconstitutionally espoused the religion of secular humanism and unconstitutionally inhibited the religion of Christianity because they don't say enough about it. These defendants contend that the textbooks are doing neither of these things and that secular humanism is not a religion. It is their stated position that secular humanism is nothing more than a convenient label that attaches to opinions and facts that do not comport with religious world views; that where the textbooks do, in fact, contain statements consistent with the beliefs of some secular humanists, they likewise contain statements that are consistent with the beliefs of some Christians. This fact does not mean that these textbooks establish a religion or unconstitutionally inhibit anyone's free exercise of their religion.

They further contend that the law makes it crystal clear that public school educators can make statements that coincide with tenets of religion without violating the Constitution and that the statements contained in the textbooks that are challenged contain sound educational reasons. There is no constitutional prohibition against poorly written passages in history textbooks, and even if some of the passages are offensive to Christians, they have no appreciable effect on the spiritual life of the children who read them. Also, any isolation or alienation that can be shown cannot be the result of the textbook passages questioned, but are almost inevitably the result of clashes between views of biblical literists and our modern society. In other words, the intervenors say, this is not a religious case, but is a case about clashes of cultures. (Tr. 44–48).

## Other Defendants

The other defendants, the Governor of the State of Alabama and the Mobile Coun-

ty School Board, et al., all entered into stipulations for consent decrees. In these stipulations, the parties agreed that secular humanism is a religion for both establishment and free exercise clause purposes, and that the advancement of this religion in public school textbooks would be a violation of the first amendment. They further agreed that the advancement of humanism does inhibit Christianity in violation of the *Lemon v. Kurtzman* tests, and that the exclusion of historical contributions of religions from the textbooks constitutes an unconstitutional discrimination against religion in violation of the first amendment as it reflects a governmental disapproval of religion. The parties further agreed that the systematic exclusion of this history violates the provisions of the Code of Alabama, Sections 16–35–3, 16–3–15 and 16–35–5, which require that the public schools teach established facts of American history, tradition, and patriotism.[9]

### Intervenors' Statements

How did the defendant-intervenors express themselves concerning these issues in this case?

*Corrine Jane Howell* testified she is a resident of Mobile. One of her children attends Murphy High School and the other graduated from Shaw High School. Mrs. Howell has a degree in elementary education and presently teaches the third grade in the Mobile system. She is a member of the Baptist church and has reared her children in the Christian faith. (Tr. 2177–81).

Mrs. Howell states that she does not think it inappropriate for the plaintiffs' parents to be concerned about the content of the textbooks utilized by their children and agrees that they have a legitimate right to see that the children are not indoctrinated with one religious view against another. (Tr. 2221). She also stated that she does not disagree with the objectives of the plaintiffs if what they seek is the teaching of historical fact about religion and leaving out the teaching of the tenets of faith. (Tr. 2216). Her involvement is to see to it that tenets of religion are not taught in the public schools. She does not believe that this is occurring in the curriculum, but if it does appear, then she, as a teacher, is in a position to counteract it. (Tr. 2193). As she put it, "You have to understand that what you want them to know, you have to interpret for them." (Tr. 2183).

Indeed, in order to accomplish this, Mrs. Howell says that on occasion she utilizes other course materials to fill in the gaps that have been omitted by the textbooks, and one of these is a reader that was formerly adopted by the School Board Textbook Committee about 29 years ago. (Tr. 2187, 2190–99). She further testified that, although her teaching effort was conducted in accordance with lesson plans developed by the system, it was up to her to develop her plan and flesh it out. She concluded that she attempts to teach her children how to think critically and in this process, how to evaluate their beliefs against that which might be presented to them by other means and modes. She acknowledged that some parents do not have the educational background that she has or the ability to assist their children when they run into similar problems. (Tr. 2220).

*Patricia Chandler Jones* testified she is a resident of Mobile, married, and has no children. She is employed by the Mobile County Public School System at Mary Montgomery and teaches home economics. (Tr. 2226–28). Mrs. Jones is a member of the Cottage Hill Baptist Church and was reared by very devout parents under the Baptist doctrine.

She testified that the students in her class are of an average age of 16 and come from varied backgrounds. It is her policy to allow open and free discussion on all issues in her classes and no one is ostracized for so doing. (Tr. 2233). She says she does not attempt to tell her children what to believe. (Tr. 2233–37). She feels that since hers is an elective course for students, she has more freedom to develop the lessons that she gives. (Tr. 2237).

---

9. See stipulation filed 1/27/86.

Mrs. Jones stated that critical thinking was relevant to her course of study and if she was unable to teach critical thinking, then she would fail in her job as a teacher. (Tr. 2240). She does not require that students accept everything they read in the book. When she does test, she has to consider the answer differently depending on whether the question asks for an objective reply or a subjective reply. If the question is one calling for a subjective reply, then she has to be willing to evaluate the student's response in the same manner that the question was asked, for there can be no right or wrong answer to that type question. (Tr. 2241). In this area, she did acknowledge that her values would ultimately be transmitted to the students in the classroom. (Tr. 2242–43). This, she also acknowledged, would influence the students in determining distinctions between right and wrong, whether the textbooks addressed the problem or not. (Tr. 2248). It is her purpose, she says, to build upon family influences, but where there is no strong family background, her course becomes more critical because it is the only place the child can get strengthening and nurturing in these areas. (Tr. 2251–52).

She acknowledged that if you simply use the textbook when it is discussing the issues of alcohol, the conclusion would be wrong because it implies it is up to the individual to make his own decisions in this respect, and the same would apply to the use of drugs. (Tr. 2256). As to these areas, she brings her background to the task and feels no restriction in so doing. She summarized by saying that in her teaching efforts she relies heavily upon her religious faith and applies it to her efforts in the classroom. When the textbook language conflicts with her points of view, then she uses her own language. (Tr. 2261).[10]

Mrs. Jones also acknowledged that her training as an educator was influenced by the teachings of John Dewey, Havinghurst, Erikson and Maslow.

No other defendant-intervenor testified.

### State Defendants' Statements

The position of the remaining state defendants, namely, the State School Board, its members, and the State Superintendent, is stated in the evidence given by several witnesses, in part, as follows:

*William Arthur Huestes* stated that the textbooks utilized in the Alabama schools are selected, pursuant to law, (Code of Ala. 1975, Section 16–36–1) by a textbook selection committee consisting of twenty-three members, nine of whom have no employment in education. The remaining fourteen of these members are made up of classroom teachers from the elementary and secondary schools, teachers or persons actively engage in the supervisory or administrative capacity, persons employed in institutions of higher learning, and members of local or city boards of education. Thus, the testimony is that the majority of the members of this committee are persons connected with the educational process. (Tr. 1644–70).

The books reviewed by this selection committee are those submitted by publishers to the State of Alabama pursuant to an invitation issued by the State of Alabama containing the recommendation of the State Superintendent of Education relative to the courses of study to be employed in the schools. (Tr. 1472–75). At 23 locations within the state the public is given the opportunity to review these textbooks and make any comment that they wish to the committee. (Tr. 1474–85). The final decision as to which textbooks will be employed is made by State Board of Education. (Tr. 1480). By and large, the local school boards select from this prepared list. (Tr. 1482). Indeed, all of the books in issue in this litigation are on that approved list.

*John Tyson* stated that the presiding officer of the State Board of Education in Alabama is the Governor, but that he, as

---

10. As Dr. Coulson states, this is fine, but the teacher does not always come with the books.

(Tr. 2575).

Vice-President of the State Board, serves as the presiding officer in the absence of the Governor. (Tr. 921). Mr. Tyson testified that he had attended all of the meetings of the State School Board since he had been elected and is not unaware of the problem with the adopted texts where they leave out reference to the contribution of the various religions to the development of the American society. He felt these facts were necessary to the textbooks if they were to teach fairly. (Tr. 925). In fact, Mr. Tyson said the State Board had adopted a resolution to that effect in June of 1986. (Tr. 926–28). In the past, it had been left completely to the considered judgment of the committee and the professionals.

Mr. Tyson went on to state that, in the main, the State Board does have the ultimate responsibility for the adoption of textbooks, and if state monies are employed, then these books will be utilized. However, local school boards can, when utilizing their own monies, go outside for other texts. (Tr. 930).

On the question of whether humanism is included in the textbooks or has been studied by the board to determine whether it exists or should be excluded, Mr. Tyson says that this has not been undertaken because he does not understand what is meant by secular humanism and therefore does not know what to look for or attempt to exclude. He did express himself, personally, that values are not something that he thinks should be taught in the schools, but should be taught at home and in the churches. "What you go to the public schools for is to be educated to learn how to read and to write." (Tr. 931).

*Wayne Teague* is the State Superintendent of Education. The state school board consists of eight members that are elected from separate districts. This board has general control of the public schools in that the board administers the state school systems in accordance with the laws enacted by the legislature. (Tr. 1613). The State Department of Education is under the control of the State Superintendent and not under the direction of the State Board, but the State Superintendent is appointed by the State Board of Education.

The Superintendent testified that there is a very loose control by the state over the local boards. He believes that these boards should be as autonomous as possible. (Tr. 1618–20). He further testified that he has the authority to review actions of local boards and that actions taken by him are binding until some court overturns them. (Tr. 1622).

Dr. Teague stated that the state board does control the teacher training institutions and programs in the State of Alabama. (Tr. 1637). This is done by setting the standards that will be applicable. A part of this is a program that deals with teaching methodologies because a teacher needs to know the various ways to teach. In this connection, they are required to take courses in human growth and development.

A number of witnesses presented by the state defendants covered subjects dealing with the educational process generally and specifically as it applies in Alabama and to the facts of this case.

An example is the testimony of *Glenelle Halpin*, an alumni professor at Auburn University.[11] Dr. Halpin has a degree in psychology and is a specialist in educational psychology. Educational psychology purports to apply psychological principles to the educational process. (Tr. 1899).

According to Dr. Halpin, various theories of learning have impacted upon the educational systems in this country. These theories or approaches may be categorized into three major areas: (1) the area of behaviorism, (2) the area of cognitive theory, and (3) the area of humanism. Dr. Halpin testified at great length about the history and substance of each of these theories of learning.[12]

---

11. See curriculum vitae, Appendix E, Defendants' Exhibit 4.

12. For a full appreciation of the depth of Dr. Halpin's testimony, one would have to read it in its entirety. (Tr. 1095 et. seq.).

The first theorist was John Watson. He is considered to be the father of behaviorism. (Tr. 1902). The next major theorist was Edward Thorndike, and basically his theory was that if the learner behaves in a situation and that behavior is rewarded, then he is likely to repeat it. (Tr. 1903). The next was B.F. Skinner. His association with behavioristic positions is probably the greatest. (Tr. 1903). Skinner's approach, she says, was akin to Thorndike's, but his contribution was that of shaping. This is a theory of gradually reinforcing positions closer and closer to the behavior desired. (Tr. 1903). The next was Albert Bandura, and his theory was one based on modeling or the imitation of a model. If the learner imitates a model and the learner's behavior is not reinforced, then the learner is not likely to imitate the model. This teaches that a teacher can shape the learner's behavior through such reinforcement.

As applied to textbooks, Dr. Halpin suggests that when a child is sitting at a desk with a textbook, you have a learning situation, and if there is a statement in the textbooks that is to be learned, that statement or the situation created by the learning medium must be reinforced. (Tr. 1906–07). She states that the textbook in this instance cannot itself provide that reinforcement. If a child reads in a textbook that you should go to your peers for assistance in making decisions about drugs or other matters, and the child, in fact, does that, then that would constitute the reinforcement under this theory. (Tr. 1910–11).

As to the cognitive learning approach, this came about in the early 1900's when psychologists made the determination that there was more to learning than just simply reinforcement of overt behavior. (Tr. 1913). Among the cognitive people were Jerome Bruner and David Ausubel. They felt that one learned through discovery. (Tr. 1916).

The third area is the humanistic psychology approach which evolved as a reaction against behaviorism. This approach focuses on the individual, the individual and the group, and the human and humankind and its interrelations. According to Dr. Halpin, the first major theorist of this view was Maslow. His approach to learning is the humanistic view. (Tr. 1916). Maslow's theory establishes a hierarchy of basic psychological needs by which we are motivated. (Tr. 1919).

When Maslow uses the term hierarchial, Dr. Halpin interprets this to mean that if needs are not fulfilled, a person will not move beyond the level of those needs. Thus if a man is starving he would tend to get food. Then, if he doesn't fulfill that need, his efforts will remain at the very basic level. (Tr. 1920). The next level according to Maslow, she says, is love and belongingness. We have a need to be accepted and we need to satisfy this need. (Tr. 1920–21). The next is esteem. As to this a teacher needs to make the child feel worthwhile. The child needs to excel and be successful in the classroom. At the top of the hierarchy Maslow puts self-actualization. He feels this is the most critical of needs. Self-actualization translates into being all one can be.

Carl Rogers is the next major proponent of humanistic psychology. He felt that teachers should facilitate learning, (Tr. 1926), through three critical attitudes of congruence, empathy and unconditional positive regard. (Tr. 1926). Congruence is realness, a genuineness, the absence of a facade. A teacher must present himself as a person with conviction. Empathy means the teacher needs to be able to put herself into the shoes of the learner. (Tr. 1927). Positive regard is appreciation by the teacher that the child is a human of worth. Dr. Halpin states that Rogers is a well-known therapist, but also an educator. The attitudes that Rogers teaches, which she outlined, were attitudes that he found to be effective in his therapy. (Tr. 1928).

The next major theorist of humanistic psychology is Arthur Combs. It is his idea that in order for behavior to be effective, the learning has to be personal and meaningful. Dr. Halpin concludes that what this means is that a child will learn from a

textbook those materials that are congruent with his or her belief system.

Dr. Halpin then moves on to a discussion of developmental psychology and refers to the works of Eric Erikson and his notion of striving for identification. This is a major crisis during adolescence. A child strives from birth to establish the "real me." During the first year of life there is the development of trust. During the next two years or so, there is the struggle for autonomy. Then comes the age of doing, which carries him through the elementary years. These stages are brought forth into adolescence where identification becomes important. In this period there may be a repudiation by the child, where the child rejects those things which he has brought to that point. During this stage, she says, the child should be given leeway, and adults who understand that should be the ones to surround the child and guide him. (Tr. 1938–39).

Her next discussion involved the theories of Kohlberg. Dr. Halpin says Kohlberg is among the foremost theorists in the area of moral development. This theory is a cognitive development theory as it involves the highest level of abstract principles such as justice and the like. Little children aren't at this level, but in order to help them get there, he suggests some activities such as a hypothetical moral dilemma, using such examples as the man whose wife is dying and the druggist won't give him the drugs needed, so the question is should he steal them. Kohlberg also feels that there should be a democratic approach to problem solving in the schools. As to this, Dr. Halpin says, he has been criticized. Kohlberg does not believe that teachers should indoctrinate, but should advocate. (Tr. 1946–47).

Dr. Halpin next discusses values clarification as developed by Raths, Harmin and Simon. She says this is a misunderstood process. As to this process, the first procedure is choosing. This should be done from among alternatives, and a concomitant to this would be considering the consequences. The next step is prizing and this involves being happy with the choice made. (Tr. 1950–51).

Dr. Halpin says as to the books that she reviewed, there was a consistency between the passages and humanistic psychology. (Tr. 1953). A critical thing in these books is the interpersonal interaction and these books seem appropriate in their content for this purpose. (Tr. 1954).

She next discussed the theory of cognitive dissonance as advanced by Festinger. This involves the results from a voluntary commitment to a choice made from among alternatives. The example given is where a girl has to choose between two boys for marriage purposes. When she chooses one, the other is ruled out and this would bring about a dissonance. (Tr. 1955). In regard to this, the choice must be between two equals. Once a choice of this nature is made, then the chooser begins to support that choice. (Tr. 1955). As this relates to the textbooks and what the children learn at home, Dr. Halpin concludes that there is most likely no cognitive dissonance under these circumstances. The reason for this is that what would be contained in the books may well be incongruent with the basic beliefs learned at home. Thus, what is presented in the books, if it is not really important to the student, will not affect his own beliefs. (Tr. 1957). Dr. Halpin does admit, however, that textbooks causing this cognitive dissonance might harm a child, though she feels that this would be the exception rather than the rule. (Tr. 1958).

She states that a purpose of school, though it may appear to be a hidden purpose, is to develop a citizen for a just world, to develop a humane being. This is part of the concern and of the ideas of humanistic psychology. The teacher is the primary agent in carrying this out. (Tr. 1959). The textbook is just one of the many tools.

Dr. Halpin then describes what she considers to be the difference between the humanistic psychological approach and the hedonistic approach. She says hedonism is concern about the self only; if it feels good, do it. This is not her understanding of the humanistic psychology. She be-

lieves humanistic psychology is one of valuing, of caring, of being concerned, not only about the individual, but about humanity in general. It's goal is the realization of the human potential, not only of an individual, but human kind, of everybody, and of everybody in relation to everybody else. (Tr. 1960–61). She says that humanistic psychology does not deny the existence of the spiritual nature of men. Nor does it deny the existence of God. She does not equate humanistic psychology with the ideas expressed in the *Humanist Manifestos*. She does admit that there are some areas where there is equality in principle expressed, but where it differs is in the denial of the existence of a prayer answering God. (Tr. 1964).

When asked specifically whether the home economics books that she looked at mentioned the existence of a hereafter or a prayer answering God, she admitted that she could find no such reference. (Tr. 1965). She also said that she has never done an exact study on the relationship of learning to textbooks, or how students learn from textbooks. (Tr. 1967). She also said that the most significant tool used in the classroom is probably the textbook. (Tr. 1970).

In regard to the area of whether the teacher should build upon or be sensitive to what the parents are trying to teach the child at home, Dr. Halpin says that she feels to some extent they should, but not being able to survey the parents to ascertain this, it would be relatively impossible to cover all bases. (Tr. 1972). In instructing her students, who are potential teachers, she does not advise them directly that they should be sensitive to the values and morals of the parents of the children in the class. (Tr. 1973). This might come up indirectly in the course of instruction out of presentations on values clarification and the like. (Tr. 1973). Dr. Halpin says that the school does not have the right to teach a value system that is different from the

parent, but the content of the curriculum in the school is not necessarily based on a survey of the value systems of the parents, so when the teacher does instruct she may well match or mismatch, deliberately, the information about values that have been presented to that child. (Tr. 1975). What is taught in the school concerning values and morals are usually based on many criteria.

In the teaching of humanistic education, the need for a Christian God is not part of what is generally taught. (Tr. 1993). Nor is there any reference to a supernatural source by Rogers or Maslow. (Tr. 1993). God is not a direct issue in humanistic psychology and is not referred to as a need in proper psychological development. (Tr. 1994).

Dr. Halpin acknowledges that she has not read many criticisms of the techniques that she has defined, (Tr. 2028) but she does say that she, in her courses, indicates to her students that there comes a point where a teacher has to indicate to her students that certain areas are not open to choice; such as those areas involving human life and maybe vulgarity and obscenity and things of that nature. (Tr. 2029).

On cross-examination Dr. Halpin also discussed various books and the content of certain teachings which are the subject of the controversy in this case. (Tr. 2040–2046). Her chief criticism of the plaintiffs' method in examining these books is that their experts took matters out of context. She contends that if you read them in context, they can be rationally explained as not denying the existence of the Christian ethic.[13]

The state defendants then offered *Dr. Charles Rudder*, currently employed with Auburn University at Montgomery teaching a course in history and philosophy of education.[14] Dr. Rudder states that it is not possible for a teacher to teach without

---

**13.** In fairness, the Court must observe that Dr. Halpin's testimony throughout its entirety reflects a decided bias in favor of her religious beliefs. This bias infects her interpretation of the efforts of all of the experts to whom she has

made reference that have effected the teaching method.

**14.** See curriculum vitae, Appendix F, Defendants' Exhibit 5.

teaching values. (Tr. 2087). In this regard it is sometimes necessary to teach origin of values, and sometimes it is not. (Tr. 2090). Keeping in mind that a distinction must be drawn between values and value judgments, Dr. Rudder states that in teaching his teachers, he does teach them the place of values in the curriculum though it is done without specificity. (Tr. 2092). He goes on to say that from a philosophical point of view, one can teach the process of one adopting a value without necessarily involving one's self in a discussion of its origin. (Tr. 2093). The fact that you do not discuss the origin does not deny its origin. When pressed on this point, Dr. Rudder says that in teaching the value of not lying, for instance, rather than getting into where that value originated, you simply state that it is a general agreement standing in our cultural tradition that it is right to tell the truth and wrong not to. (Tr. 2094). In other words, if you do not teach a child that a value is not absolute, then you are not denying that it in fact may be absolute. (Tr. 2094). If something is thought to be absolute, then it is said that that thing is without beginning and end. In other words, changeless. So if you teach this, you are in fact teaching the nature of the existence of things. (Tr. 2095).

Dr. Rudder says there are some philosophical positions that recognize the realm of reality which has no beginning and no end. But in education, you are dealing with fallible human beings. So that in considering whether the principles or laws or truths exist in an absolute realm or not, you run into the possibility of misapprehending or misunderstanding them because of the fallibility of the human. Therefore, you do not teach absolutes. (Tr. 2096–97).

Dr. Rudder acknowledges that John Dewey, an American philosopher, influenced educators and philosophers of education until at least 1950. It was Dewey's view that schools are vehicles through which society can be changed, and it was his effort to influence the direction of that change. (Tr. 2099). Dewey desired that society become democratic in the sense that society would determine what the emergent outcome of cooperative activity would be. (Tr. 2100). Dr. Rudder says he does not agree with this position of Dewey. He further states that he believes that Dewey's influence today is very slight. (Tr. 2101). His reason for this is that educational reformers who have tried to advance theoretical constructs of how education ought to be have generally failed in that effort. As an example, the concept of the new math failed, he says, because teachers wouldn't do it, parents wouldn't support it, and there was suspicion that it wasn't a sound theory in any event. (Tr. 2103). Dr. Rudder says the greatest influence on education today is social pressure. (Tr. 2103).

Dr. Rudder also says that there are a multitude of ideological influences competing for attention and loyalty in public education, and this is reflected apparently in the textbooks, though he has not specifically read them. He says if you accept what Dr. Baer has stated about the textbooks, then you would have to agree with him that they are internally contradictory and incoherent. (Tr. 2105–06).

Dr. Rudder then goes on to try to identify the teaching effort as it has evolved today. He defines teaching as a structured activity in which you say a specific activity has a specific anticipatable outcome. That is, the teacher teaches and the student learns. In this context, he finds it difficult to see how leaving something out of a book fits that definition of teaching. If, on the other hand, teaching is that which produces a change in a person, then likely silence or omission would have some kind of teaching—learning consequence. (Tr. 2108). To really make that determination, one would have to make specific studies of the subject to see what the impact of omission would be. (Tr. 2109).

On the issue of making choices, Dr. Rudder theorizes that if the student is given reasons in the literature why one choice would be better than the other, and these choices do not exclude reasons that might have been given that child at home or at church, then there is no conflict that he sees between the efforts. On the other

hand, if the school teaching encourages the student to ignore that outside influence, then that's another matter. (Tr. 2115). Dr. Rudder then discusses two understandings of what is religion. One is the functional and the other is the substantive approach. The functional view, as he understands it, is whatever we say it is. The substantive view is related to the sacred. It is his opinion that so long as you do not extract a denial of the supernatural, then the supernatural and the natural can co-exist without necessary conflict between them. The educational process is to acquaint the learner with the natural. (Tr. 2121–22).

The state defendants also presented *Barbara J. McMillan* of Montgomery, Alabama, who is the Executive Secretary of the State Course of Study Committee and who testified as to the procedures followed in coming up with courses of study. Mrs. McMillan testified that, pursuant to state law, twenty-one persons comprise the committee and all of them are from the educational field. (Tr. 2136).

The Court has spent this time outlining the method of textbook selection, the composition of the committees dealing with selection of instructional material, and the process used to train in the teaching institutions in Alabama, to reflect the philosophic base of those involved in the selection process of the school texts. The Court finds this plays a very real part in the inquiry dictated by this case. More as to this.

According to *Dr. Russell Kirk*,[15] John Dewey's school of thought may now be adjudged as dominant in educational circles. Dewey was a humanist and was of the opinion that this humanism which he espoused was the religion of the future. (Tr. 1354). Dewey felt that religions existing at that time were outmoded, and that in the future the individual would be classified as little and the society as much. He believed that his religion was primarily concerned with the social order rather than the ordering of the soul. (Tr. 1355).

Dewey contended one should not read books written prior to 1900 because wisdom was new and not old. One should look to the future rather than to the past and hope to work toward an egalitarian society, marked by equality of condition and talent, a universally peaceful society which would guide itself not by old beliefs, but by new ethics derived from modern scientific doctrine in both the biological and physical sciences. He did not feel that society would have to cease to be religious, for he felt that there was a need for a religion in the sense of a set of central moral beliefs of a permanent character, but this religion would be quite different from any religion of the past. These would have to be cast off. (Tr. 1375). Kirk says Dewey also expressed himself that "We must be militant in our new religion." (Tr. 1377).

It was Dewey and his colleagues who issued the first *Humanist Manifesto*. (Tr. 1379–80). Dr. Kirk explained that Dewey's ideas were called instrumentalism and that it looked upon education primarily as an instrument to prepare the way for an egalitarian society in which people will cooperate and in which there will be little challenge or problems. Thus, education would become a social function as contrasted with other ideas that had prevailed. (Tr. 1388). Present day progressive education is an outgrowth of his ideas and is sometimes carried beyond those ideas by its followers. In short, it is an elaborate system of pedagogy, which established a form of learning through personal experience and by classroom activities that simulate adult life. Though this was established in the 20's and 30's, it is still often called today the American educationalist empire. (Tr. 1389).

An illustration is the social science disciplines which came into being during the 20's and were later enlarged upon and given considerable boost by the former president of Harvard, James Bryant Conant, during the 50's. Social science is viewed as a kind of "omnium-gatherum" in which improved behavior in society is brought about by imposing upon society a new moral pat-

---

**15.** See curriculum vitae, Court Exhibit 1 and Appendix G.

tern. This social science supplanted the former teachings of history and geography. What history and geography is now taught is under this general umbrella of social science. (Tr. 1389-90).

Dr. *Richard A. Baer, Jr.*, professor in the Department of Natural Resources at Cornell University in Ithica, New York, also testified concerning the background of some of the psychologists and philosophers referred to by Dr. Halpin.[16] Dr. Baer says that a review of the textbooks leads to the conclusion that they contain sources that clearly are linked with the philosophy of hedonism. (Tr. 822). That is, that all motivation is pleasure determined. It is closely related to the philosophy of existentialism that argues there is no God and we are totally dependent upon ourselves to make our value judgments. He notes that this is the philosophy of Jean Paul Sartre and is strongly influenced by what is sometimes called humanistic psychology advanced by Maslow and Rogers. This psychology argues there is no God and we must make our own choices, and if we let others influence us in this, then that is an example of bad faith. The result is a convergence of thinking about the nature of values on the metaethical level. This is basically antithetical to traditional Christian thinking, which is that values can be objectively grounded.

Metaethical value judgments are matters of preference and taste in personal opinions and they cannot be known to be right or wrong or true or false. They have to do with one's own desires and fulfillments and self-satisfaction. Knowing this philosophy is absolutely essential to an understanding of what is going on in the specific passages in the various books questioned. (Tr. 825). Dr. Baer testified there are many sections in the book that are consistent with Rogerian psychology and Maslow humanistic psychology, thus advancing the teachings of secular humanism. (Tr. 868). He also indicates that Sidney Simon and Merrill Harmin, two of the names mentioned by Dr.

Halpin, follow the same general philosophy of Maslow and Rogers. (Tr. 916).

Dr. *William R. Coulson*, a licensed psychologist in the State of California and Professor of Psychology and Education at the United States International University, also testified in regard to these matters.[17] Dr. Coulson received his Ph.D in philosophy at Notre Dame, but also pursued a degree in counseling psychology at the University of California at Berkeley and studied clinical psychology at the University of Wisconsin under Dr. Carl Rogers. (Tr. 467-8). After completing his educational efforts he went to La Jolla, California to the Western Behavioral Sciences Institute. This is a non-profit organization which was then doing research in humanistic psychology and was under the direction of Dr. Rogers. As resident fellow, he served as Dr. Rogers' research associate. In this capacity he got to know, and developed a very strong relationship with, Dr. Rogers. (Tr. 469-70).

Dr. Coulson says that humanistic psychology is the most accessible of the major psychologies and has been seized upon by the writers of many textbooks and especially those used in high schools. It is the preferred psychological modality revealed to high school students of psychology, as well as other subjects. In terms of influence, Dr. Coulson says that Carl Rogers is by far the most influential in this field, surpassing Sigmund Freud and B.F. Skinner. (Tr. 369). Dr. Coulson testified that others who had influence in humanistic education were Louis Raths, the father of values clarification, and his associates, Howard Kirschenbaum, Merrill Harmin and Sidney Simon. (Tr. 473).

Without, at this juncture, cataloguing all that Dr. Coulson had to say relative to the textbooks in question and his statements relative to their advancing the theory of humanistic psychology, he does summarize that the philosophy espoused is "that only you can judge your values, you are the designer of your life, you are the most important person in your life," and this

---

**16.** See curriculum vitae, Appendix H, Plaintiffs' Exhibit 1.

**17.** See curriculum vitae, Appendix I, Plaintiffs' Exhibit 2.

serves to deny all absolute values except that one absolute value. This, essentially, is a claim that one takes on an absolute kind of authority to one's self. (Tr. 2558).

All of this comes from the philosophy advanced by Dewey. In his paper, "Religion in our Schools," Dewey created a new religion having four basic elements. First is that right and wrong reside only in consequences. Secondly, there is no cosmic guarantee of meaning. "As Dr. Kurtz stated in the *Humanist Manifesto II:* 'No god will save us. We must save ourselves....' Thirdly: Children, no less than the rest of us, must be liberated from their subjection to the past.... (our parents) ... And fourthly, because of all of these, the preferred method of getting through life in a wholesome way, is to engage in what is called value processing...." (Tr. 2561).

Dewey's philosophy seeks to exclude older moralities which developed through the centuries in exchange for making each individual supreme so that the educational experiment can continue in a properly scientific way. This has brought on values clarification. Louis Raths acknowledges that his efforts in this area are quite dependent upon the works of John Dewey. As Raths put it "We have been extraordinarily blessed in this century with a great philosopher. His name is John Dewey." (Tr. 2560–63).

Dewey's influence was also felt by Abraham Maslow, Carl Rogers, and Lawrence Kohlberg. (Tr. 2569–70).

Responding to Dr. Rudder's testimony and that of Dr. Kurtz, to the effect that Dewey has relatively no influence today, Dr. Coulson says they feel that way because they, in fact, see through the eyes of Dewey though they do not know it. He analogizes by referring to his glasses. As long as you have them on, you are not aware that you do, and thus Dewey is the spectacles through which American educators have been trained to see the world. He determines that it is not surprising that they no longer see Dewey because they see with Dewey. (Tr. 2572). He also noted that when the other educators were interrogated about who the greatest philosopher

affecting American education is, they all mentioned John Dewey.

Dr. Coulson testified that not only is it the American who has observed the effect of Dewey on the educational process, but also his students at the International School have commented that one of the concerns they have is that somehow coming to America would serve to convert them to a kind of a new form of American imperialism, which they call moral relativism. They expressed themselves as troubled by the thought that they will go back, having become typical Dewey-eyed Americans. (Tr. 2572).

Also, he commented on reflections by R.S. Peters, a noted British philosopher of education. Peters observed that the American system is that we do not teach religion in public schools, yet we teach Dewey's philosophy, and that is a religion. (Tr. 2570–71).

Dr. Coulson summarizes by saying that he agrees with Dr. Russell Kirk that there are two sources of Deweyism today. One is the publishing industry and the other is the college of education. As to the colleges of education, this is reflected by the high regard that Dr. Halpin and others have for Maslow, Rogers, et al. These theorists are direct in the line of descent from John Dewey, particularly in the rejection of the need for the supernatural. (Tr. 2582). Children who have been raised and educated in the schools over the last twenty years or so are in special jeopardy because this relativism which has been espoused has become the church of the public school. (Tr. 2583). It is a philosophy that is hostile to established religion because in the establishment of this new church, a very comprehensive system had to be erected that left out the cornerstone of most previous ethical systems: the absolute. (Tr. 2566).

The foregoing is a truncated version of the testimony dealing with the impact of modern teaching philosophy and ideas on our present educational efforts. In abbreviating in this fashion, it is not the Court's intention to denigrate or ignore the testimony given by others on these points. In-

deed, this Court is overwhelmed by the volume of such testimony.

That these philosophies have been advanced with zeal is indicated by the testimony of Dr. Halpin and other teachers who are the products of the educational institutions of the modern day, and by the testimony of Robert F. Baker, formerly an educational publisher of school books, the most recent employment being with Ginn & Company. (Tr. 1855 et seq.).

As to the publishers, *Dr. Kirk* addressed their problem in this way: there prevails with the textbooks published today an attitude which is uneasy with traditional religion and its doctrines or creeds, but which readily accepts the views which might be labeled as those of secular humanism. (Tr. 1360). He concludes that this results not so much out of conviction on the part of these publishers as it does out of expediency, and he concludes that a good many textbook publishers, mostly being centered in New York or Boston, are affected because of the milieu from which they come, and because of their schooling. These things do not create friendly attitudes towards traditional religion. In other words, the publishers are more concerned with their pocket book than anything else. (Tr. 1360).

Dr. Kirk also asserted that these publishers are constantly tormented by, and yield easily to, well organized pressure groups. He concluded that these publishers feel that if they were to insert very much about Christianity into the textbooks they would be strongly criticized by school administrators, who in turn are uneasy about possible actions at law against them for being in violation of possible court orders concerning the first amendment, and, therefore, there is a tendency to say as little as possible about established religions. (Tr. 1361). He also noted that many on the staff of these publishers, the editors and the like, too, were brought up under the schooling and teaching of the Dewey philosophy, being strongly influenced by the instrumentalist school of education. (Tr. 1374).[18]

Dr. Kirk testified concerning the quality of instruction available today. He says that his opinion is based on a 25 year study of the teachers colleges. He has discovered in university after university that it is the students entering these schools of education that have the lowest IQ ratings and the lowest high school grades of any group on the college or university campus. Yet when these students graduate, despite having received A's in educational courses, they still rated in the lowest IQ ranks of any other group graduating from the college. This phenomenon, he says, is not based upon unions and salaries of teachers, but is based in large measure upon the fact that the courses taught are so dull they repel more able students. (Tr. 1392). He concluded that this phenomenon is due to the dulling and unimaginative influence of the philosophies fathered by Dewey. In short, he says these lack push and drive and vigor and what is called moral imagination. (Tr. 1392).

### Quality of Education

With the exception of the state experts who testified, all other experts who addressed the question of the end result of the present effort of the teaching process utilized in Alabama and elsewhere, stated that the results were abominable. *Dr. Delos McKown*, testified that in his position as a professor at Auburn, he is horrified by what he is getting out of the schools and shares the very great concern about the mess in the primary and secondary schools. He classified it as a scandal, that the children come out with their brain so scrambled that nobody could teach them anything. (Orig. Tr. 391).

*Dr. Paul Kurtz*,[19] defendant-intervenors' expert, was also asked about various passages in the books that were the subject of plaintiffs' criticism and which dealt with various teaching philosophies. He stated that he concurred with plaintiffs in some

---

**18.** Dr. Kirk reports on his dealing with publishers of his books prepared for use in the lower grades, including Alabama. (Tr. 1362, 1394).

**19.** See curriculum vitae, Appendix J, Defendant-intervenors' Exhibit 10.

respects in that if the curriculum in these aspects were followed by the students, it would lead to an absolute breakdown in morality in society. He stated that such teachings deny to the educational process what is known as critical thinking. (Tr. 1731–40).

*Dr. Richard Baer's* expression about the books was that they are dismal, (Tr. 862) and very shoddy. (Tr. 886). As Dr. Baer puts it, "in terms of present curricular decisions most public schools ... today are no longer local schools functioning in loco parentis ... They are really functioning in curricular materials as a part of government." (Tr. 904). Dr. Baer concludes that instruction needs to be structured so that it becomes truly a place where one learns, but in learning, has equal access to all learning, agreeing with Dr. Kurtz that what needs to be taught is critical thinking. (Tr. 914).

*Dr. Coulson* says that the books that have been produced are not only bad psychology, but constitute an unfounded faith claim. They are ideology. (Tr. 574).

*Dr. Robert Coles,*[20] defendant-intervenors' expert, whose deposition was introduced by plaintiffs, testified that he felt for the parents in their complaints and struggles because he shared their view of the books as containing a quantity of "social and cultural rot." (Plaintiffs' Exhibit 92, depo. 176–66).

*Dr. Timothy Smith* stated that high school students are confused by the history curriculum. (Tr. 98).

Other witnesses testified on these points, and without stating their criticism as graphically as the above did, nevertheless expressed themselves in the totality of their testimony as being critical of the content and the method of instruction employed.[21] These witnesses referred at some length to the fact that the textbooks now being used in Alabama, and indeed elsewhere, make no meaningful reference to theistic religions, or other ethical premises which they espouse, and that this trend is becoming more and more prevalent with the passage of time. Some say that this is based on economic desires of the publishers of textbooks and some say that it is the result of the generalized acceptance of the theories initiated by John Dewey which have filtered down through the teaching mechanism to the state institutions that are involved with the textbook selection process. The evidence reflects that this process commenced in the 20's and has now so permeated the industry that the only time a student can expect the opportunity to critically examine the secular humanist philosophy is when the teacher provides the critical information for such study based on his or her theistic beliefs.

Thus, it becomes important to understand what the evidence demonstrates is meant by the term secular humanism.

### Secular Humanism

As one might surmise, a great deal has been said and written about secular humanism. The evidence preponderates that the terms humanism, humanities, humanitarianism, and secular humanism mean different things to different people depending upon who is using the terms, what is being considered, and upon the age in which the term was utilized.[22]

As stated by Giustiniani, " 'Humanism' is one of those terms the French call *faux amis.* Although it occurs in all modern languages in very similar forms, its meaning changes not only from continental European languages to English, as in most English borrowings from Latin or French, but also from Italian and German to French. Even in the same language the meaning of 'humanism' can fluctuate. It can hardly be otherwise...."

---

**20.** See curriculum vitae set forth in Appendix K.

**21.** See testimony of Strike (Tr. 942), Hitchock (Tr. 719), Smith (Tr. 52), Hunter (Tr. 208), Vitz (Tr. 1040), and Spykman (Tr. 1152).

**22.** One interested in a comprehensive understanding of the development of these terms might read the article by Vito R. Giustiniani entitled "Homo, Humanis, and the Meanings of 'Humanism,' " *Journal of the History of Ideas,* Vol. 46, April-June 1985.

The general public obviously does not concern itself with any classical or philosophical definition of these terms, thus the problem of understanding their relevance to this litigation is greatly multiplied. An example: Dr. Kirk feels that the term secular humanism is a misnomer and thinks the term humanitarianism is better.

Dr. Kirk states that the term "secular humanism" is a term of the twentieth century and is now widely used in scholarly circles. (Tr. 1352). It came into being after the formation of the American Humanist Association in 1933. (Tr. 1353). During the late 20's and early 30's, a curious battle for the use of the word humanism arose between those who called themselves ethical humanists, and led by Irving Babbitt and Paul Elmer More, and a group who called themselves religious humanists, led by John Dewey and his disciples. The ethical humanists emphasized classical disciplines and advanced what might be referred to as a study of the humanities. Babbitt's theory faded in significance as the Dewey philosophy gained ascendance. (Tr. 1353). The term secular humanism arose, states Dr. Kirk, apparently to distinguish the humanism of the school of Dewey from the humanism of the school of Babbitt and More.

Dr. Kirk says Giustiniani examined at some length the change in the term from classical times down to the present, and discussed the development of the different uses of the word and how it has come to be used in America today. Giustiniani concluded that the American Humanist Association is the church of secular humanism in this country today and recognizes it as a kind of religion. (Tr. 1352–53).

Dr. Kirk defines secular humanism as "... a creed or world view which holds that we have no reason to believe in a creator, that the world is self existing, that there is no transcendent power at work in the world, that we should not turn to traditional religion for wisdom; rather that we should develop a new ethics and a new method of moral order founded upon the teachings of modern naturalism and physical science." (Tr. 1372). Secular humanism is to be distinguished from the term humanism, he says, for the latter term properly employed in its historical sense, "means primarily regard for a body of humane literature, belief derived from historical experience and from a body of literary criticism, and especially from the classical, that is, the ancient Greek and Roman experience." (Tr. 1374).

The definition of humanism or the humanities, as an expression in the classical sense, is still utilized today in various colleges and universities and has been employed by the National Endowment for the Humanities as well as the United States Department of Education. (Tr. 1383). This is not the same view of the term taken by secular humanists or humanitarians, for what they have in mind is largely social objectives rather than objectives which are primarily personal, literary and philosophical. (Tr. 1384). He explains this dichotomy and how it came to be in this fashion:

"... there had been going on ever since the first decade of the twentieth century and down to 1933, when the first *Humanist Manifesto* was issued, a movement about which there occurred a great deal of discussion in America.

It was generally called the new humanism or American humanism. There were many eminent writers whom the most well known were Irving Babbitt at Harvard University and Paul Elmer More, the literary editor of *The Nation* magazine.

These two men and their followers were trying to reinvigorate classical studies in America. In short, to bring back real attention to great literature, particularly Greek and Roman literature, together with the whole tradition of great literature down to our times. As contrasted with utilitarian or practical or Benthamite attitudes towards learning, they were literarily conservative and stood for the great tradition of learning and education. As they preached their doctrines, they were attacked by various people from various points of view. This was a fa-

mous debate that extended over thirty years.

They went on radio, held public discussions before large forums, and so on, literary journals and popular journals, touched somehow upon this movement called the new humanism or American humanism in one way or another.

By 1933 there had been so many attacks upon this intellectual movement that it was beaten back.

Irving Babbitt in 1933 was dying of colitis. At this moment while Babbitt lay dying there suddenly was issued the first *Humanist Manifesto*. Dewey and his colleagues proclaimed themselves American humanists, using exactly the term already used for an entirely different group of people who were quite opposed to Dewey's view. Babbitt had publicly criticized Dewey's views. Suddenly Dewey and his friends seized upon this term already used by others, and converted it to their use as if the Republican Party suddenly should seize the name Democratic Party and apply it to themselves, saying, 'we are the real democrats.'

It was a very odd performance. I suspect Dewey and his friends wanted to have the advantage of the term humanist. It's a term that has favorable connotations. It connotes a humane person, a person who's really human, a person who thinks about humanity. This is a good connotation. It's a nice label to have, that of humanist. At least it has been so in the past, most of the time.

It means one is a scholar, having some connection with the Renaissance and perhaps with antiquity.

And so it was more or less deliberately that the disciples of Dewey took over this term of a beaten body of scholars. The conflict goes on.

This I write about humanism, describing it as a historical movement. But I am not speaking ordinarily about Secular Humanism. I have to make the distinction. (Tr. 1379–80).

. . . . .

That was a point which Irving Babbitt made strongly. He said that what various people called humanism was really humanitarianism. The term humanitarianism is used in the popular press and in many serious quarters as synonymous with 'charitable', which is a term of religion, of course. *Caritas* is one of the theological virtues.

The word charitable and the word charity have diminished in the popular usage and the words humanitarian and humanitarianism have been substituted.

Why so? Forgetfulness about the accurate meaning of the words as they are used in serious dictionaries.

Humanitarianism is defined in the larger dictionaries as the belief that the individual and society may be perfected without the operation of divine grace.

That's the root meaning of 'humanitarian'; one who believes we need to use humanistic means for social and perhaps spiritual reform.

Humanitarianism means that there is no need of divine intervention to perfect the person or society. Humanitarian is one who casts aside belief in a religious system and instead works practically through social and impersonal means for improvement.

As Babbitt said, people like Dewey are not really humanists; they are humanitarians.

That is still true if we turn to the sciences of philology and etymology, that the word humanitarian means a person who doesn't believe in divine grace and says that we can perfect ourselves without that grace; while the word humanism, which originally meant attachment to the classics in literature, is now converted into a term describing a philosophical, religious and social movement. There is great confusion about words. As Alice says to Humpty Dumpty, 'Can you make words mean what you want them to mean?' And Humpty Dumpty says, 'It's a question of who's to be master, that's all.'"

(Tr. 1381–82).

When asked what he found to criticize in secular humanism as he defined it, Dr.

Kirk said: "Why, sir? Because it omits what Plato said was the real important thing in all his writings; the doctrine of the soul. We find in secular humanism no recognition of the soul. There is only the human animal—the naked ape, if you will. What really distinguishes us human beings from the brutes is possession of a soul. Thus the development of the spiritual is the highest aim of a good education. That is not taken into account at all by the Secular Humanists. They think of man as a mechanism, a fleshy computer. That is my primary objection." (Tr. 1397–98).

*Dr. James Hitchcock* also discussed the definitions of the terms involved.[23] Dr. Hitchcock is a professor of history at St. Louis University, having received his doctor of philosophy from Princeton in 1965. (Tr. 719–20). He traces, as a historian, the development of modern day humanism. (Tr. 734 et seq.). He states that most renaissance humanists were believers in God and wrote on theological questions. (Tr. 737). In the early part of the eighteenth century the first frontal assault occurred on traditional Judaism and Christianity by intellectuals, mainly associated with the movement referred to as the Enlightenment. This is the first time that the term humanist came to have a connotation that is capable, at least, of excluding God. (Tr. 738).[24] He goes on to say that most humanists probably had a belief in God, but God was not a working reality in their lives or their thoughts.

In the nineteenth century atheism began to be seen. Here the question of whether there was or was not a God came to the forefront because people began to question what proof there was of the existence of a God. It was during this period that the most powerful form of atheism came into being and this form denied the existence of God or said that if there was a God or one believed in God then the human race would be kept in a position of dependency and therefore childishness. (Tr. 738). This was the position of the philosophers Feuerbach, Kark Marx and Nietzsche. It was a radically new kind of humanism. The more traditional form of humanism would have seen the two as harmonious and complimentary.

The new humanism of our century has drifted to the point where it usually denotes a godless kind of philosophy. Though there have been efforts to try to reclaim the term humanism to its original meaning, in most parts, the term today denotes a sort of godlessness. (Tr. 739).

A Christian humanist is one who places high value on man and says the reason for this high value is because man is made in the image and likeness of God and though his human nature is badly flawed, he is redeemable. Christian humanists are virtually the same as renaissance humanists. Contrasted to this is modern day humanism, which would encompass both atheistic and non-theistic humanism, sometimes referred to a secular humanism. This form of humanism excludes the divine, the supernatural, and the transcendent. It concentrates on the here and now. The word secular comes from the Latin word *seculum* which means age or time. It therefore translates to someone who is time bound to a particular period of history and doesn't feel as though he can get beyond it. (Tr. 740–42).

Other witnesses discussed the definitions and each emphasized a different aspect as it applied to various areas in the case. It would take a reading of their entire testimony, or good parts of it, to come to an understanding of the point that they make. For example, see the testimony of Dr. Rousas John Rushdoony, (Orig. Tr. 294) and Dr. James Kennedy. (Orig. Tr. 606).

*Dr. Delos McKown* testified at the original trial that there are three characteristics of a secular humanist. The first is that a humanist takes a naturalistic view of the cosmos and feels no reason to make affirmations about the supernatural. They may be atheistic or they may retain some vague deistic outlook, but secular deism is a naturalistic philosophy. Secondly, a humanist

**23.** See curriculum vitae, Appendix L, Plaintiffs' Exhibit 3.

**24.** Dr. Russell Kirk says a lot of this came from the influence of Voltaire (Tr. 1368).

looks to science and the techniques developed as the best and safest avenue to knowledge. He does not claim infallibility. Thirdly, the secular humanist believes that morals take their origin in humanity, are centered about humanity and have man as their end. Morality has to do with living the good life. One cannot live a good life except by accident, and unless others treat you morally. (Orig. Tr. 371–83).

*Dr. Paul Kurtz* was asked to define humanism spelled with a small "h" and humanism spelled with a capital "H", and secular humanism. He said that humanism spelled with a small "h" is the oldest intellectual, moral, artistic, philosophical and literary tradition in western civilization and has its roots in the pre-Socratic early dawn of science and philosophy in the fifth and sixth century BC. (Tr. 1680). It was first stated and defined in the period in which western civilization had its roots, its laws, its speculations about justice, the nature of reality, science, art, literature, and the like. (Tr. 1689). It came down through the Renaissance and on into the scientific revolution of the sixteenth and seventeenth centuries where there was an effort to use reason as it applied to nature and to man and to use independent judgment to try to discover what is the nature of things and how they operate. (Tr. 1681–82). This scientific revolution continued into the nineteenth century with the development of physics, chemistry and biology and into the twentieth century with the development of social and behavioral sciences. Dr. Kurtz says that humanism, as he views it, is the whole body of learning and the arts and science and philosophy and ethics. (Tr. 1683).

Humanism with a capital "H" is a fairly recent development with some precursors in history, but is an organized movement of peoples today that are attempting to combine principles of humanism that cut across all fields of investigation. These people publish books, convene meetings, and try to advocate what they call the humanist point of view. It is expressed in this country by a limited number of organizations. (Tr. 1683–84).

Secular humanism is a much used and misused term. Secularism is a very deep trend in modern societies. Like the industrial revolution, it continues. It is part of modernism and refers to the development of institutions in the fields of investigation separate from the religious interests of church institutions that may prevail. (Tr. 1684).

In recent years the term has largely been used to refer to humanistic development and the point of view that is non-religious. Basically, it is a scientific, philosophical, moral or ethical and literary expression, but has certain characteristics. (Tr. 1685). It is a method of inquiry. It is a way of investigating nature and human nature. It is basic to all the sciences. (Tr. 1686).

Dr. Kurtz says "again secular humanists are not pious in the traditional sense. They don't believe in an unseen hidden—they have no evidence for an unseen hidden or transcendent being and hence are not pious in the sense that they pray to deity." (Tr. 1689).

Secular humanism is not a dogma, it's not a doctrine, "but I think it does express moral values," so says Dr. Kurtz. (Tr. 1690). It does have a belief about the cosmos but only in a limited sense. Dr. Kurtz says he hopes that it does not proselytize with zeal. (Tr. 1691). Dr. Kurtz further says that secular humanists do attempt to educate, but the very basis of secular humanism is criticism and doubt even about one's own view. Therefore, there would be some difficulty in saying that this education proselytizes. For example, he says Stephen Gould and E.L. Wilson, both Harvard professors, one a paleontologist and the other a social biologist, hold different theories about human societies and functions. Both of these are humanists. Also B.F. Skinner, a behavioralist, disagrees with Carl Rogers or A.H. Maslow, who are another kind of humanistic psychologist, and all of them are secular humanists. So with such conflict, it would be difficult to see how they proselytize with zeal. (Tr. 1693).

Further, Dr. Kurtz contends that secular humanism is not a creed and does not have

an absolute claim to truth. Likewise, secular humanists have no concept of salvation and the content of the *Humanist Manifesto II* that says that no deity will save us but we must save ourselves is not a concept of salvation. (Tr. 1694).

Dr. Kurtz does say that humanistic psychology is not the same as secular humanism. He falls into a group that has been extremely critical of humanistic psychology because of its loose methodology in science. He also says that Carl Rogers, and others who advance this humanistic psychology, have a tendency to be subjectivistic and to emphasize the relativistic values of individuals where his kind of secular humanism is committed to intellectually believing that there are moral standards and moral values that can be discovered by intelligence, therefore, one must distance a whole body of secular humanistic thought from the developments in humanistic psychology. (Tr. 1696). He also says that secular humanism is not the same as the human potential movement. He does believe in keeping alive the great traditions and heritage of philosophical thought and this result of human potential movement is good, but certain aspects of the movement are too subjective and emotional and therefore defective. (Tr. 1697).

Dr. Kurtz also says that secular humanism is not the same as progressive education. Progressive educationists believe children should be permitted to do their own thing and there is no discipline in the schools at all as a result of this. Some secular and nonsecular humanists adhere to this, but it is subject to considerable criticism, especially by those who believe, as he does, that one should not release the child without producing some form of structure. (Tr. 1698).

Dr. Kurtz also states that the philosophy of John Dewey is not secular humanism because he argued for a kind of religious humanism. His followers, Sidney Hook, Ernest Nagel and Corliss Lamont felt that it was nonreligious. Others who disagree with Dewey as to any religious connotation were Bertrand Russell and Jean Paul Sartre. So in Dr. Kurtz's opinion secular humanism is broader than the thought of Dewey. (Tr. 1699–1700).

On cross-examination Dr. Kurtz admitted that in a magazine published in 1983 he stated that there were three notions of humanism. First, one may be speaking specifically of humanist organizations and churches, and secondly, one may be speaking of the vast number of nominal humanists throughout the world, and in this sense, humanism is a dominant, moral, and religious point of view in the scientific age among the intellectuals and educated classes. The third notion is that one can speak of the humanistic revolution taking place in the Orthodox bodies. (Tr. 1753).

Dr. Kurtz admitted that in 1964 he expressed himself to the effect that the central doctrine of humanism is that value is relative to man. (Tr. 1758).

Dr. Kurtz stated that he is a member of the American Humanist Association, the Fellowship of Religious Humanists, the publisher of Prometheus books, author of the *Humanist Manifesto II* and of the *Secular Humanist Declaration.* (Tr. 1708). He is also a member of the Unitarian Universalist Fellowship in Buffalo, New York and has been for over thirty years. (Tr. 1790).

Without cataloging all of the instances brought out by the cross-examination of positions taken by Dr. Kurtz, and there are many, and what he has written on previous occasions, which criticisms Dr. Kurtz testified were taken out of context, the Court would simply refer to the transcript commencing page 1826 through 1842 and a reading of appropriate passages from plaintiffs' exhibits 74, 75 and 76, which are books written by Dr. Kurtz or edited by Dr. Kurtz and entitled *In Defense of Secular Humanism, Exuberance* and *The Humanist Alternative.* This Court has made such an examination and finds that the form of questioning did not serve the purpose of overly distorting the position advanced by Dr. Kurtz.

### Religion Defined

Those who testified as regards a definition of religion approached it from two

points of view. One, the traditional concept; and two, the first amendment concept. It will be the Court's purpose to simply report as briefly as possible what each of the witnesses who testified in this area had to say about it.

The first was the testimony of *Delos McKown*. He says that it would be easy to assemble 100 substantial definitions of this term, but gave this one: "A religion is a series or set of beliefs and practices relative to say, great things, belief in which unites the believer to a moral community called the church, or you could call it the synagogue or temple, it doesn't have to be a church. But, into a believing community, a community set apart in some sense." (Orig. Tr. 375).

*Fred Wolfe*, minister of the Cottage Baptist Church in Mobile, Alabama, having a congregation of 7,600 members, and who holds a Masters of Divinity from Southwestern Baptist Theological Seminary in Fort Worth, Texas, was asked to define religion. He stated: "My definition of religion, it is a man's or woman's worship and expression of their faith in God." He went on to say that religion does not have to be belief in a god as such under the rulings of the Supreme Court. A religion is a set of values and views to which a person adheres. (Orig. Tr. 212).

*Dr. James Kennedy* testified on this subject also. Dr. Kennedy is a minister of the Coral Ridge Presbyterian Church in Fort Lauderdale, Florida. He holds an AB Degree from the University of Tampa, where he majored in english and education, and received his Masters in Divinity from Columbia. He holds a Masters of Theology from Chicago Graduate School and his Ph.D from New York University through the Department of Religion in the School of Education. He also holds a DD Degree. Dr. Kennedy has authored several books and a number of articles and presides over a church of some 6,000 members. (Orig. Tr. 607–08).

Dr. Kennedy was asked to give a definition of religion and in response he says that that is a difficult subject to define. He stated that the first approach that normally is made is that religion involves a belief in God and, yet, we know that there are a number of religions which are included in the world's great religions, such as Buddhism, Confucianism, et al., that do not hold any belief in any personal god or any god at all. One reason that it eludes attempts to define it is because almost any criterion that you select will result in the discovery of a religion that is accepted as such by virtually everyone that does not hold to that particular criterion. (Orig. Tr. 609). He goes on to say: "Probably that definition which is broadest and, therefore, has probably received the most widespread acceptance is the idea that religion involves one's ultimate concerns in life." (Orig. Tr. 610).

Dr. Kennedy says that in his belief, which is the Presbyterian concept, everything is sacred; thus they hold no distinction between the secular and the sacred. All life is sacred.

*Dr. Gordon John Spykman*, a teacher of theology at Calvin College from which he obtained his AB Degree with a major in Greek and Roman culture, and whose doctoral work was done at the Free University of Amsterdam in systematic theology with minors in ethics and elenctics, described religion in this fashion. "Religion is our on-going series of responses to the claim of God upon the human race to start with."

"Number one. One can approach religion from the point of view of cultic activities: what kinds of rituals, what kinds of meditational practices, prayers, scripture readings, holy day observances, etc....."

"The second is religion regarded as a cultural pattern. That is to say the historical cultural realities of any given community—for example, what we would call religious art, religious music, religious artifacts, historic stands on life and death or war and peace, issues on the part of different communities—cultural patterns that are developed, let's say, either by Islam, Judaism, Christianity or some other Christian tradition."

... "The third is religion regarded as ultimate commitment which then gets worked out in terms of life orientation.

These are concepts taken from Phillip Phenix. To put it in my own words, this third approach to religion would come down to calling it a religious world view. That is to say, it has the depth dimension of ultimate commitment but it has the scope of a world view." (Tr. 1159–60).

*Dr. James Davison Hunter,* a sociologist connected with the Department of Sociology of the University of Virginia and the holder of a Masters and Ph.D in sociology from Rutgers University, who presently teaches classes in classical social theory, was asked to give a definition of religion from the sociological standpoint. (Tr. 208–09, 249). In response to this inquiry Dr. Hunter stated that there were two main traditions in the theoretical approach to the definition of religion. These are analytically distinct approaches to the phenomenon. One has been called the substantive approach and the other has been called the functional approach. (Tr. 249–50).

The substantive approach defines religion at the very core by a variety of attributes. One of the most important is its definition of the sacred. It defines the sacred according to what is.

In the functional approach, one generally defines religion according to what it does. By this he means the meaning and/or content of the phenomenon.

The analytical distinctions are based upon different theoretical traditions. For example, the substantive approach basically comes out of the German idealist tradition or German phenomenology. The functionalist approach comes out of the French and English structuralism, as well as the German sociological materialism, or mainly the approach of critical theory or Marxist scholarship.

The substantive definition differs not in its use of the category of the sacred, but in the way it defines the sacred. The sacred is the realm of the supramundane or the transcendent. It evokes feelings of ineffable wonder and awe.

Phenomenologists are concerned with the meaning that human beings intend or impute to their own experience, thus many phenomenologists argue that religion or a particular belief system must impute religious meaning upon the sacred or upon this phenomenon. (Tr. 250–51).

As stated, the functional approach defines religion according to what it does. For the individual, religion provides a sense of order, a sense of place in life and in the cosmos, a sense of direction and meaning in life. It also provides moral coordinates by which individuals can live everyday life, a means by which they can know right from wrong, correct from incorrect, appropriate from inappropriate and so on. It also provides an explanation for such things as death.

Religion has functions at the institutional level or the societal level of the community. These involve priestly and prophetic functions.

Religion is a meaning system which emanates from the sacred and yet the sacred in this case could be any ultimate value or concern or any orientating principle adhered to by a social group. (Tr. 254). The main difference is how do you define sacred. In the substantive approach, emphasis is on the transcendent. Most social sciences adopt the functionalistic approach, but he, Dr. Hunter, follows the German phenomenology and adopts the more substantive approach.

Most social scientists would agree that filing past the body of Mao Tse-tung or Vladimir Lenin is a religious ritual in communist societies whether you consider it from the substantive or the functionalist perspective.

From the functionalist perspective, religion has become, in the literature, largely synonymous with such terms as cultural system, belief system, meaning system, moral order, moral vision ideology, and world view cosmology. (Tr. 258).

Traditional religion would be the major theisms. The functional definition, however, recognizes nontheistic religions as religion. Some of these, of course, are Confucianism, Buddhism, and the like. (Tr. 258–59). Some refer to these as functional equivalents, and even those who are of the substantive approach would recognize the

religious nature of these functional equivalents. Another such functional equivalent is humanism. (Tr. 260).

*Dr. Richard A. Baer* was asked to define religion, and in so doing he says that it is a difficult subject to define in a short order. (Tr. 804). He stated that what troubled him in trying to define the term is that it is such a big concept, so very fundamental in human existence that it becomes very difficult to define in general. (Tr. 806). Dr. Baer goes on to discuss what he considers to be various concepts of religion that prevailed at the time of the adoption of the first amendment and how that broad concept applied to most philosophies existing at the time. So when asked how the Court should define the word religion in light of historical development, he responded: "I believe that we have to focus on these elements of religion that have to do with what was at stake in the first amendment. And I believe, as I understand, that historically and philosophically and theologically and to some extent legally, what was at stake was the strong conviction which grew out of the historical experience which grew out of a sense of what was right and also a pragmatic sense. That it is not the business of the state to tell us what to believe at the deepest levels of our human existence. And that ought to apply, if we are consistent, to the state whether it is propagating traditional Christian or Jewish ideas or to the state whether it is propagating humanistic ideas as in these books that I have reviewed when they are functioning as religion." (Tr. 811–12).

*Floyd C. Enfinger, Sr.*, pastor of the First United Methodist Church in Prattville, Alabama, a church of 1,400 members, is an Alabama native who obtained his theological training at the Candler School of Theology at Emory University. When asked to define religion he, too, responded that it was a very difficult term to define, but felt the simplest definition was one that he came across while studying comparative religions. It was from Cicero who said that religion is the worship of God. He went on to say that in our complex society today he tries to keep what he calls the simple traditional concept of religion, but being called upon to put it in words in this testimony he would say that it would be the sum total of a person's thoughts, feelings, convictions, will and action in his solitude as he apprehends them to be in a relationship to a god or a divinity. (Tr. 2465).

*Dr. Russell Kirk* defines religion as a body of belief and practice which has some view of the cosmos, the place of human kind in the cosmos; which posits a moral system; which has a body of doctrine or dogma; which proselytizes with zeal; and which strongly criticizes or denounces rival creeds. Most religions are theocentric, related to a belief in a deity or deities, but not all. Modern definitions of religion encompass those religions which do not believe in a transcendent order or in a divine power, but which are primarily ethical in content rather than transcendent or supernatural. (Tr. 1358–59).

The foregoing references in the transcript to definitions of religion are not intended to imply that other witnesses did not address this issue. Indeed, most witnesses who testified had some conception of the term and what it meant, but their comments were so intertwined with other aspects of their testimony that to try to extract it at this point would call for this Court's interpretation of what they may have meant. It should be read by any who are interested.

### Does Secular Humanism Fit the Description of Religion?

*Dr. Russell Kirk* testified that in the sense of the extended definition of religion, secular humanism falls within the limits of the definition. This is so insofar as it is organized as a body of belief, as a body of doctrine, preaches an ethical creed and proselytizes. (Tr. 1359). According to Dr. Kirk, *Humanist Manifesto I, Humanist Manifesto II* and the *Declaration of Secular Humanism* are three documents which form a creed or body of doctrine for secular humanism. (Tr. 1372). Dr. Kirk says that Christians immanentize symbols of transcendence by claiming that one enters upon immortality through perfection in

grace in death. Secularists immanentize this by bringing the issue down to this world, and he says instead of salvation through grace in death, the secularists achieve the perfection of society here in this world. The equivalent of death to the secularists is passing through a form of revolution to a new order of a perfect kind. The role model for this secularist thinking, Dr. Kirk says, is the Marxist theory: revolution and then eternal changelessness here on earth, in a condition of perfect equality. This is an example of immanentizing of the eschaton—the eschaton being the essential belief, the representation of enduring reality. (Tr. 1376–77).

Dr. Kirk said he tended to call anyone religious who calls himself religious and he realizes that in the realm of the secular humanist there are those who would debate with vigor whether it constituted a religion. While he recognizes that there are both types of secular humanists, he would generally look to Dewey as the great authority in the field and the prophet of it. Dewey repeatedly declared that he was trying to found a new religion, a religion to supplant earlier religions. (Tr. 1399). These views of Dewey were succinctly stated in *Humanist Manifesto I.* (Tr. 1400). He goes on to say that as to proselytizing, he will observe that in most religious bodies there is a kind of an elite who vigorously proselytize while most members are relatively inactive. In the case of secular humanism, one may look at the vigorous zealous proselytizing of the magazine *The Humanist*, which repeatedly carries articles of a militant sort demanding that the schools be converted into instruments of humanism, their cause. (Tr. 1401).

*Dr. Paul Kurtz* testified that secular humanism refers to humanistic developments and points of view that are non-religious. (Tr. 1685). It is a scientific method of unfettered opportunity to investigate any domain of human interest without preconceptions of a religious nature. (Tr. 1686). It expresses an ethical point of view and seeks to develop moral awareness and to cultivate moral sensitivity in individuals. (Tr. 1687). It does not have an element of the spiritual, (Tr. 1688) nor of the tran-

scendent or other worldly elements. There is no element of piety or any cultic practice or worship service, (Tr. 1689) or churches or any body of doctrine. It does posit a moral system, but does not have a cosmic belief. (Tr. 1690–91). Nor does it proselytize with zeal. It does not denounce rival creeds, does not advance a universal truth, (Tr. 1693) nor does it have a concept of salvation. And, lastly, he says secular humanism does not call for a submission to a greater authority. (Tr. 1695). The *Humanist Manifestos* are not creedal statements, but simply working papers. The reason for the secular humanist declaration was to restate the outlook and ethics of secular humanism. (Tr. 1710). He likens these documents unto the Declaration of Human Rights, the Declaration of Independence, and in a different sense, the Magna Charta. (Tr. 1711).

Dr. Kurtz admits that there are other humanists with different views on this subject, and cites several examples, one appearing in the *Humanist Magazine*, published in 1983, which contained an article that in part stated: "I am convinced that the battle for human kind's future must be waged and won in the public school classroom by teachers who correctly perceive their role as the proselytizers of a new faith, a religion of humanity. ... These teachers must be ministers of another sort, utilizing a classroom instead of a pulpit to convey humanist values in whatever subject they teach regardless of the grade level. ..." (Tr. 1729).

As to the American Humanist Association, he says the points of view held are split. Some members believe that what is espoused is a religion and others do not. (Tr. 1730).

However, Dr. Kurtz admits he did write an article, which appeared in his book *In Defense of Secular Humanism,* stating there were at least three notions of humanism. One may be a discussion of humanist organizations and churches; the second may be consideration of the vast number of nominal humanists in the United States and the world, and in this broad sense humanism is a dominant, moral and religious point

of view in the scientific age among intellectuals and educated classes, though they may not be aware of the fact that they are humanist; and third, one may be concerned with the revolution taking place within the orthodox bodies, in liberal Protestant theology, in the Catholic reawakening, and in humanistic Judaism. (Tr. 1753–54).

He also subscribes to the philosophy of the American Humanist Association, which, in its preamble, states that one of the functions of the association is to extend its principles and operate educationally. This association publishes books, magazines, and pamphlets; engages lecturers; selects, trains, and accredits humanistic counselors as its ordained ministry of the movement; forms and charters local or area chapters as an integral part of the association; holds seminars, institutes and conferences; utilizes the mass media; and affiliates and cooperates for mutual and increased service with other associations, churches, and societies. (Tr. 1770).

Dr. Kurtz acknowledged that some members of the secular humanist movement do take an adversarial position towards theistic religions, (Tr. 1779) and also that the Humanist Association has been recognized as a religious minority. (Tr. 1782). They have undertaken efforts to obtain first amendment constitutional immunities and the protections afforded theistic religions. (Tr. 1783). The American Humanist Association certifies humanist counselors who enjoy the legal status of ordained priests, pastors, and rabbis. (Tr. 1784). He also acknowledges that the president of the Humanist Association published an article in the *Free Inquiry* in the 1985–1986 issue to the effect that secular humanism is a religion. Then he said this is hotly contested. (Tr. 1797).

In 1973 Dr. Kurtz wrote in the preface to the publication of the *Humanist Manifesto* to this effect, "Humanism is a philosophical, religious and moral point of view as old as civilization itself." (Tr. 1800).[25]

Dr. Kurtz republished in 1983 an article that he had published in 1968 for the *Religious Humanist* magazine which stated "Yet it is well known that restraining the definition of religion to belief in God leaves out many important religions such as Buddhism, where western notions of a god head are not present. The theist has tried to impose a narrow definition in order to corner the term religion. What is common to all religions is not the content of the religious beliefs or their truth claims, but their functions." (Tr. 1813–14).

There are many other instances of contradictory statements of this nature throughout the testimony of Dr. Kurtz for which he gives the explanation that his philosophy has grown and changed through the passage of time and what he believed at one time he no longer believes.

*Dr. Richard Baer* testified that in the early stages of secular humanism, as expressed in the *Manifestos,* in the writing of John Dewey in *A Common Faith,* and the earlier writings of Paul Kurtz and Corliss Lamont, they understood or expressed themselves to fall under the rubric of religious and they understood their atheistic humanistic beliefs to be religious and to constitute a religion. He explains that now they are saying they really didn't mean that. "Though they talk about life meaning at its deepest level and the purposes of life and what it means to be human and called themselves religious, while they said that this is a new religion, they didn't really mean it in the sense that it constituted a religion." (Tr. 810–11).

*Dr. Gordon Spykman* stated this on the issue of whether humanism is a religion: "I believe humanism constitutes a religion as an alternative to, say, the Protestant, Catholic, and Jewish traditions." The term secular humanism, naturalistic humanism, atheistic humanism, scientific humanism,

---

**25.** He also acknowledged that Professor Herbert Schneider, a former editor of the *Journal of Philosophy* and president of the American Philosophical Association, who was a professor of philosophy at Columbia University, contributed to the *Humanist Alternative,* and was on his doctoral committee, believed that the humanist religion is primarily an effort to free religious faith and devotion from the dogmas of theistic theologies and supernaturalistic psychologies. (Tr. 1807–08).

says Spykman, are all of the same reality called humanism, but come from different sides or different points of view constituting different qualifiers. The term religious humanism points to the depth and dimension of its commitment. It is what, he says, Corliss Lamont would call the supreme commitment. Secular humanism is talking about humanism in terms of its world view, the cosmos. It is a cosmological approach, that is, man's place in the world. If one talks about humanism as naturalistic, it is an attempt to react against the visions of supernaturalists. If one talks about humanism as scientific, one is talking about methodology. So there are different qualifiers for the same reality. (Tr. 1160–61).

*Dr. James Hitchcock* testified that there are many forms of religion that have existed throughout the history of time with varying results and beliefs. For example, historians of various times have designated movements like nationalism, communism or fascism as religions in the sense that these movements call forth total and complete dedication from their adherents and claim to teach the ultimate truth about existence. They have well developed codes of conduct or discipline, rituals, cults, and scared books. In this sense humanists have insisted very vigorously that they are a religion and that the movement they represent is religious. (Tr. 747).

He goes on to say humanism, as a self-conscious movement, is creedal. That is, it involves a set of beliefs. It has various books written intending to be expositions of humanistic teachings. These are formulated rather precisely and carefully, a claim that if you are humanist you would adhere to these positions. In addition there are organized groups which function like churches, one example being the Ethical Culture Society. There have also been attempts made to incorporate ritual into the humanist movement, and indeed, Corliss Lamont has written in one of his books that he has created a humanist burial service and it is appropriate for humanists to have such things. (Tr. 749). Also, there are certain figures in history that are revered and emulated, such as Socrates, Thomas Payne, Ralph Waldo Emerson and others. (Tr. 749). They list in various catalogues under the heading of ministers and clergy their counselors and the like. (Tr. 750).

*Dr. Timothy Smith* testified that Michael French, the young historian who is head of the State Historical Society for Maryland, wrote in the Ethical Cultural Society magazine that ethical cultural people must stand up for their religion and show the virtues of their religion in controversy with the religious right in American politics. He was talking about the Ethical Cultural Society, a humanist organization. (Tr. 112). Dr. Smith also stated that the general scholarly opinion is that secular humanism, or nontheistic humanism, functions as a religion. Sociologists and anthropologists and various commentators on modern American culture make exactly this point. As Alfred North Whitehead taught at Harvard, a thing is as it operates. (Tr. 158). Dr. Smith said that atheism is not a religion because it is without a system of morals and cosmology, but nontheistic humanism is because it has a system of morals and a cosmology. (Tr. 155).

*Dr. James Davison Hunter* testified that Corliss Lamont, president of the American Humanist Association, in a book called *The Philosophy of Humanism* published in 1985, or at least an edition published in 1985, refers to humanism as a religion. Also, the *Humanist Manifesto* is replete with references that humanism is a religion. (Tr. 280–81). He goes on to say that beyond this, one could note that the Ethical Culture Society describes itself as a religious fellowship, as does the Fellowship of Religious Humanists. Also, Mr. Charles Reams, president of the Humanist Association of the nation's capitol area, applauded the United States Commission on Civil Rights for its finding that the Association of Humanists was a religious minority. (Tr. 281).

There are other references in the testimony on this issue as with other issues that the Court has heretofore catalogued, and in cataloguing these issues, the Court does not intend to imply that it has covered all of them.

*The Textbooks*

The role that the questioned textbooks play in the educational process got mixed reviews by the various witnesses who testified. Some expressed the opinion that the teacher is more important to the learning process, the textbook simply providing the base. (See testimony of Dr. Teague, Tr. 1461, and Corrine Howell, Tr. 2183). Others expressed the view that the textbooks are the more important and dominate the structure and presentation of the curriculum. (See testimony of Dr. Halpin, Tr. 1970–71 and 1988, Dr. Strike, Tr. 966). Indeed, Dr. Kirk says that in most schools the role of the textbooks is bigger than the role of the teacher. (Tr. 1385). Dr. Spykman stated that the use to which curriculum materials are put depends to a large extent on teachers, but textbooks make an independent impact and are the major component in the learning process. (Tr. 1175–77).

Dr. Timothy Smith concluded that textbooks contain the greater burden and body of materials, and that teachers spend a great majority of their time helping students understand what is in the textbook. (Tr. 93–94). He further testified that a small portion of the teachers can cure the problems of omission from history books and the like, but most can not due to the time constraints under which they function. (Tr. 146). As to this, Dr. Coulson says that problems of textbooks can be cured by some teachers, as testified by Corrine Howell, Verdene Ryder and others, but unfortunately they do not come with the textbooks. (Tr. 2559–60).

Contrasted to the correction propensity of the teachers, Douglas Smith testified that as a teacher he had been directed to stick strictly with the text as it was contained in the books and express no opinion on his own, (Tr. 441–44) and Dr. Kenneth Strike stated that, where it is not clear to a teacher that he would be entitled to do these things, the likelihood is that he would be inhibited in mentioning his own point of view as a counter balance to any position taken in the textbooks. (Tr. 973).

The testimony of Dr. Teague and others was that the teachers were encouraged to use outside materials to supplement what is contained in the textbooks, however, an observation of actual classroom activity indicated, at least to Dr. Coulson, that the teachers pretty well stuck to the worksheets and instructional materials and manuals that came with the textbooks. In the main, the teachers he observed lectured from the textbooks exclusively. (Tr. 551–52, 554, 1304–06 and 2576). On this point, in the proposal entitled *A Plan for Excellence: Alabama's Public Schools*, the State Superintendent, Dr. Wayne Teague, stated: "The textbook is perhaps the most important tool in the classroom.", (Tr. 1669) which statement is contradictory to the position that he took when giving his oral testimony on this point.

There were a large number of textbooks introduced at the first hearing and an additional forty-five introduced at this just concluded hearing.[26] Against the contention by the defendants and defendant-intervenors that the objectionable material contained in the textbooks was selective, out of context, and de minimis, the plaintiffs offered the testimony of many experts to demonstrate that the various books do, in fact, contain a religious philosophy or dogma, a belief system, or advance a tenet of faith that is of a religious bias, and that nothing therein presents any contrary view. These witnesses agreed, generally, that this leads to the anomaly that the state could somehow establish atheism as its official dogma, but not theism. (Dr. Baer, Tr. 836).[27]

As to the home economics books, the state defendants contend that this is an elective course and, therefore, if any damage is done to any student, it is only done to them by this election. While the plaintiffs agree that the course is elective, they

---

26. For a listing of these see Appendix M.

27. The passages to which the plaintiffs took exception were catalogued and set forth in the appendix to the plaintiffs' brief in response to the intervenors' proposed Findings of Fact and appear in the Appendix to this opinion as Appendix N.

contend that fact is irrelevant. They also note that in *A Plan for Excellence: Alabama's Public Schools,* which was adopted by the state board, there is a provision that Home and Personal Management become a mandatory one semester course. Dr. Teague testified that this may never come to be. (Tr. 111).

Some examples of the effect of the teaching of the textbooks, which plaintiffs' experts found objectionable as advancing secular humanistic morality and philosophy, are:

Telling a student that only he can decide what is right and wrong. This is to be contrasted to telling a student that he is responsible for choosing between right and wrong. The latter promotes responsibility. (Tr. 575–80). The point made is that such teaching leaves out the distinction that must be drawn between what moral values are to be freely chosen and the personal decision involved in applying these values. (Dr. Baer, Tr. 830; Dr. Coulson, Tr. 579).

The teaching that it is wrong to tell a lie because it results in the disapprobation of your fellow-man, leaves out many an example of how a theist might make this same moral decision. It implies that it is no longer a sin to tell a lie, and this is the advancement of the humanistic approach to morals which are man centered. (Dr. Coulson, Tr. 1270–71).

Plaintiffs' Exhibit 60, entitled *Homemaking,* contains a statement: "The development of your values is influenced by your religious beliefs and morals...." The text goes on to say on the next page that your values are "personal and subjective." This is incoherent and advances only one moral logic that must be ultimately accepted, and that is humanism. (Dr. Baer, Tr. 828–29).

In discussing Verdene Ryder's book, Dr. Baer quotes: "How can you prepare yourself to make the right decision? Know yourself, accept yourself and believe in yourself, establish a sound self-concept and learn to deal with your strengths and your weaknesses." He says this statement is

fine if one is a secular humanist and has that as one's religious faith. It is not fine if one is a traditional religious Jew or a believing Christian, who believes that we can prepare ourselves to make right decisions by being conformed to the mind of Jesus Christ for the Christian, or to the Torah for the Jew. It is a totally different framework. And again, the offense is that the state is indoctrinating a captive or semi-captive student audience in one religious position, and excluding others. (Tr. 882).

Discussing another book, *Today's Teen,* where the author deals with the acceptance of parents' values, Dr. Baer says that the book states that six and seven year olds are content to be their mother's daughters or their father's sons, but then says: "However, you probably do not feel this way any more. In adolescence people begin defining the world for themselves in their own way. They no longer want to be just someone's son or daughter. They want to be a unique person. They want to discover life and themselves on their own." Dr. Baer says this is consistent with secular humanism. It undermines and competes with a Christian point of view which does not see particular value simply in being your unique self in the sense that your values and your choices all come from within you. Teaching this represents a competing point of view, and when presented in isolation without any mention of other points of view, becomes a form of state indoctrination in humanism. (Tr. 876).

There are many, many other instances contained in the testimony that more graphically point out the complaint of the plaintiffs, but this opinion has already been burdened and the Court will not further indulge in this effort.[28] The defendants and defendant-intervenors, in their briefs, point out wherein they think that the efforts of the plaintiffs fail because of the context in which the objectionable language is found. Any study of these positions should be looked at in the total

---

**28.** A more detailed cataloguing of these points can be found in plaintiffs' proposed Findings of Fact and reply briefs. Reference might also be

had to the plaintiffs' position paper and brief filed with the Court in September of 1985.

scheme of things, keeping in mind that these specific references may advance a religion the same as if the Decalogue itself was posted on the school corridor wall.

### A Conclusion

Dr. Coulson summarized the present curriculum in this fashion, and I paraphrase:

Everything is commandment. (Martin Buber) The only commandment offered by the state textbooks is, "don't forget value processing." Teachers should not have to cover for deficiencies in them. If these books would stop trying to teach morality (which is preemptive and one-sided) they would have nothing to worry about.

"If we had textbooks that were either more representative of the diversity of views that are true in this country or stayed out of the realm of value education altogether, let the value education in the school go on around the learning activities of the school, then I don't think any of these parents would have anything to complain of. But twenty years ago we got the idea that education ought to be somehow morally more relevant. And the only thing available that wasn't founded on theism was John Dewey." (Tr. 2569)

### Conclusions of Law

The plaintiff classes claim a violation of the first amendment free exercise and establishment clauses, as applied to the states through the fourteenth amendment.

■ The State of Alabama is responsible, through its State Board of Education, for the selection of textbooks for use in the public schools in this state. The selection of textbooks is therefore state action, subject to the prohibitions of the first and fourteenth amendments. Such federal constitutional claims constitute a case or controversy within this Court's original jurisdiction. 28 U.S.C. § 1331.

■ The Court has already addressed the procedural history of this case. When the original ruling by this Court was made, it dismissed all claims, including those of the then defendant-intervenors, now plaintiffs, as being outside its jurisdiction. The state defendants in *this* case, and the defendant-intervenors, contend now that the Court cannot consider the plaintiffs' claims because those contentions were reversed on appeal. This is not true. There has never been any ruling on the merits as to plaintiffs' claims, and those issues were not addressed on appeal. Perhaps this Court should have, before ruling on the original *Jaffree* case, severed the current claims and treated it as a separate case. Perhaps this case should have been given a new docket number upon reversal of the jurisdictional-constitutional ruling. Nevertheless, plaintiffs' claims have never been tried and there was nothing to prevent them from filing a new action after this Court was told it had to consider such claims.[29] Under those circumstances, this Court can see no *jurisdictional* grounds for dismissing this action. There is now no doubt that a claim of a first amendment violation by a state is cognizable in federal court as a matter of federal law. *Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985).

It must first be noted that this case is not about returning prayer to the schools. That was *not* the issue in this Court's opinion in *Jaffree v. Board of School Commissioners*, 554 F.Supp. 1104 (S.D.Ala. 1983), and is not the issue here. Neither does this case represent an attempt of narrow-minded or fanatical prorelionists to force a public school system to teach only those opinions and facts they find digestible. Finally, this case is not an attempt by anyone to censor materials deemed undesirable, improper or immoral. What this case *is* about is the allegedly improper promotion of certain religious beliefs, thus violating the constitutional prohibitions against the establishment of religion, applicable to the states through the Fourteenth Amendment. *Wallace v. Jaffree, supra.*

---

29. Note that the original ruling would have equally precluded these plaintiffs from suing as it did Jaffree. Until that ruling was overturned finally, the plaintiffs could entertain little hope of being able to pursue this action.

Three parents testified during the plaintiffs' principal case: Robert C. Whorton, Sue Webster and Douglas T. Smith. They testified that they did *not* want their religious beliefs promoted as the truth, nor did they want to keep their children from mere exposure to contrary beliefs, or ideas espoused by secular humanism.[30] Trans. at 389–90 (Robert Whorton); 432–24, 428–29 (Sue Webster); 440–41, 447–49 (Douglas T. Smith). The Court finds that the plaintiffs herein seek objective education, not partisan indoctrination. The plaintiff-witnesses did not complain of simple exposure to improper ideas, but of systematic indoctrination. All contended that a man-centered belief-system, which they know by the appellation "secular humanism," is promoted in the public schools to the detriment of their children's first amendment right of free exercise, all in violation of the establishment clause.[31]

### A First Amendment Definition of Religion

The Supreme Court has never stated an absolute definition of religion under the first amendment. Rather, the high court's approach has been one of deciding whether conduct in a particular case falls within the protection of the free exercise clause or the prohibitions of the establishment clause.

The court's focus has shifted over the years from monotheism to a broad and mayhap vague notion of ultimate concerns and equivalent beliefs. *See* Choper, *Defining "Religion in the First Amendment,* 1982 U.Ill.L.Rev. 579; Note, *The Sacred and the Profane: A First Amendment Definition of Religion,* 61 Tex.L.Rev. 139 (1982); Note, *Toward a Constitutional Definition of Religion,* 91 Harv.L.Rev.

1056 (1978). The so-called Mormon cases, *Reynolds v. United States,* 98 U.S. (8 Otto) 145, 25 L.Ed. 244 (1878) and *Davis v. Beason,* 133 U.S. 333, 10 S.Ct. 299, 33 L.Ed. 637 (1890), treated religion as dealing with man's relationship to his Creator. Subsequent free exercise cases, while throwing out the strict belief-action dichotomy of *Reynolds,* involved theistic claimants, so that it was not essential to re-examine the concept of religion as monotheism. *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Murdock v. Commonwealth of Pennsylvania,* 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) and *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) dealt with the exercise by Jehovah's Witnesses. The school establishment cases, *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), *McCollum v. Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), *Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952), and *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), also dealt with activities or entities inarguably religious. The curriculum content and prayer cases, *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968); *School District of Abington v. Schempp,* 374 U,S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) and *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), concerned practices indisputably religious. The scope of the term religion was first carefully examined by the Supreme Court in draft exemption cases. *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733

---

**30.** This makes this case fundamentally different from *Mozert v. Hawkins County Pub. Schls.,* 647 F.Supp. 1194 (E.D.Tenn.1986); a case linked with this one in some media reports. *See, e.g.,* Bowen, *A Courtroom Clash over Textbooks, Time,* Oct. 27, 1986, at 94. The *Mozert* plaintiffs contended that mere *exposure* to certain ideas or beliefs infringed on their free exercise of religion. These plaintiffs do not make such a claim.

**31.** The state defendants and the individual defendant-intervenors have argued that plaintiffs

could not point to a specific instance of infringement on their, or their children's, free exercise. This misses the point. Any establishment clause violation *per se* infringes the rights of every adherent to a belief other than that established, and, arguably, the rights of the "favored" adherents as well. *See, e.g.,* Merel, *The Protection of Individual Choice: A Consistent Understanding of Religion Under the First Amendment,* 45 U.Chi.L.Rev. 805, 829 (1978) (two clauses protect one fundamental right).

(1965) and *Welsh v. United States,* 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970), required the Court to construe the statutory exception to the Selective Service Act. In each, the Court refused to limit the exception to theists. While the opinions are phrased in terms of statutory construction, the *Seeger* concurrence by Justice Douglas, 380 U.S. at 188, 85 S.Ct. at 865, and the *Welsh* concurrence by Justice Harlan, 398 U.S. at 344, 90 S.Ct. at 1798, state that a different interpretation would encroach on the first amendment. A number of commentators indicate that these decisions are at least constitutionally significant, if not mandated. *See, e.g.,* Bowser, *Delimiting Religion in the Constitution: A Classification Problem,* 11 Val.U.L.Rev. 163, 170–185 (1977); Choper, *Defining "Religion" in the First Amendment, supra,* 1982 U.Ill.L.Rev. at 589; Freeman, *The Misguided Search for the Constitutional Definition of Religion,* 71 Geo.L.J. 1519, 1526 n. 45 (1983); Note, *Beyond Seeger/Welsh: Redefining Religion Under the Constitution,* 31 Emory L.J. 973, 982 (1982); Note, *supra,* 61 Tex.L.Rev. 139, 148; Note, *supra,* 91 Harv.L.Rev. 1056, 1064.

The cases dealing with the nature of religion from strictly a standpoint of constitutional interpretation are *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Torcaso v. Watkins,* 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982 (1961).

For analyzing the permissibility of government action under the first amendment, the current line of cases begins with *Walz v. Tax Commission,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970) and *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct.

2105, 29 L.Ed.2d 745 (1971), which created the three part test of

1) secular purpose;

2) principle or primary effect must neither inhibit or advance religion; and

3) no excessive government entanglement with religion.

*Lemon,* 403 U.S. at 612–13, 91 S.Ct. at 2111. The high court has maintained this test in *Wallace v. Jaffree,* 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985); *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981); *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980) and *Committee for Public Education v. Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973). In none of these cases, however, has the Court defined religion, concentrating on constructing the effects of government activity in favor of arguably secular or clearly religious goals.

Out of these cases can be discerned several threads. First, the requirement of neutrality affirmed in every one of the above cited cases means that the Constitution protects every religious belief without regard to its theological foundations or idiosyncrasies. Second, what is religious is largely dependent on the way people in America currently think of religion, and this is a product of our past as a people. Third, the government cannot hinder or prohibit the growth of new beliefs by its definition of religion, since this growth is a product of the fundamental rights guaranteed by the first amendment. Fourth, the government is still obligated to perform its essential functions, thus reasonable boundaries may circumscribe acts performed in the name of religious freedom.[32]

---

**32.** The Supreme Court has stated repeatedly that the freedom to believe is absolute, while the freedom to act is not. *See, e.g., Prince v. Mass,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944). The state and lower federal courts have had the lion's share of unique free exercise claims. A small sampling includes: *United States v. Allen,* 760 F.2d 447 (2d Cir.1985) (right to disable nuclear armaments); *Patrick v. Le Fevre,* 745 F.2d 153 (2d Cir.1984) (state prisoner seeking free exercise of Islamic sect); *Quaring v. Peterson,* 728 F.2d 1121 (8th Cir.1984) (right to driv-

er's license without being photographed); *Africa v. Commonwealth of Pa.,* 662 F.2d 1025 (3d Cir.1982) (state prisoner claiming right to practice naturalist MOVE religion); *Callahan v. Woods,* 658 F.2d 679 (9th Cir.1981) (right to governmental benefits without obtaining social security number); *United States v. Kuch,* 288 F.Supp. 439 (D.D.C.1968) (drug use); *People v. Woody,* 61 Cal.2d 716, 394 P.2d 813, 40 Cal.Rptr. 69 (1964) (drug use by native Americans); *State*

These ideas revolve around an individualistic and subjective view of religion, as opposed to the objective test of the Mormon cases. Thus, in *Seeger, supra,* each claimant was found to have a sincere and meaningful belief that occupied "a place in the life of its possessor parallel to that filled by the orthodox belief in God." 380 U.S. at 166, 85 S.Ct. at 854. The *Seeger* conscientious objectors apparently were all theistic to some extent. *Id.* at 174, 85 S.Ct. at 858. The Court stressed, however, the individualistic nature of such beliefs, and the "intensely personal area" with which it dealt. *Id.* at 184, 85 S.Ct. at 863. In *Welsh, supra,* the petitioner held beliefs that were moral and ethical, and would not himself characterize them as religious, yet he was granted the exemption, the Court equating his beliefs with religious ones because they were held with equivalent strength. 398 U.S. at 343–44, 95 S.Ct. at 1798–99. These cases represented the farthest extension of freedom of individual conscience. In *Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971), the Court refused exemption to persons claiming a right to decide that a particular war was unjust.[33] The basis for the decision was basically practical and administrative. *Wisconsin v. Yoder, supra,* allowed the free exercise claim of Amish parents, but the analysis of their religious beliefs was tied heavily to the Amish's long history, respectable character, and unblemished pattern of social conduct. The Amish system of beliefs and way of life is also theo-centric, so the existence of a religion was not at issue. More importantly, *Yoder* shows that the social and organizational characteristics of traditional religions are not irrelevant to the first amendment analysis. Proving that a belief or practice is religious is much easier if those types of factors are applicable. The Supreme Court's decisions do not reflect, however, an attitude that these are *the crucial* factors.

In *Sherbert, supra,* the plaintiff was a Seventh-Day Adventist, who sought unemployment benefits because she lost her job after refusal to work on Saturday, her religion's Sabbath. The Court easily found this to be a detriment suffered by reason of a religious obligation. Only Justice Douglas' concurrence spoke in terms of freedom of conscience.

The decisions involving schools, whether public or private, reflect the Court's uncertainty in leaving clear trail markers through what has become, at best, a quagmire. The Court has clearly stated that the state may not, through the educational process, dictate or even specifically encourage a particular religious belief. Thus, all endorsements of the Judeo-Christian scriptures as vessels of religious truth are forbidden. *Stone v. Graham, supra; Abington v. Schempp, supra; Epperson v. Arkansas, supra.* Similarly, the state may not require any particular form of worship, whether verbal prayer or physical acts. *Jaffree, supra,* 105 S.Ct. 2479; *Engel, supra; Barnette, supra.* Direct monetary support of a religious school is forbidden, *Nyquist, supra; Lemon, supra;* as is allowing sectarian instructors to use public property during the school day, *McCollum, supra.* Moreover, neither a tuition reimbursement program nor tax deductions for *only* private school expenses are allowable. *Nyquist.* However, tax exemptions for religious groups are legitimate. *Walz, supra.* A tuition deduction program for expenses of attending *any* elementary or secondary school is permissible. *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983). The state may loan texts, *Board of Education v. Allen, supra,* pay for state ordered secular tests, *Committee for Public Education v. Regan,* 444 U.S. 646, 100 S.Ct. 840, 63 L.Ed.2d 94 (1980), or assume the cost of transportation for all students, *Everson, supra,* including those in religious schools. If public stu-

*v. Bullard,* 267 N.C. 599, 148 S.E.2d 565 (1966) (drug use by non-native American).

**33.** This was, again, couched as interpretation of the Selective Service Act, but Justice Douglas' dissent pointed out that the Court was effectual-

ly discriminating on the basis of the content of religious belief. *Gillette v. United States,* 401 U.S. 437, 463, 91 S.Ct. 828, 843, 28 L.Ed.2d 168 (1971) (Douglas, J. dissenting).

dents attend religious instruction off of state property, the establishment clause is not implicated, *Zorach, supra,* and the federal government may loan or give funds to sectarian *colleges* and *universities* if used for secular purposes. *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971).

 Perhaps the safest way to reconcile these varying opinions is to note that overt sponsorship that, as much for appearances as in reality, seems to place the state's imprimatur on specific religious acts, contravenes the establishment clause. Laws of general application that incidentally agree with or assist a particular religion are a legitimate acknowledgment of the central importance of religious free exercise to our history and present society.[34] Any state action generally designed to encourage free exercise or allow religious expression in an open, public forum does not equal an establishment of religion.[35] Finally, the government should not accept or deny the validity of religious beliefs, regardless of the nature of them.[36] This has been expressed a number of times by stating that the government may not "establish" irreligion or a secular belief system hostile to religion. *See Lynch v. Donnelly,* 465 U.S. 668, 673, 104 S.Ct. 1355,

1359, 79 L.Ed.2d 604 (1984); *Schempp, supra,* 374 U.S. at 225, 83 S.Ct. at 1573; *Zorach, supra,* 343 U.S. at 314–15, 72 S.Ct. at 684–85; *McCollum, supra,* 333 U.S. at 211–12, 68 S.Ct. at 465–66 and *Barnette, supra,* 319 U.S. at 642, 63 S.Ct. at 1187.

 The application of these principles to the question of what constitutes a religion under the first amendment indicates that the state may not decide the question by reference to the validity of the beliefs or practices involved. Any content-based decision must inevitably result in showing favoritism to some religions and disapproval of others. The purpose of the first amendment, particularly as expressed by the free exercise clause, would be thwarted.[37] The state must instead look to factors common to all religious movements to decide how to distinguish those ideologies worthy of the protection of the religion clauses from those which must seek refuge under other constitutional provisions.[38]

Any definition of religion must not be limited, therefore, to traditional religions, but must encompass systems of belief that are equivalent to them for the believer. Yet the test cannot just be one of equivalency, as *Seeger* and *Welsh* appear to im-

34. *Cf.* the Sunday closing cases: *Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961); *McGowan v. Md.,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *Two Guys From Harrison-Allentown, Inc. v. McGinley,* 366 U.S. 582, 81 S.Ct. 1135, 6 L.Ed.2d 551 (1961); holding that *mere* coincidence with a religious sect's belief or practice will not invalidate otherwise constitutional legislation.

35. This principle seems to not only affect schooling, *e.g., Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), but also other traditional sites for the "market-place of ideas," such as parks, *Lynch v. Donnelly,* 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984).

36. *But see Bob Jones Univ. v. United States,* 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983), holding that the government may regulate or even forbid a practice alleged to be religious if there is a sufficiently compelling public policy, even though the practice is not forbidden by criminal statutes. *Cf. Prince v. Mass., supra* note 1, along with the lower court decisions in note 1, *supra.* What this means, as a practical matter, is that the government really can and

does decree what should be believed, if the policy issue is grave enough.

37. The restriction of certain actions is still possible despite a claim of religious exemption, even without a content based decision. Governmental prohibition must be based on the general welfare. *See Prince v. Mass., supra,* note 1. A content based definition of religion would result in prohibitions beyond those required by laws of general secular application. *Cf. Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) (requirement of registration by certain religious groups based on extent of practice of soliciting funds violates first amendment).

38. There is some sentiment that religion should not be defined by the state at all. *See, e.g.,* Freeman, *The Misguided Search for the Constitutional Definition of Religion,* 71 Geo.L.J. 1519 (1983). The Court rejects this notion. As difficult as drawing parameters in this area may be, the alternative of leaving the entire question in a vague gray area for ad hoc resolution is untenable in light of the prospect of interminable and unbounded litigation.

ply. *See Seeger, supra,* 380 U.S. at 166, 85 S.Ct. at 854; *Welsh, supra,* 398 U.S. at 339–40, 90 S.Ct. at 1796–97. This would just be a definition based on the belief's validity. The Constitution exists to establish a government to effectively preserve the rights of people. The first amendment religion clauses further one aspect of that goal: the *people's* religious freedom. Religion must therefore be defined, for first amendment purposes, in a way that protects the people's right to define their religious beliefs, yet leaves the people's government leeway to regulate activities to protect other rights and privileges that are unrelated to religion.[39]

■ The Supreme Court has focused on such factors as a person's "ultimate concern," *Seeger-Welsh,* organizational and social structure, *Yoder,* and on equivalency to belief in a Supreme Deity. *Seeger-Welsh.* All of these are evidence of the type of belief a person holds. But all religious beliefs may be classified by the questions they raise and issues they address. Some of these matters overlap with non-religious governmental concerns. A religion, however, approaches them on the basis of certain fundamental assumptions with which governments are unconcerned. These assumptions may be grouped as about:

1) the existence of supernatural and/or transcendent reality;

2) the nature of man;

3) the ultimate end, or goal or purpose of man's existence, both individually and collectively;

4) the purpose and nature of the universe.

■ In some systems these assumptions can be implied from less fundamental beliefs; in others they are stated outright. Whenever a belief system deals with fundamental questions of the nature of reality and man's relationship to reality, it deals with essentially religious questions.[40] A religion need not posit a belief *in* a deity, or a belief *in* supernatural existence. A religious person adheres to some position on whether supernatural and/or transcendent reality exists at all, and if so, how, and if not, why. A mere "comprehensive world-view" or "way of life" is not by itself enough to identify a belief system as religious. A world-view may be merely economic, or sociological, and a person might choose to follow a "way of life" that ignores ultimate issues addressed by religions. Describing a belief as comprehensive is too vague to be an effective definition under the religion clauses; some religious persons may consider some issues as peripheral that others find central to their beliefs. Diet is one example of this.[41] Another is the devotion of some religions to a non-technological life-style, such as the Amish. A person can be religious for first amendment purposes without having rules and regulations governing every aspect of everyday conduct.[42] Equating comprehensiveness with religion results in an overinclusive definition. A religious system *should* thus be comprehensive, but only in that the potential exists to resolve as yet unasked moral questions.

■ There are also a number of characteristics exhibited by most known religious groups to which courts can look when trying to determine if a set of theories or

---

**39.** Or, perhaps, these other rights precede and are a condition to religious freedom: life, an orderly civilization, peace, protection of the material means for preserving life.

**40.** Testimony of Dr. Richard A. Baer, Jr., Tr. 817.

**41.** Christians generally take no theological position on the contents of a person's diet. (The Roman Catholic abstinence from meat on some days is a disciplinary matter, done out of self-denial, not a belief that the eating of meat is of itself wrong). Muslims and Orthodox Jews, however, consider pork to be sinful of itself, and some Buddhist sects require a vegetarian diet.

**42.** Those persons adhering to a religion governing all such mundane matters could conceivably argue that other religions are deficient, that is, not *really* religious, in failing to regulate so pervasively. This would be, however, a theological argument, and the first amendment is not a yard stick for arbitration of theological disagreements. It is a guardian of personal freedom, prohibiting the government from interfering in religious disputes.

system of ideas is religious in nature. First would be the sincerity of the adherents' claims. In *United States v. Ballard*, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed.2d 1148 (1944), the Supreme Court held that only the sincerity of a religious adherent's belief, not the validity of the ideas in which faith was reposed, could be determined by a court. At times, the sincerity of a religious claim will overcome objections that it is not actually religious in nature. *See, e.g., People v. Woody*, 61 Cal.2d 716, 394 P.2d 813, 40 Cal.Rptr. 69 (1964), in which the use of the drug peyote by native Americans was found to be religious. However, the non-religious character of a movement, as demonstrated by the adherents' behavior, will undercut protestations of sincerity. *See, e.g., United States v. Kuch*, 288 F.Supp. 439 (D.D.C.1968), in which drug use was not rendered religious by a camouflage of ritual. By the same logic, an allegedly non-religious movement may be shown by the adherent's behavior to actually be religious. *See, e.g., Malnak v. Yogi*, 592 F.2d 197 (3d Cir.1979), in which the Science of Creative Intelligence—Transcendental Meditation was held religious, not scientific. Sincerity is an important factor because the courts are accustomed to deciding questions of credibility and veracity, while the state is incompetent to issue decrees on the validity of a belief.[43]

Another factor is group organization and heirachical structure,[44] which evidence the social characteristics of a movement, and show that the adherents sincerely follow a theory of human relationship.[45] Literary

manifestations of a movement may also be important, particularly if they take the form of an authoritative text.[46] Ritual and worship also would be significant because they would be evidence of the religion's belief about supernatural or transcendent reality.

### Humanism A Religion?

■ In the present case, the plaintiffs contend that a particular belief system fits within the first amendment definition of religion. The plaintiffs' experts used several different labels in referring to this belief system. Dr. Timothy Smith used the phrase "atheistic humanism." Trans. at 113. Dr. James Davison Hunter used "naturalistic humanism." Dr. William R. Coulson accepted these terms, as well as "religious humanism," a term John Dewey used. Trans. at 498, 507. Dr. James Hitchcock used nontheistic humanism as a synonym for humanism, Trans. at 741–42, and secular humanism as encompassing atheistic and nontheistic humanism. Trans. at 742. Dr. Richard A. Baer, Jr. used "humanism" to refer to secular humanism and atheistic humanism. Trans. at 812.[47] All of the experts, and the class representatives,[48] agreed that this belief system is a religion which:

> makes a statement about supernatural existence a central pillar of its logic;
>
> defines the nature of man;
>
> sets forth a goal or purpose for individual and collective human existence; and
>
> defines the nature of the universe, and thereby delimits its purpose.

**43.** *Id.* at 836. *See also* Riga, *Religion, Sincerity and Free Exercise*, 25 *Cath.Law.* 246, 260–61 (1980).

**44.** Testimony of Dr. James Davison Hunter, Trans. at 263; Testimony of Dr. James Hitchcock, Trans. at 748–49, 768–69.

**45.** Dr. Hunter concentrated on the sociological aspects of religion. His testimony referred to numerous social manifestations a religion might exhibit. *See Dodge, The Free Exercise of Religion: A Sociological Approach*, 67 *Mich.L.R.* 679 (1969) for one commentator's notion that a religion should be defined purely by functional criteria. The analysis is, however, inadequate, and would include many non-religious activities.

**46.** Testimony of Dr. Hunter, Trans. at 263–64; Testimony of Dr. Hitchcock, Trans. at 748, 769–70.

**47.** Much, if not all, of the variety in language denominating the belief system under consideration arose from the differing disciplines from which the experts approached the topic, and the fact that a number of witnesses believed that other labels, while essentially correct, had been overused by the public and popular press and turned into mere epithets.

**48.** Whorton, Trans. at 389; Webster, Trans, at 424–25; Smith, Trans. at 452–53.

It purports to establish a closed definition of reality; not closed in that adherents know everything, but in that everything is knowable: can be recognized by the human intellect aided only by the devices of that intellect's own creation or discovery. The most important belief of this religion is its denial of the transcendent and/or supernatural: there is no God, no creator, no divinity. By force of logic the universe is thus self-existing, completely physical and hence, essentially knowable. Man is the product of evolutionary, physical, forces. He is purely biological and has no supernatural or transcendent spiritual component or quality. Man's individual purpose is to seek and obtain personal fulfillment by freely developing every talent and ability, especially his rational intellect, to the highest level.[49] Man's collective purpose is to seek the good life by the increase of every person's freedom and potential for personal development.[50]

In addition, humanism, as a belief system, erects a moral code and identifies the source of morality. This source is claimed to exist in humans and the social relationships of humans. Again, there is no spiritual or supernatural origin for morals: man is merely physical, and morals, the rules governing his private and social conduct, are founded only on man's actions, situation and environment. In addition to a moral code, certain attitudes and conduct are proscribed since they interfere with personal freedom and fulfillment. In particular any belief in a deity or adherence to a religious system that is theistic in any way is discouraged.

Secular humanism, or humanism in the sense of a religious belief system, (as opposed to humanism as just an interest in the humanities), has organizational characteristics. Some groups are more structured and heirachical, others less so. These include the American Humanist Association, the Council for Democratic and Secular Humanism, and the Fellowship of Religious Humanists.[51] These organizations proselytize and preach their theories with the avowed purpose of persuading non-adherents to believe as they do. They conduct seminars and retreats, with various organizations cooperating in such activities.

These organizations publish magazines, newsletters and other periodicals, including *Free Inquiry, The Humanist* and *Progressive World.*[52] The entire body of thought has three key documents that furnish the text upon which the belief system rests as on a platform: *Humanist Manifesto I, Humanist Manifesto II,* and the *Secular Humanist Declaration.*

These factors noted in the two preceding paragraphs demonstrate the *institutional* character of secular humanism. They are evidence that this belief system is similar to groups traditionally afforded protection by the first amendment religion clauses.

Furthermore, the movement has leaders, alive and deceased, who are acknowledged, even revered, as authorities on its purposes and application in daily life. These include John Dewey, Sidney Hook, Paul Kurtz and Corliss Lamont.[53] These men do not present a monolithic front,[54] and this is another factor evidencing this as a religious movement. There is a diversity of views and philosophies within the humanist community very similar to the schisms and debates existing within the Christian, Jewish and Muslim communities.[55]

---

**49.** Testimony of Dr. Paul Kurtz, Trans. at 1687–88, 1697–98. The tenets of this belief-system are succintly expressed in *Humanist Manifesto I* and *Humanist Manifesto II.*

**50.** *See, e.g.,* Kurtz, *Preface to Humanist Manifestos I and II* at 3 (1978) ("If the starting point of humanism is the preservation and enhancement of all things human, then what more worthwhile goal than the realization of the human potentiality of each individual and of humanity as a whole?") *See also Humanist Manifesto I,*

*Id.* at 10 ("[T]he quest for the good life is still the central task for mankind.")

**51.** Dr. Hunter, Trans. at 262–63.

**52.** *Id.* at 264.

**53.** Testimony of Mr. Paul Kurtz, Trans. at 1698–1700.

**54.** *Id.*

**55.** Dr. Baer, Trans. at 855–56.

Dr. Paul Kurtz testified that secular humanism is a scientific methodology, not a religious movement. In his testimony he attempted to make a case that humanism generally, and secular humanism in particular, is the entire body of western philosophical and scientific thought. He thus attempted to claim for this ideology the heritage of learning found in all prior western civilizations. Dr. Kurtz's attempt to revise history to comply with his personal beliefs is of no concern to this Court. Whether his concept of history and western civilization is true is irrelevant. It may be that Dr. Kurtz really does perceive himself as one of a group of scholars committed to the continuation of this tradition. For first amendment purposes, the commitment of humanists to a non-supernatural and non-transcendent analysis, even to the point of hostility towards and outright attacks on all theistic religions, prevents them from maintaining the fiction that this is a non-religious discipline. This Court is concerned with the logic and consistency, the rationality, one might say, of Dr. Kurtz's contention that secular humanism is not a religious system, but science. Secular humanism is religious for first amendment purposes because it makes statements based on faith-assumptions.

To say that science is only concerned with data collected by the five senses as enhanced by technological devices of man's creation is to define *science's* limits. These are the parameters within which scientists function. However, to claim that there is nothing real beyond observable data is to make an assumption based not on science, but on faith, faith that observable data is all that is real. A statement that there is no transcendent or supernatural reality is a *religious* statement. A statement that there is no scientific proof of supernatural or transcendent reality is irrelevant and nonsensical, because inquiry into the fundamental nature of man and reality itself may not be confined solely within the sphere of physical, tangible, observable science.[56]

To demand that there be physical proof of the supernatural, and to claim that an apparent lack of proof means the supernatural cannot be accepted, is to create a religious creed. It is not scientific to say that because there is no physical proof of the supernatural, we must base moral theories on disbelief and skepticism.[57] If there is no evidence, the theory, one way or the other, has nothing to do with science. Religious persons can and do conduct rational and systematic debate on matters of *faith.* The physical sciences do not preclude religion and religious faith. They examine other areas of inquiry, and are unconcerned, yet compatible with, religious inquiry.[58] The Court is holding that the promotion and advancement of a religious system occurs when one faith-theory is taught to the exclusion of others and this is prohibited by the first amendment religion clauses.

Dr. Kurtz's testimony that secular humanism has no religious aspect is not logical. For purposes of the first amendment, secular humanism is a religious belief system, entitled to the protections of, and subject to the prohibitions of, the religion clauses. It is not a mere scientific method-

56. The fact that such inquiry can be, and often is, conducted by systematic and quantifiable methods does not make the inquiry itself one belonging to the physical sciences.

57. In particular, morals are inevitably based on theories of man's nature and ideas about his purpose and destiny. As science does not inquire whether man has a supernatural nature or not, the foundation for a moral theory cannot be represented as having a scientific basis. Therefore, it is specious and false to represent as a scientific and non-religious statement the claim that "morals must not be based on supernatural beliefs."

58. Dr. Charles Rudder, a witness proffered by the State Board of Education testified that it was not rationally possible to "defend the claim that on the basis of what we know about the natural, we know anything about the supernatural or can draw any conclusions one way or another about the supernatural. It would appear to me that if the supernatural exists, we can be informed about the natural from the supernatural, but we can't inform ourselves about the supernatural from the natural." Tr. at 2122.

ology that may be promoted and advanced in the public schools.

### Religious Promotion in Textbooks?

The Court now considers whether this religious belief system of Humanism (in whatever particular strain it occurs) is involved in a constitutional controversy before this Court. As already noted,[59] the Supreme Court has declared that teaching religious tenets in such a way as to promote or encourage a religion violates the religion clauses. This prohibition is not implicated by mere coincidence of ideas with religious tenets.[60] Rather, there must be systematic, whether explicit or implicit, promotion of a belief system as a whole. The facts showed that the State of Alabama has on its state textbook list certain volumes that are being used by school systems in this state, which engage in such promotion.

The parties presented various experts who examined different types of texts. Dr. Timothy Smith and Dr. Paul Vitz conducted examinations of high school history texts.[61] Dr. Vitz analyzed all of the listed social studies books, and Dr. Hunter analyzed all non-fifth grade social studies books. The home economics books were reviewed by Dr. Coulson, Dr. Baer, Dr. Strike, Dr. Spykman, Dr. Kurtz, and Dr. Halpin. Additionally, Verdene Ryder, the author of *Contemporary Living*, Robert F. Baker and Dr. Charles Rudder testified

about the quality of school textbooks in general.

The virtually unanimous conclusion of the numerous witnesses, both expert and lay, party and non-party, was that textbooks in the fields examined were poor from an educational perspective. Mere rotten and inadequate textbooks, however, have not yet been determined to violate any constitutional provision, much less the religion clauses. The Court points this out to demonstrate the predicament confronting the people who must select textbooks. As to the history books, Dr. Smith and Dr. Vitz testified that all of them omitted numerous significant *facts about* religion and religious contributions to American history. Their expert opinion was that religion was so deliberately underemphasized and ignored that theistic religions were effectively discriminated against and made to seem irrelevant and unimportant within the context of American history.[62] Some of the books were worse than others, according to Dr. Smith, but none were good.[63] His opinion was that, except for one text, each of the books reviewed conveyed an historical picture biased against theistic religions.[64]

The pattern in these books is the omission of religious aspects to significant American events. The religious significance of much of the history of the Puritans is ignored. The Great Awakenings are generally not mentioned. Colonial mis-

---

59. *See*, discussion, *supra*, at 977.

60. *See, e.g., McGowan, supra,* note 34. As previously observed, plaintiffs do not contend that mere exposure to ideas and concepts of humanism violates their rights.

61. Dr. Smith studied all ten listed books, plus two other eleventh grade texts that were not introduced: *America! America!*, see page 97 in the State List, Plaintiffs' Exhibit 119; *The United States: A History of the Republic*, State List, p. 97; *A People and a Nation*, State List, p. 97. He also analyzed an eighth grade book: *We The People*, State List, p. 92. The complete list of books examined by Dr. Smith is Plaintiffs' Exhibit 174. Dr. Paul Vitz examined all of the history texts listed in the body of the opinion, *supra*, except for *Our American Heritage*, Exhibit 53, and *A History of the United States*, defendant-intervenors' Exhibit 6. The list of books reviewed by Dr. Vitz is plaintiffs' Exhibit 16A.

62. In the course of American history, Judeo-Christianity occupies the major role within the theistic religious tradition. Thus discrimination against theistic religion within American history texts occurs if this tradition is ignored or neglected.

63. *See,* Tr. 189.

64. Tr. 94–96, 100. The one book that did not exhibit a bias in Dr. Smith's opinion was the text *A History of the United States*, by Daniel Boorstin, defendant-intervenors' exhibit 6. Dr. Smith did fault this text, see Tr. at 100, for insufficient explanation of the religious motivations behind major American events and social movements. He concluded that this, while bad history, was not so bad as to be biased.

sionaries are either not mentioned or represented as oppressors of native Americans. The religious influence on the abolitionist, women's suffrage, temperance, modern civil rights and peace movements is ignored or diminished to insignificance. The role of religion in the lives of immigrants and minorities, especially southern blacks, is rarely mentioned. After the Civil War, religion is given almost no play. Dr. Smith repeatedly noted that these omissions were not questions of adding material that would result in unwieldy and overlong texts. Rather, they were a matter of writing the facts with a tone and attitude ignoring or denigrating religion. The books need only, in his opinion, be rewritten to reflect these religious factors,[65] not lengthened to add superfluous material.

Dr. Paul Vitz testified that he systematically analyzed the history books by the quantity and quality of references to religion. His testimony was based on the lack of appropriate references and agreed generally with Dr. Smith that the books underemphasized or neglected the Judeo-Christian tradition in American society.

The Court's conclusion about these history books must take several factors into account. Dr. Smith, Dr. Hunter, Dr. Baer and Dr. Coulson all testified that omission of references to religion in school curriculum is detrimental to the free exercise of the excluded religion. Dr. Rudder questioned this theory. To what extent can omissions constitute a violation of the first amendment religion clauses?

▮▮▮ First, the Supreme Court has recognized a right to not be prevented from learning material if it was excluded for religious reasons and there is a legitimate secular or non-religious (as opposed to anti-

religious or irreligious) reason for teaching the material.[66] *See Epperson v. Arkansas, supra.* Thus an omission *can* constitute a first amendment violation. Second, a number of commentators contend that *sufficient* omissions violate religious freedom. *See, e.g.,* McGarry, *The Unconstitutionality of Exclusive Governmental Support of Entirely Secularist Education,* 28 Cath.Law 1 (1983); Nielsen, *The Advancement of Religion versus Teaching About Religion in the Public Schools,* 26 J.Ch. & St. 105 (1984); Note, *The Myth of Religious Neutrality by Separation In Education,* 71 Va.L.Rev. 127 (1985). On the role of government in preferring one ideology over others, *see generally* Horn, *Secularism and Pluralism in Public Education,* 7 Harv.J.L. & Pub. 177 (1984); Louisell, *Does The Constitution Require a Purely Secular Society,* 26 Cath.U.L.Rev. 20 (1976); Toscano, *A Dubious Neutrality: The Establishment of Secularism in the Public Schools,* 1979 B.Y.U.L.Rev. 177; Whitehead and Conlan, *The Establishment of the Religion of Secular Humanism and its First Amendment Implications,* 10 Tex.Tech.L.Rev. 1 (1978); Comment, *Secularism in the Law: The Religion of Secular Humanism,* 8 Ohio N.U.L.Rev. 329 (1981). Furthermore, there is no doubt that adherents to the religion of the *Humanist Manifestos* affirmatively seek the exclusion of influence by theistic religions in the public schools.[67] Finally, Dr. Smith testified that he has observed students who have received an education that excluded discussion of the historical facts of religion, and that as a definite result thereof, those students think differently about their belief system and its relationship to their lives than students educated in a fairer and more objective environment.[68] (Tr. at 99–

---

**65.** Tr. 76.

**66.** One commentator argues that, since government must remain neutral as to religious matters, there is a distinction between irreligious and non-religious. The former is a possible choice under the free exercise clause, the latter is the Government's proper domain. *See* Merel, *The Protection of Individual Choice,* 45 U.Chi.L. Rev. 805 (1978).

**67.** *See, e.g.,* Potter, C.F., *Humanism: A New Religion,* 127 (1930); Blanchard, *Three Cheers For*

*Our Secular State, The Humanist* 17, April 1976. John Dewey was the principle proponent of using the schools as vehicles for altering people's perceptions of religion.

**68.** Dr. Smith was not testifying about Alabama students, but about the effects omissions *can and do have* on persons.

100, 146–40). Omissions, if sufficient, do affect a person's ability to develop religious beliefs and exercise that religious freedom guaranteed by the Constitution. Do the omissions in these history books cross that threshold? For some of them, yes. In addition to omitting particular historical events with religious significance, these books uniformly ignore the religious aspect of most American culture. The vast majority of Americans, for most of our history, have lived in a society in which religion was a part of daily life. This aspect was not something that most people even thought about, or had to; it was a given, it was axiomatic, just as telephones, automobiles and fast food are a given of current culture. For many people, religion is still this important. One would never know it by reading these books. Religion, where treated at all, is generally represented as a private matter, only influencing American public life at some extraordinary moments.[69] This view of religion is one humanists have been seeking to instill for fifty years. These books assist that effort by perpetuating an inaccurate historical picture. This Court cannot define with absolute precision the way in which a history book should be written to cure these problems, nor would that be desirable. What this Court can and does say is that its independent perusal of these books forces it to agree in general with the conclusions of Dr. Smith and Dr. Vitz: These history books discriminate against the very concept of religion, and theistic religions in particular, by omissions so serious that a student learning history from them would not be apprised of relevant facts about America's history. Even where the factor of religion is included, as in statements that some colonies were founded to obtain religious freedom, there is rarely an explanation of Christianity's involvement. The student would reasonably assume, absent other information, that theistic religion is, at best,

extraneous to an intelligent understanding of this country's history. The texts reviewed are not merely bad history, but lack so many facts as to equal ideological promotion. The Court notes that while both sets of defendants conducted an extensive defense of the home economics books against which the plaintiffs' heaviest artillery was trained, they did not even conduct a rearguard action to ward off the assault on these deplorable history texts.[70]

This Court is not in the business of writing, or re-writing, history texts. But it is this Court's solemn duty and obligation under the first and fourteenth amendments as interpreted by the Supreme Court in *Jaffree, supra,* to protect the rights of these plaintiffs and defendants to the free exercise of their various religions, unimpaired by an officially sponsored version of history that ignores the facts that give the first amendment its importance and significance. The Court will consider below what specific relief is appropriate.

The fifth grade social studies books are all elementary grade American history texts. They suffer defects worse that those of the high school books. References to religion are isolated and the integration of religion in the history of American society is ignored.

■■■ Dr. Hunter's review of the remaining social studies texts shows that they generally ignore the presence and factual importance of theistic religion as undeniable influences in American society. The attitude and approach of the books simply overlooks such a possible aspect of a student's existence. Although the role and significance of religion in American life has altered over the years, the picture portrayed by these series of books relegates religion to *other* cultures, *other* times and *other* places. These books teach that this is how people *are:* that people's actions,

---

**69.** *See* A. Reichley, *Religion in American Public Life* at 165 (1986), noting that exclusion of religion from public, civic life is not neutrality but an establishment of secularism.

**70.** The Court notes that a review conducted by a public interest group, People for the American Way, on an even wider sample of history texts, agrees virtually unanimously that the *facts* about religion in American history are not being taught. *See, e.g.,* Davis, O., et al., *Looking at History: A Review of Major U.S. History Textbooks* (1986).

behaviors, jobs, schooling, their very lives are based on anything but religion. The factual inaccuracies are so grave as to rise to a constitutional violation. The Court's independent review of the books confirm Dr. Hunter's testimony in this regard.[71] Religion, especially theistic religion, is never placed in context by these books.

The home economics books were examined by Dr. Coulson, Dr. Baer, Dr. Strike, Dr. Spykman, Dr. Kurtz, Dr. Rudder, Dr. Halpin and Mrs. Ryder. According to the plaintiffs' experts, the five home economics books espouse humanistic psychology or education. Humanistic education is an application of humanism. Not all adherents to the latter agree with every aspect of the former, and Dr. Kurtz spent considerable time on the stand denying that he personally adheres to certain teachings of humanistic psychology. This, however, does not show that humanistic psychology as present in these books is not a variety of humanism or a religion in its own right under the first amendment.

Humanistic psychology was originated by Carl Rogers and Abraham Maslow, and put into practice most effectively by Sidney Simon, Howard Kirschenbaum and Merrill Harmin. This Court is unconcerned with whether it is a valid field of the science of psychology. In these books, it is presented in such a way as to require the student to accept as true certain assumptions. These assumptions are about human nature, the origin and nature of the rules governing human relationships, the non-existence of supernatural or transcendent reality, and the purpose of human existence individually and collectively.

According to humanistic psychology, as with humanism generally, man is the center of the universe and all existence. Morals are a matter of taste, dependent upon whether the consequences of actions satisfy human "needs." These needs are always defined as purely temporal and non-supernatural. Moreover, the books imply strongly that a person uses the same process in deciding a moral issue that he uses in choosing one pair of shoes over another.[72] The books do not state that this is *a theory* of the way humans make choices, they teach the student that things *are* this way. This claim, according to Dr. Coulson, Dr. Baer, Dr. Strike and even Dr. Kurtz, is not a legitimate scientific claim, but a faith-statement: an assumption based on a particular vision of human nature unrelated to science.

The books teach that the student must determine right and wrong based only on his own experience, feelings and "values." These "values" are described as originating from within. A description of the origin of morals must be based on a faith assumption: a religious dogma. The books are not simply claiming that a moral rule must be internally accepted before it becomes meaningful, because this is true of *all* facts *and* beliefs.[73] The books require the student to accept that the validity of a moral choice is only to be decided by the student. The requirement is not stated explicitly. Instead, the books repeat, over and over, that the decision is "yours alone," or is "purely personal" or that "only you can decide." [74] The emphasis and overall approach implies, and would cause any reasonable, thinking student to infer, that the book is teaching that moral choices are just a matter of preference, because, as the books say, "you are the most important person in your life." This highly relativistic and individualistic approach constitutes the promotion of a fundamental faith claim opposed to other religious faiths. Such a relativistic claim can only be made on the basis of a faith assumption. This faith assumes that self-actualization is the goal of every human being, that man has no supernatural attributes or component, that there are only temporal and physical consequences for man's

---

**71.** The Court points out that the defendants defended these books as little as the history books. See text accompanying note 70, *supra.*.

**72.** *See* F. Parnell, *Homemaking: Skills For Everyday Living,* (1984) at 26.

**73.** Testimony of Dr. Baer, Tr. at 830.

**74.** See Appendix N setting forth numerous examples of such statements.

actions, and that these results, alone, determine the morality of an action. This belief strikes at the heart of many theistic religions' beliefs that certain actions are in and of themselves immoral, *whatever the consequences*, and that, in addition, actions will have extra-temporal consequences.

Humanistic psychology is a manifestation of humanism.[75] Both deny the supernatural, both make man the center of all existence, including morals formulation, both view man's sole collective and individual purpose as fulfillment of his physical, temporal potential.[76] Both view man as a completely physical being, leaving no supernatural dimension. Such characteristics constitute a religious faith under the first amendment. It was argued at trial that only small portions of the home economics books were devoted to "values." However, each book was imbued with these religious assumptions in their discussions of human relationships. Moreover, a religion may not be promoted through one chapter any more than through a whole book. If a psychology chapter in one of these books were devoted solely to an explanation and discussion of the Amish attitude on maturity, with its theological background, as *the* approach, disregarding other systems, it would obviously be found wanting. The facts that: 1) the psychology presented is not theistically based and, 2) only a portion of the book is devoted to it, do not justify the violation.[77]

The Court is not holding that high school home economics books must not discuss various theories of human psychology. But it must not present faith based systems to the exclusion of other faith based systems, it must not present one as true

and the other as false, and it *must* use a comparative approach to withstand constitutional scrutiny.[78]

The Court therefore proceeds to consider what relief is appropriate in light of its findings that use of these texts violates the religion clauses of the first amendment.

■■■ The question arises how public schools can deal with topics that overlap with areas covered by religious belief. Mere coincidence between a statement in a textbook and a religious belief is not an establishment of religion. However, some religious beliefs are so fundamental that the act of denying them will completely undermine that religion. In addition, denial of *that* belief will result in the affirmance of a contrary belief and result in the establishment of an opposing religion.

The state may teach that lying is wrong, as a social and civil regulation, but if, in so doing it advances a reason for the rule, the possible different reasons must be explained evenhandedly. As otherwise stated, the state may not promote one particular reason over another in the public schools.[79]

Teaching that moral choices are purely personal and can only be based on some autonomous, as yet undiscovered and unfulfilled, inner self is a sweeping fundamental belief that must not be promoted by the public schools. The state can, of course, teach the law of the land, which is that each person is responsible for, and will be held to account for, his actions. There is a distinct practical consequence between this fact, and the religious belief promoted, whether explicitly or implicitly, by saying "only you can decide what is right and

**75.** Dr. Coulson, Tr. at 580.

**76.** Humanistic psychology is somewhat more relativistic in this respect, as it concentrates on "needs," personal satisfaction, and feelings, while humanism concentrates on intelligence, talents and rationality. However, the difference is purely one of degree and not substance.

**77.** Obviously, if one chapter alone of a biology book were given over to the Genesis account, without any further explanation, as *the* account of the world's existence, there would be no *de minimis* exception.

**78.** Dr. Strike pointed out with regard to these books, as Dr. Smith, Dr. Hunter and Dr. Vitz did regarding the history and social studies books, that invisibility is one of the main academic criterion for quantifying bias in textbooks. Tr. at 978.

**79.** Similarly, as a matter of history, teaching that there are religions that believe that God does or does not exist is constitutional. Teaching that, as a matter of fact, God does or does not exist is unconstitutional.

wrong." With these books, the State of Alabama has overstepped its mark, and must withdraw to perform its proper non-religious functions.

### Relief

The Court, having concluded that the challenged textbooks violate the establishment clause of the First Amendment to the United States Constitution, is thus compelled to grant plaintiffs' their requested relief barring the further advancement of the tenets of the religion of secular humanism. The Court will enter an order and judgment granting an injunction against all parties defendant save Annie Bell Phillips, Julia Green, Betty Lee, Charlene Boyd, Emma Reed and Pixie Alexander, as to whom the plaintiffs requested no relief nor established any right thereto, said injunction to prohibit further use of the books listed therein and set out as Appendix M to this opinion, except for the text *A History of the United States*, by Boorstin and Kelly, Defendant-intervenors's Exhibit 6. No other or further relief to any party is deemed required by the Court under the facts in this case, except consideration of an award of attorneys' fees and costs to the plaintiffs should they file a motion to this effect within ten days.

The Court notes that since the filing of this lawsuit a number of the elected officials named as defendants have changed. The injunctive relief shall run as to the present office holders.

### JUDGMENT

Pursuant to the Findings of Fact and Conclusions of Law entered this day, it is hereby ORDERED, ADJUDGED and DECREED in accordance with Rule 58, Federal Rules of Civil Procedure, that JUDGMENT be entered for the following plaintiff classes:

Class A:

all those persons adhering by belief and practice to a theistic religion, who are or will be teachers in the public schools of Alabama. The class representatives are Douglas T. Smith and Karen O. Phillips.

Class B:

all those persons adhering by belief and practice to a theistic religion, who are Alabama taxpayers and who are or will be parents of children in the public schools of Alabama. This class of persons sued individually and also as representatives of their children who are or will be enrolled in public schools in Alabama. The class representatives are Reginald E. Phillips, Robert C. Whorton and Judith C. Whorton,

and against the defendants: the Board of School Commissioners of Mobile County: Judy A. McCain, Howard T. Mathis, III, Charles S. Belk, Norman G. Cox and Dr. Robert W. Gilliard; the Superintendent of the Mobile County school system, Billy D. Salter; the Attorney General, Don Siegelman; Governor Guy Hunt; State Superintendent of Schools Dr. Wayne Teague; and the Alabama State Board of Education, Steadman S. Shealy, Jr., Ethel H. Hall, Willie J. Paul, Spencer Bachus, John M. Tyson, Jr., Isabelle Thomason, Victor P. Poole and Evelyn Pratt. The above named parties-defendant are hereby permanently RESTRAINED and ENJOINED, pursuant to Rule 65 of the Federal Rules of Civil Procedure, from using any of the following books:

Home Economics Books

| Book | Principle Author | Publisher | Editions |
|---|---|---|---|
| Caring, Deciding and Growing | Helen McGinley | Ginn and Company | 1983 |
| Contemporary Living | Verdene Ryder | Goodheart-Willcox Company, Inc. | 1981, 1985 |
| Homemaking: Skills for Everyday Living | Frances Baynor Parnell | Goodheart-Willcox Company, Inc. | 1981, 1984 |
| Teen Guide | Valerie Chamberlain | McGraw Hill Book Company, Webster Div. | 1985 |

Home Economics Books

| Book | Principle Author | Publisher | Editions |
|---|---|---|---|
| Today's Teen | Joan Kelly | Bennett & McKnight Publishing Company | 1981 |

History Books

| Book | Author | Publisher | Editions |
|---|---|---|---|
| America Is | Frank Freidel | Charles E. Merrill Publishing Co. | 1978 |
| The American Dream | Lew Smith | Scott, Foresman and Company | 1980 |
| Exploring Our Nation's | Sidney Schwartz | Globe Book Company, Inc. | 1984 |
| History of a Free People | Henry W. Bragdon | Macmillan Publishing Company | 1981 |
| A History of Our American Republic | Glenn M. Linden | Laidlaw Brothers | 1981 |
| Our American Heritage | Herbert J. Bass | Silver Burdett Company | 1979 |
| People and Our Country | Norman K. Risjord | Holt, Rinehart & Winston | 1978 |
| Rise of the American Nation | Lewis Paul Todd | Harcourt Brace Jovanovich | 1977 |
| These United States | James P. Shenton | Houghton Mifflin Company | 1981 |

| Social Studies Books | Grade | Exhibit |
|---|---|---|
| Rand McNally Series (1980 editions) (State List p. 88) | | |
| You and Me | 1 | 17 |
| Here We Are | 2 | 18 |
| Our Land | 3 | 19 |
| Where On Earth | 4 | 20 |
| Across America | 5 | 21 |
| World Views | 6 | 22 |
| Scott Foresman Series (1979 editions) (p. 88) | | |
| Social Studies | 1 | 23 |
| " " | 2 | 24 |
| " " | 3 | 25 |
| " " | 4 | 26 |
| " " | 5 | 27 |
| " " | 6 | 28 |
| Speck (1981 editions) (p. 89) | | |
| Our Family | 1 | 29 |
| Our Neighbors | 2 | 30 |
| Our Communities | 3 | 31 |
| Our Country Today | 4 | 32 |
| Our Country's History | 5 | 33 |
| Our World Today | 6 | 34 |
| Laidlaw (1981 editions) (p. 88) | | |
| Understanding People | 1 | 35 |
| Understanding Families | 2 | 36 |
| Understanding Communities | 3 | 37 |
| Understanding Regions of the Earth | 4 | 38 |

---

These books are not to be used as primary textbooks, as the primary source for a course that is designed for use without a primary text, or as a teaching aid, in *any* course, but may be used as a reference source in a comparative religion course

that treats all religions equivalently. Within their area of jurisdiction, the Board of School Commissioners of Mobile County and the Superintendent of schools for Mobile County shall not allow the use of any listed books except as stated above.

Within their area of jurisdiction, the Alabama State Board of Education shall not furnish the listed books to any school system. For the purpose of the performance by the State Board of its duty, this Judgment and Injunction acts to remove these books from the State-Adopted Textbook List. Furthermore, the State Board shall not approve any of the listed books for use by any local school board or district that may be allowed to use textbooks other than those listed on the State-Adopted List when that local school board or district seeks to obtain state approval. Finally, the State Board shall forthwith revoke any such approval heretofore given for the use of any of the books and shall amend the State-Adopted Textbook list to strike same therefrom. Costs are taxed against the defendants.

### APPENDIX A

### Excerpts from Footnote 41

. . . . .

"The second major area that this Court must concern itself with should this judgment be reversed is that raised by the evidence produced by the intervenors dealing with other religious teachings now conducted in the public schools to which no attention has apparently been directed and to which objection had been lodged by the intervenors."

. . . . .

"Textbooks which were admitted into evidence demonstrated many examples in the way this theory of religion is advanced. The intervenors maintain that their children are being so taught.... To this extent, this Court is impressed that the advocacy of the intervenors on the point of

necessity makes them parties plaintiff and to this extent they should be realigned as such inasmuch as both object to the teaching of certain religions."

. . . . .

"This Court is confronted with these two additional problems that must be resolved if the appellate courts adhere to their present course. ... Should this happen, then this Court will hunker down to the task required by the appellate decisions.... The Court will be called upon to determine whether each book or any statement therein advances secular humanism in a religious sense, a never ending task...."

### APPENDIX B

Report written by W.R. Coulson of the Webster family. (Plaintiffs' Exhibits 92 and 168 [under the pseudonym Wilson]).

### *The Websters* [1]

"The Webster family's concern is of long-standing. Mr. Webster's mother had been a teacher and a principal, and from her they knew some of what was going on. When the Webster's son David, now 15, was nine years old, "values-clarification" was introduced into his curriculum for gifted students. Increasingly, over the years, therefore they have become aware of a religious overlay to the school's teaching. Yet they do not want to be forced out. They believe American public schools are not intended for capturing by one religious point of view.

The religion is humanism. The interest of her husband and herself, Mrs. Webster says, has always been to protect the children. It is becoming increasingly difficult.

We've been concerned for years that the children were being put into a position where they were having to make choices between lines of authority: between meeting the standard of the classroom material presented at school and the standard of our home and our Christian faith.

---

**1.** The Websters were interviewed in their family room in suburban Mobile, Alabama, between 3:15 and 4:00 P.M. August 15, 1985. Members of the family are father John, Mother Sue, 12- year-old Laura and 15-year-old David. All were present. The interview was conducted by W.R. and Jean D. Coulson.

So far, the family hasn't been defeated. Both children continue to confess the family's traditional Christian faith and willingly attend the Cottage Hill Baptist Church with their parents.

But the school continues to offer institutional competition, and, in any case, the family's concerns exceed the immediate moment. They are worried about their children in the critical years of schooling yet ahead and worried about their children's children, yet to be born. They have responsibilities there, too. Their experience convinces them that someone wants to drive a wedge between the generations in the name of a humanistic creed.

Whether a group is responsible, a market force or a pervasive philosophy, they cannot say for sure. (They have some ideas, suggested below, but they are not detectives.) What they see reflected in the materials of their childrens' public school classrooms, however, is an alienating influence, an influence intending far more than "to expose children to different points of view." It intends to convert them. Fifteen-year-old David says he can see it.

> I can tell you first hand all this teaching at the school is making an effect. Most of the people I know, they live with the philosophy "It's my life, I'm going to live it the way I want." If that keeps up, there's no ultimate power.

David's juxtaposition of the pervasive selfism he observes with "If that keeps up, there's no ultimate power," is perspicacious. That there is no God but man is the fundamental tenet of religious humanism. If faith in the self carries the day, one crying need David observes of his own generation will go unmet. It is for a brake on individual impulses.

> We [the Webster family] have God for an ultimate power. If this keeps up—where everybody's taught to make all their *own* decisions, there's nothing or anybody to look up to. It's everybody for themselves.

"That system won't work," he adds. "I mean, I'm worried about *my* kids."

It is, of course, a concern his parents deeply share, or they would not have become as involved over the years in trying to monitor the schools' influence and as willing now to put themselves on the line in court if necessary. But their deepest commitments are being used against them. It is because of their Christian faith, Mrs. Webster says, that "we have always taught our children to respond to and respect authority." Now this teaching of the home is being employed in the school to undermine the children's welfare, however inadvertently, and the parents are wracked with concern about it.

> I want you to know our attitude has been a disadvantage to us with the public school [Mrs. Webster says]. Because of the standard of education in this community, our children are submitting to things that aren't right. It has compromised them and compromised the standards of our faith.

Her husband adds that something has been taken away from public education. Control has passed from the people. Not all parents are as involved as the Websters; but those that are, particularly if they profess an orthodox religious faith, are less and less likely to experience being taken seriously. To the Websters, the school appears to be in the grip of a rival dogmatic faith.

> It didn't used to be that way [Mr. Webster says]. My parents could get action. My parents *did* get action when it was required. You didn't have people running the school from fringe positions.

What Mr. Webster means by "fringe positions" are the positions of the educational revolutionaries of the '60s and early '70s. "Revolutionary" was their own description of the implications of their work; Merrill Harmin, Howard Kirschenbaum and Sidney B. Simon, for instance, wrote in 1973 that "Clarifying values through subject matter is a relatively simple method for the teacher to implement in his or her classroom; yet its implications are, we think, revolutionary."[2] A key aim of the method of

---

**2.** Harmin, Kirschenbaum and Simon in their *Clarifying Values Through Subject Matter: Ap-*

values clarification (of which the Websters point out they long ago had reason to complain to the school) is precisely the aim David identified: to transform the self into the "ultimate power." The revolutionary declaration of 1973 continued with the claim that

> ... an increasing number of students are no longer willing to tolerate a curriculum that does not acknowledge their needs, interests, and concerns. Schools, as well as homes, must offer young people a way to develop a set of values upon which they can act and base their lives. How do young people acquire a set of values? Are we to tell them what to value and how to live, over and over again, in the hope that they will listen? No. None of us can be certain that our values are right for other people. (*ibid*, p. 31).

The preemptive inclusiveness of the claim that "None of us can be certain that our values are right for other people" is what troubles the Websters so deeply and makes them realize that they are contending with a blind faith.

"Blind faith" is the term *A Secular Humanist Declaration* applies to traditional religions such as the Websters' own Christianity. But the Websters have seen nothing so blind as the claim of these authors (whom they named for us and invited us to study carefully): the values-clarification authors who hold that as *they* lack certitude, so must everyone. Overlooked by these authors, the Websters seem to suggest, are two crucial points:

(1) The Christian "values" of which the Websters are convinced [3] are not of their own making. In that sense they are not "our values" but God's. For the Websters to pass them on to their children, therefore, is hardly the self-centered act the authors' rhetoric implies. The very possibility of an enduring *our*—"our family,—our love for one another,—our Christian home,—our personhood"—is predicated on the fact that the Websters have not created themselves.

What has *truly* created them is their acceptance of Christ as their Savior. Says Mrs. Webster, "Jesus is Lord of our lives, and *His* standard is our standard."

The values-clarification authors appear blind to this possibility. They insist that everyone *must choose his own values.* The first of the seven key steps in their "value processing" method is *"Choosing freely:*

> If we are to live by our own values system, we must learn how to make independent choices. (*ibid*, p. 32).

It is precisely the demand for children's freedom and independence from family standards which seems to the Websters intolerably intrusive, and dangerous. Says Mrs. Webster:

> The standard of our faith is that you don't live in isolation like that. The decisions you make will bear consequences for those around you—immediately and in the future. They have a rippling effect. You're *not* self-contained and self-centered. You're *related.* You can't adopt the philosophy "I, me, mine" or you wind up being an Idi Amin or a Mummar Kadahfi. But it's different to articulate the problem confidently to your children because you're *constantly* being buffetted by the philosophy they're learning in school.

The dangerousness of the selfism creed would be evident even if fidelity to God's word, were not at stake. Again David's suggestion of the social disintegration which follows on "everybody for themselves" gets at this. He is quite right to worry about his future children. It will only take the forging of an alliance in the next generation for his children to be in mortal jeopardy: an alliance between those who would convince parents of their children's right to independence from the family's deepest, long-lived commitments and those who have something dangerous to insert into the subsequent vacuum.

---

*plications for the Classroom* (with a chapter by Clifford E. Knapp). Minneapolis: Winston Press, 1973, p. 7.

**3.** The "convicted" one hears in evangelical confession gets the point across even better.

(2) The authors miss the mandatory character of their own professions. Having become convinced of what they are sure is true—namely the need (widely acknowledged in their circles in the '60s and '70s) for new methods of education—they will not let up. In one book after another throughout the '70s and into the '80s they will say that everyone must make his or her own choices. They will condemn the "over and over again" preachment of those who would tell others "what to value and how to live." But they will (a) go on and on to affirm what (b) everyone (c) *must* learn. And in this they really have no choice, given that what they see strikes them as true.[4]

If there were free-market competition between rival conceptions of truth in the public school, the Websters would not be quite so alarmed. One set of firmly-held convictions might be balanced by another. But the values-clarification authors and their supporters in the public schools are blind to the compulsory nature of their own grasp of the truth. It makes them the more dangerous, from the Websters' perspective. Readers of *Clarifying Values Through Subject Matter* are referred to as a recommended bibliography of 39 items, 20 of which the authors themselves have written and every one of which makes the same demands. These are the authors who condemn parental repetitiveness and condemn anyone who knows on behalf of another person "what to value and how to live." One can see more than a little bit of *Animal Farm* in it: "All animals are equal, but some are more equal than others."

So this is what Mr. Webster means by "running the school from fringe positions" and why he and his wife have become so alarmed: The revolutionaries[5] have succeeded in seeing their aims—originally anti-establishment aims—validated in the schools of education. The revolution would not succeed, however, if a parental perspective continued to hold sway in local schools.

Curricular materials therefore would be needed to undercut parents, especially those with strong convictions, and the publishing houses have come through.

Thus the family members' anguish and thus the basis of their complaint. The fringe has become the center, and everything that has gone before—including (or perhaps especially) the Websters' Christianity—appears scheduled to pass away under the raised regimen.

All four Websters are very bright. But they can hardly understand the justification for such a program. It seems to them the grossest misuse of a public institution for a private religious end. And they are worried, too, very worried. For increasingly are they having difficulty keeping "on top of the material." Mrs. Webster admits, "Honestly, we probably did a better job at the elementary school level than we've been able to do since."

There's just too much of it coming at them. They're concerned they won't be able to do enough to offset the school's own "religious standards" as David now moves into tenth, eleventh and twelfth grades—to say nothing of the fact that Laura is moving out of the elementary school setting where before, with but a single teacher to consult, the Websters were able to have enough influence to feel responsible.

It was, in fact, David's own elementary school experience with values clarification to which they referred the interviewers in first expressing their concern about the religious conflict between school and home. At that time—David's third grade year—they were able to put a stop to his involvement: the other students in the gifted program went off for what seems essentially a form of group therapy while David stayed with the regular class.

The Websters mention a book.[6] Tracing the origins of this approach of which they

---

4. This is what Michael Polangi argues is the "universal intent" of all knowing.

5. Harmin's term. See page 3.

6. Sidney B. Simon, Leland W. Howe and Howard Kirschenbaum, *Values Clarification: A Handbook of Practical Strategies for Teachers and Students.* NY: Hart Publishing Co., 1972, pp. 281–288.

complain, one learns that it derives from John Dewey, signer of the original *Humanist Manifesto*, the document which declares "The time is past" for any theistic faith (such as the Websters) and which offers in its place a "Religious humanism [which] considers the complete realization of human personality to be the end of man's life."

Religious humanism, in the assumption of the *Manifesto*, would "take the path of social and mental hygiene." In time, Sidney B. Simon, Leland B. Howe and Howard Kirschenbaum would come to create the handbook of hygienic classroom exercises through which the Websters found their David initially being led. In their introduction, indeed, the handbook authors attribute their insights to "the approach formulated by Louis Raths, who in turn built upon the thinking of John Dewey" (p. 19).

Elsewhere (in the work of Harmin, Kirschenbaum and Simon referred to earlier) the concerned inquirer will see Dewey quoted in what the authors declare is "A Call for Change." He will see Dewey's words joined with A.S. Neill's confession of "a radical approach to child rearings;" will see these things seconded by the author's own appeal for an education "more relevant to a world of change, confusion, and conflict"—and the whole identified with "teaching as a subversive activity."

The pattern is disconcerting to the Websters, to say the least. The family is pretty sure what all these authorities have in mind to "subvert," and they are made more than anxious for the realization.

> You feel so *powerless* in all this [Mrs. Webster says]. We're part of America, too. We're part of this community, too. Yet it seems that our morality is being negated.

Mr. Webster points up an additional note of absurdity:

> The system to defeat our beliefs is being financed out of our own pockets.

Were it not for their identification with a crucified and risen Lord, they would be near to despair.

APPENDIX C

The plaintiffs' list of contested issues:

1. Is Humanism a religion for First Amendment purposes?

2. Is Humanism being advanced in the challenged textbooks adopted by the Alabama State Board of Education?

3. Do the morals, values and decision making sections of the six challenged home economics textbooks adopted by the Alabama State Board of Education advance Humanism?

4. Do the morals, values and decision making sections of the six challenged home economics textbooks adopted by the Alabama State Board of Education inhibit theism, particular Christianity?

5. Are the rights of free exercise of religion of Plaintiff-Teachers, Plaintiff-Parents and Students (represented by Plaintiff-Parents) violated by the advancement of Humanism in morals, values and decision making sections of the six challenged home economics textbooks adopted by the Alabama State Board of Education?

6. Are the facts about theistic religion (especially of the existence, history, contributions and roles of Christianity and Judaism) excluded from the thirty-nine challenged history and social studies textbooks adopted by the Alabama State Board of Education?

7. Are the free exercise rights of Plaintiff-Teachers, Plaintiff-Parents and Students (represented by Plaintiff-Parents) violated by the exclusion of facts about theistic religion (especially the existence, history, contributions and roles of Christianity and Judaism) from the thirty-nine challenged history and social studies textbooks adopted by the Alabama State Board of Education?

8. Are the rights of students (represented by Plaintiff-Parents) to receive information violated by the exclusion of facts about theistic reli-

gion (especially the existence, history, contributions and roles of Christianity and Judaism) from the thirty-nine challenged history and social studies textbooks adopted by the Alabama State Board of Education?

9. Are the free speech rights of Plaintiff-Teachers violated when they are required to use any or all of the thirty-nine challenged history and social studies textbooks adopted by the Alabama State Board of Education which exclude facts about theistic religion (especially the existence, history, contributions and roles of Christianity and Judaism)?

10. Are the free speech rights of Plaintiff-Teachers violated when they are required to instruct from the morals, values and decision making sections of any or all of the six challenged home economics textbooks adopted by the Alabama State Board of Education which advance Humanism?

11. Are the free speech rights of Plaintiff-Teachers violated when they are required to instruct from the morals, values and decision making sections of any or all of the six challenged home economics textbooks adopted by the Alabama State Board of Education which inhibit theism and especially Christianity?

12. Does the exclusion of facts about theistic religion (especially the existence, history, contributions and roles of Christianity and Judaism) from the thirty-nine challenged history and social studies textbooks adopted by the Alabama State Board of Education violate the Constitutional prohibition against government disapproval of theistic religion and especially Christianity?

13. Does the exclusion of facts about theistic religion (especially the existence, history, contributions and roles of Christianity and Judaism) from the thirty-nine challenged his-

tory and social studies textbooks adopted by the Alabama State Board of Education inhibit theistic religion, especially Christianity?

14. Does the exclusion of facts about theistic religion (especially the existence, history, contributions and roles of Christianity and Judaism) from the thirty-nine challenged history and social studies textbooks adopted by the Alabama State Board of Education discriminate against theistic religion, especially against Christianity?

15. Does the exclusion of facts about theistic religion (especially the existence, history, contributions and roles of Christianity and Judaism) from the thirty-nine challenged history and social studies textbooks adopted by the Alabama State Board of Education violate *Code of Alabama* 1975, § 16–3–15, § 16–35–3, § 16–35–5, and/or § 16–40–6?

Plaintiffs' Pretrial Order at 14–18.

### APPENDIX D

#### The Classes Certified

On September 22, 1986, the Court certified two classes of plaintiffs:

Class A:

all those persons adhering by belief and practice to a theistic religion, who are or will be teachers in the public schools of Alabama. The class representatives are Douglas T. Smith and Karen O. Phillips.

Class B:

all those persons adhering by belief and practice to a theistic religion, who are Alabama taxpayers and who are or will be parents of children in the public schools of Alabama. This class of persons sued individually and also as representatives of their children who are or will be enrolled in public schools in Alabama. The class representatives are Reginald E. Phillips, Robert C. Whorton and Judith C. Whorton.

### APPENDIX E

Glennelle McCollum Halpin

Ph.d—Psychology—1972—University of Georgia.

M.A. Psychology—1969—University of Georgia.

B.S.—English, Education—1964—Jacksonville State University.

Dr. Halpin taught in the public schools in Lexington, Georgia from '67 to '68, was a visiting professor in the Department of Educational Psychology at the University of Georgia in Atlanta, Georgia in 1972, was psycho-educational evaluator for the Montana Public Schools in 1973, lectured in the School of Education at the University of Montana in '73 and '74 and then came to Auburn University.

Dr. Halpin holds many honors and awards, holds membership in the International Association of Applied Psychology, the American Psychological Association, the American Educational Research Association and others. For more detailed description see Defendants' Exhibit 4.

APPENDIX F

Charles F. Rudder, Auburn, Alabama

Ed.d degree—1978—University of Florida, major in foundations of education with minor in philosophy

M.E.D. degree—1972—University of Florida, major in Foundations of Education

B.A.E. degree—1969—University of Florida, major in Secondary Education

Dr. Rudder is Assistant Professor, Foundations of Education at Auburn University. He has served as a teacher in the Knox County School System, as well as the Knoxville City School System in Knoxville, Tennessee, as a teaching assistant at the University of Florida and in various positions at Auburn. Dr. Rudder has published in the *University Press*, Washington, D.C., and made presentations of a number of articles to various gatherings, all of which more fully appear on his curriculum vitae found in Defendants' Exhibit 5.

APPENDIX G

Russell Kirk, Mecosta, Michigan

B.A. degree, Michigan State, 1940

M.A. degree, Duke University, 1941

D.Litt. degree, St. Andrews University, Scotland, 1952

Dr. Kirk holds an honorary doctors degree from Boston College, St. Johns University, Park College, Lemoyne College, Loyola College, Niagara University, Gannon University, Albion College, Olivet College, Central Michigan University, Pepperdine University, and Grand Valley State College.

Dr. Kirk is a Senior Fellow, American Council of Learned Societies, a Guggenheim Fellow and others.

He has served as Assistant Professor of History of Civilization at Michigan State; Research Professor of Politics, Long Island University; Visiting Distinguished Professor of Politics, History, University of Detroit and others, including Troy State University and has written many books, published many periodicals and served as a contributor to such works as the Encyclopedia of Britannica. See Court's Exhibit 1 for further delineation.

APPENDIX H

Richard A. Baer, Jr., Cornell University, Ithica, New York

Graduate School of Arts and Sciences, Harvard University, 1957—1962 with a Ph.d in 1965

Princeton Theological Seminary, B.D., 1957

University of Tubingen, Germany, 1953–1954, doing graduate study in philosophy

Syracuse University, A.B., 1953, majoring in philosophy

Presently Professor, Department of Natural Resources, New York State College of Agriculture and Life Sciences, Cornell University

Dr. Baer received the Rockefeller Doctoral Fellowship in Religion, the Princeton Theological Seminary Fellowship in the New Testament and a Fulbright Grant for study in Germany in the field of philosophy. He is also a member of Phi Beta Kappa, Syracuse University.

Dr. Baer teaches, consults and speaks quite widely and has written rather prolifically. For further information, see Plaintiffs' Exhibit 1.

### APPENDIX I

William Rodney Coulson, Comptche, California

Dr. Coulson obtained the following degrees:

Ph.D. degree, University of Notre Dame in philosophy

Ed.D. degree, University of California, Berkeley, California in Counseling Psychology

M.A. degree, University of Notre Dame in philosophy

B.A. degree, Arizona State University, majoring in English

Dr. Coulson has been a Research Fellow at the Psychotherapy Research Group, Wisconsin Psychiatric Institute in Clinical Psychology and was a Teaching Fellow in the Department of Philosophy at the University of Notre Dame. He has done post-doctoral work with the Western Behavioral Sciences Institute in LaJolla, California and with the Veterans Administration Hospital in Phoenix, Arizona.

Dr. Coulson holds many honors and has served as a consultant to many institutions, written many papers, and published a number of books, all of which more particularly appear on Plaintiffs' Exhibit 2.

### APPENDIX J

Paul Kurtz, Department of Philosophy, State University of New York, Buffalo, New York

B.A. degree, New York University

M.A. degree, Columbia University

Ph.D degree, Columbia University

Dr. Kurtz has taught at Queens College, Trinity College, Vassar College, Union College, University of Desancon (France) and other schools. He has published books, served on editorial boards and specializes in philosophy. He has appeared on radio and television and has served a moderator of The Humanist Alternative: Ethics in America. For further information, see Defendants' Exhibit 10.

### APPENDIX K

Robert Coles, Concord, Massachusetts

A.B. degree, 1950, Harvard College

M.D. degree, 1954, Columbia University of Physicians and Surgeons

Intern—1954–1955—University of Chicago Clinics

Psychiatric Residency—1955–1965—Mass. General Hospital

Psychiatric Residency—1956–1057—McLean Hospital

Dr. Coles also did residency work at Judge Baker Guidance Center—Childrens Hospital, worked in the Alcoholism Clinic at Mass. General Hospital, was a Teaching Fellow in Psychiatry at Harvard Medical School, was Chief of Neuropsychiatric Service and Wards at Keesler Hospital, United States Air Force, Biloxi, Mississippi, and became a member of the Psychiatric Staff at Harvard Medical School and presently is Professor of Psychiatry and Medical Humanities. He is the Norman Tishman lecturer in psychology and teaches courses at Harvard College, Harvard Medical School, Harvard Law School, Harvard Business School and the Harvard Graduate of Education School.

Dr. Coles' list of honors and activities is long and impressive and the Court refers one to his deposition and the appendix thereto that contains his curriculum vitae, the deposition being Plaintiffs' Exhibit 92.

### APPENDIX L

James Hitchcock, St. Louis, Missouri

A.B. degree—1960—St. Louis University

M.A. degree—1962—Princeton University

Ph.D. degree—1965—Princeton University

Dr. Hitchcock presently serves as Professor of History at St. Louis University. He

holds an Honorary Doctorate from Benedictine College and from the University of Stubenville. He has written articles in a variety of journals and published several books, all of which appear in his curriculum vitae found in Plaintiffs' Exhibit 3.

## APPENDIX M

The Textbooks
These books, with exhibit number and recommended grades, are:

| Home Economics Books | Grades | Plaintiff's Exhibit No. | 1985–86 State Textbook List [1] |
|---|---|---|---|
| Contemporary Living | 8–12 | 61 | p. 134 |
| Homemaking: Skills for Everyday Living | 9–12 | 60 | p. 134 |
| Caring, Deciding, and Growing | 9–12 | 59 | p. 133 |
| Today's Teen | 8–12 | 58 | p. 134 |
| Teen Guide | 8–12 | 56 | p. 135 |

| High School History Books (State Textbook List p. 97) | Grade | Exhibit |
|---|---|---|
| Exploring Our Nation's History | 11 | 47 |
| Rise of the American Nation | 11 | 48 |
| People and Our Country | 11 | 49 |
| These United States | 11 | 50 |
| A History of Our American Republic | 11 | 51 |
| History of a Free People | 11 | 52 |
| Our American Heritage | H.S. | 53 |
| America Is | 11 | 54 |
| The American Dream | 11 | 55 |
| A History of the United States | 11 | 6 def-int. |

| Social Studies Books | Grade | Exhibit |
|---|---|---|
| Rand McNally Series 1980 Editions (State List p. 88) | | |
| You and Me | 1 | 17 |
| Here We Are | 2 | 18 |
| Our Land | 3 | 19 |
| Where On Earth | 4 | 20 |
| Across America | 5 | 21 |
| World Views | 6 | 22 |
| Scott Foresman Series 1979 Editions (p. 88) | | |
| Social Studies | 1 | 23 |
| " " | 2 | 24 |
| " " | 3 | 25 |
| " " | 4 | 26 |
| " " | 5 | 27 |
| " " | 6 | 28 |
| Speck (p. 89, 1981 editions) | | |
| Our Family | 1 | 29 |
| Our Neighbors | 2 | 30 |
| Our Communities | 3 | 31 |
| Our Country Today | 4 | 32 |
| Our Country's History | 5 | 33 |
| Our World Today | 6 | 34 |
| Laidlaw (p. 88, 1981 editions) | | |
| Understanding People | 1 | 35 |
| Understanding Families | 2 | 36 |
| Understanding Communities | 3 | 37 |
| Understanding Regions of the Earth | 4 | 38 |
| Understanding Our Country | 5 | 39 |
| Understanding the World | 6 | 40 |

| Social Studies Books | Grade | Exhibit |
|---|---|---|
| Houghton-Mifflin (pp. 87–88, 1980 editions) | | |
| At Home, At School | 1 | 41 |
| In Our Community | 2 | 42 |
| Ourselves And Others | 3 | 43 |
| Our Home, The Earth | 4 | 44 |
| America: Past And Present | 5 | 45 |
| Around Our World | 6 | 46 |

[1]Plaintiffs' Exhibit Number 119.

## APPENDIX N

## ATTACHMENT A

## EXAMPLES OF ANTI–THEISTIC TEACHING

Plaintiffs' Exhibit 56: *Teen Guide*

Page 20

"Even though you are a special, one-of-a-kind human being, you share certain basic needs with all other people. These needs are psysical, emotional, mental, and social." (T. 548, 667, Dr. Coulson; RC 68, 69) * **religious? spiritual?**

Page 21

"Do you know the saying, '**Man cannot live by bread alone**'? ** This means that if people are to find life rewarding, their whole beings must be nourished, not just their stomachs." (T. 668, Dr. Coulson) **source of quote?**

Page 62

"Nothing was 'meant to be'. **You *** are the designer of your life.** If you want something, you can plan and work for it. Nothing is easy. But nothing is impossible, either. When you recognize that **you are the one in charge of your life,** you will be way ahead of where you would be if you think of your life as something that just happens to you." (T. 663, 665, Dr. Coulson; RC 53)

Page 103

"However, some very quiet people have grown up in active, noisy homes. And not every football player had active, noisy homes. Somewhere within their environment, people sometimes find something to lead them in a special direction all their own. Each person is, therefore, a complicated blend of heridity and environment. And while you may seem like a 'chip off the old block' in the beginning, **you will become someone special as you grow.**" (T. 669, Dr. Coulson; RC 8; Depo. Dr. Rbt. Coles, Pl.Ex. 92 at 66–69)

**Plaintiffs' Exhibit 58: Today's Teen**

Page 12

"Thus it is important to care for yourself. You are the most important person in your life." (RC 12) **God? others?**

Page 18

"There are at least three types of maturity. They are: Emotional maturity. Physical maturity. Mental maturity." (RC 68) **spiritual?**

Page 22

"It takes time and experience for people to arrive at the beliefs best for their life." (T. 505; Dr. Coulson)

Page 23

"**Too strict a conscience** may make you afraid to try new ventures and meet new people. It may make you feel different and unpopular. **None of these**

* Key to Abbreviations follows Attachment D.

** Boldface represents material particularly objectionable to Plaintiff's expert witnesses.

*** Boldface, underlined represents material that was italicized in original text.

feelings belongs to a **healthy personality.**" (T. 1264, Dr. Coulson)

"You can learn about yourself when you listen to your conscience. It is **you talking to yourself,** guiding you." (T. 505; Dr. Coulson)

Page 78–84

"DEVELOPMENT OF THE INFANT AND THE YOUNG CHILD, (1) Psysical Development. (2) Intellectual Development. (3) Emotional Development. (4) Moral Development (5) Personality Development (RB–TT 12) **spiritual?**

**Plaintiff's Exhibit 59: Caring, Deciding, and Growing**

Page 5

"... we can **direct our own lives** instead of letting others do the directing for us. Each of us can become the kind of person we want to be." (RST 2)

Page 27

"Specialists in human development classify growth or development as physical, social, emotional, and intellectual." (RB–CDG 15; RC 68) **spiritual?**

Page 119

"**Think positively about yourself.** You may be tired of hearing this suggestion." (RC 54)

Page 140

"Professional help includes psychologists, psychiatrists, social workers, counselors, and others who are trained in helping people deal with small and large problems." (RB–CDG 16) **ministers? rabbis? priests?**

**Plaintiffs' Exhibit 60: Homemaking Skills For Everyday Living**

Page 22

"People grow and mature in six different ways: Chronologically, physically, intellectually, emotionally, socially and philosophically." (RB–HS 7; RC 69) **spiritually?**

**Plaintiffs' Exhibit 61: Contemporary Living**

Page 9

"Once you are familiar with the many aspects of your personality, you will be able to answer the important questions, 'Who am I?' and 'How do I deal with who I am?'" (T. 2393, Verdene Ryder) **Who is God?**

Page 19

"According to Maslow, phsical needs have firs priority," (RB–CL 7) spiritual?

Page 20

"Self-actualization is the highest level of human need." (CL–HS 6; RC 68) **others? pleasing God?**

Page 22–23

"**Personality Test** Rate yourself on each of the following 20 traits using a scale of 1 to 10. (A score of 1 is the lowest and least desirable. A score of 10 is the highest and most desirable.) When you have finished, total the scores and divide by 20. This will give you the average score. Ask four other people to evaluate your personality in the same way. Each time, total the scores and find the average. Then compare the five average scores." (T. 2290, Patricia C. Jones) **therapy as a cultic exercise?**

Page 52–53

"When students are asked the question, 'Do you think people need religion?' over half of them say people do need religion in their lives. Given a chance to define religion in any way they choose, these students said they were either currently religious or would probably be religious in the future." (RST 44)

"Religious choices could be a factor in your environment. If you choose religious values, you will be influenced by them throughout your life.

"Religion offers psychological security which can be helpful in your life. It also broadens the dimensions of your faith in yourself and in others." (T. 2260–2261, Patricial C. Jones; RB–CL 8; RST 44)

"People who are religious often have greater abilities to handle crisis in their lives. Trust, security, tolerance and humbleness are often more obvious in individuals who profess a faith.

"The importance religion plays in your life is one of the most personal elements in your environment. Many teens still

cling to the religious beliefs which were founded in their childhood. Some teens feel less strongly about religion than they did as children. On the other hand, some people who did not have early childhood training in religion begin investigating religious expressions and beliefs during their teenage years." (RST 44; RB–CL 8)

Page 73

"People who have strong prejudices are called **bigots**. (RB–CL 9)

" "Bigots are devoted to their own church, party or belief and will not consider the right of others to have varying opinions." (T. 2260, Patricia C. Jones; RB–CL 9; RST 45)

Page 76

"2. Growth may be measured in six ways: chronologically, physically, intellectually, emotionally, socially and philosophically." (T. 716, Dr. Coulson; RC 68) **spiritually? religiously?**

Page 141

"If a **theist** (one who believes a god exists) marries an **atheist** (one who denies the existence of a god), they may have some adjustment problems." (RB–CL 11)

Page 329

"Do not say, 'God took Daddy away because He wants Daddy to be with Him in heaven.' Not only is this confusing, but it **causes the child to fear and hate God** for taking the father away." (T. 2408, 2419, Verdene Ryder)

"The simplest way to talk to a child about death is to **talk about how flowers and pets die.** If you explain that death is a normal part of life, the child will be able to accept it." (T. 2412, 2437, Verdene Ryder)

Page 331

"8. Death is a part of the human life cycle and must be accepted as a reality of life." (T. 2418, Verdene Ryder)

**Plaintiffs' Exhibit 62: Person To Person**

"When Gary Simon was growing up, his father used to tell him that it was a sin against God to tell a lie. **Today,**

Gary works to teach his own son Mark honesty. However, **he does not tell his son that God will punish him for lying.** Instead, he explains to Mark that people will not believe in him or trust him unless he tells the truth." (T. 1271, Dr. Coulson)

Page 298

"**FREQUENCY OF DIVORCE** One hundred years ago, there was one divorce for every thirty-four marriages. Divorce was considered a sin against God. Many people thought it **immoral** and an indication of a weak or poor character." (RB–PP 13)

ATTACHMENT B

SUBJECTIVE AND PERSONAL VALUES WITHOUT AN EXTERNAL STANDARD OF RIGHT AND WRONG

**Plaintiffs' Exhibit 58: Today's Teen**

Page 12

"**You are the most important person in your life.**" (T. 671; RC 7, Dr. Coulson; RB–TT 1, Dr. Baer)

Page 17

"The person you want to be-your ideal self-behaves and looks according to what you **feel** is important." (RB–TT 2; RST 6)

Page 21

"A conscience is a set of guidelines or beliefs which help you to tell the difference between right and wrong. Part of the process of discovering yourself is the development of your own beliefs. Of course, in most cases you will still accept the ones of your family.

"As you mature, you discover that **right and wrong are not well defined** as they were when you were a child. You didn't steal because you knew it was wrong. You learned it was **wrong because adults told you so.** In adolescence you begin to find that many issues are not that definite. **What is right and wrong seems to depend more upon your own judgment than on what someone tells you to do.** Of course,

laws must be obeyed. **But beyond the law, you must decide on your actions.**

"When teenagers begin to go against some of the beliefs of their parents, there may be conflicts. Although you are acting in agreement with your own conscience, you may still feel guilty at times. For instance, you might have decided there is **nothing wrong with using your brother's motorcycle without asking.** However, you still might feel guilty because as a **child,** you were taught not to use other people's property without their permission." (T. 679–680, 699 Dr. Coulson; Depo. Dr. Rbt. Coles, Pl.Ex. 92 at 65–66, 83–87; RC 11, 37)

"What is **right and wrong seems to depend more upon your own judgment than on what someone tells you to do.**" (T. 505, Dr. Coulson; RC 11; RB–TT 2, 4; RST 10)

Page 22

"It takes time and experience for people to arrive at the beliefs best for for their life." (T. 505, Dr. Coulson; RC 11; Depo. Dr. Rbt. Coles, Pl.Ex. 92 at 65)

"What happens if you continue acting against your conscience? At the moment, you may be able to push away your guilt. However, **you may end up losing respect for yourself for yourself.** Have you ever looked back at something you did the day before and wondered why you behaved like that?

On the **other hand** teenagers should not judge themselves too harshly. Remember that **adolescence is a time of trial and error.** You are likely to make mistakes. That is a part of learning. **Too strict a conscience may make you afraid** to try new ventures and meet new people. It may make you feel different and unpopular. **None of these feelings belongs to a healthy personality.**

You can learn about yourself when you listen to your **conscience.** It is **you talking to yourself,** guiding you. It is the part of you that is concerned with **your own goodness.**" (T. 681–683, Dr. Coulson)

Page 23

"Remember that adolescence is a time of trial and error. You are likely to make mistakes. That is a part of learning. **Too strict a conscience may make you afraid to try new ventures and meet new people.** It may make you feel different and unpopular. **None of these feelings belongs to a healthy personality.**" (T. 587, 1264, Dr. Coulson; RC 11)

Page 25

"There are two purposes to this chapter. One is to identify your own values," (RB–TT 6)

Page 26

"When you were very young, you probably **accepted all of your family's values without question.** As people grow, see more of life, and learn to think on their own, they may **choose other values.** However, changing a set of values may bring conflict to your life. For example, you may decide that the ideals your friends have will not make you happy. Someday you may be faced with putting your ideals before theirs. **Only you can judge your own values.** (T. 675, Dr. Coulson; RST 2; RC 37, 44; RB–TT 6; Depo. Dr. Rbt. Coles, Pl.Ex. 92 at 83–87)

"Design a bulletin board showing **conflicting values** which young people and their parents hold. (T. 675, Dr. Coulson)

Page 29

"Values and goals influence <u>what</u> you do. Another type of decision you make every day concerns <u>how</u> you do something. How carefully you do your homework, how often you clean your room, how high you let the grass grow before cutting it-all these decisions depend upon your standards.

"**A standard is a mental picture of how something should be. It is a measure of what is acceptable to you.** Making a grade of C may be all right for one student but not for another. Eating toast and coffee may meet the standards for breakfast for one family. Others prefer a more nutritious breakfast, in-

cluding cereal and eggs." (T. 691, Dr. Coulson; RB–TT 7)

Page 30

"**Standards** are a **personal** decision and will **vary** with **each person.**" (T. 690, Dr. Coulson; RB–TT 7; RC 20)

Page 34

"**Decisions** which are part of most people's lives include problems such as: To drink alcohol or not. To tell the **truth.** To **drive beyond the speed limit.** To study." (RC 52; Depo. Dr. Rbt. Coles, Pl.Ex. 92 at 82–87)

Page 35

"Different decisions occur because people have their own goals and values. They want different outcomes. Often, there is **not one right answer.** Getting advice from elders or friends who have been in the same situation is helpful. However, remember, **in the end it is you who must choose.**" (RB–TT 35)

Page 67

"The best way to know if you can get along with someone and if you are in love is through **personal experience.** Dating can help give you experience in knowing the kind of person you would like to spend the rest of your life with." (RB–TT 11)

Page 68

"People's personalities also change. However, nothing can guarantee that two people will mature in the same direction. The goals and desires of a married couple may become so different that they cannot live together anymore." (RB–TT 11)

Page 80

"As you mature, you gain the privilege and responsibility of making more of your own decisions. You may remember times in your childhood when your parents did not allow you to make decisions. They felt you were not old enough to make the right choices. At that time, you wished you could have your own way.

"Now that you are older, you have more chances to have your own way. You make more of your own decisions. Within the next five or six years, you will have to make some of the most important decisions of your life. Some of these decisions will be difficult to make. But they <u>are</u> your decisions. And you <u>will</u> have to live with the **consequences** of the decisions you make. Therefore, you should learn all you can about the process of making good decisions." (T. 2323, Verdene Ryder)

Page 82

"**Morals are rules made by people.**" (T. 505, Dr. Coulson; RC 11, 23, 37; RB–TT 8; Depo. Dr. Rbt. Coles, Pl.Ex. 92 at 64, 83–87)

"Children learn morals mainly in the home. Of course, **moral standards vary** in different families. Children also learn morals in school, at places of worship, and from friends." (T. 608, Dr. Coulson; RC 11, RC 23, RB–TT 8)

"Teach children that the world will react in a certain way to their actions. Some behaviors will be followed by disapproval and punishment. Others will be followed by praise." (T. 695, Dr. Coulson)

**Plaintiff's Exhibit 59: <u>Caring, Deciding, and Growing</u>**

Page 4

"Self-acceptance and self-knowledge are basic to appreciating the uniqueness of others rather than feeling threatened by it." (RST 6)

Page 18

"**Values are what we prize in life.** They are what we consider most important to us. They help make up the self and affect our self-concept. Our values usually are based on ideas or feelings about conditions." (RB–CDG 11)

Page 19

"**Values are expressed in strong feelings.** Our values are very closely related to our emotions." (RB–CDG 11)

Page 20

"**Values can change.** Since values result from learning and from our experiences and relationships with others, they

may change as we get older." (RB–CDG 11)

"A major influence has been the attitudes and behaviors of each of your parents or guardians as male and female." (RB–CDG 11)

"You probably have learned some fairly traditional ideas about sex roles." (RB–CDG 11)

"You may not agree with these ideas about what males should or should not do. Many people believe that these traditional attitudes hinder growth and development of a person because they limit possibilities." (RB–CDG 11)

Page 12

"**Your ideas** about sex roles are related to **your values** and **your self-concept.**" (RB–CDG 11)

"You will also not hesitate to follow **your dream** if it happens to fit into the more traditional mold. In other words, you think well of yourself and value **your individuality.**" (RB–CDG 11)

Page 67

"People of all races and cultural backgrounds should be shown as having high ideals and goals." (RB–CDG 12)

Page 120

"People with positive self-concepts try to accept differences readily and appreciate others for what they are and stand for." (RB–CDG 11)

"They can understand and accept that what is right for one person is not necessarily right for another." (RB–CDG 11)

**Plaintiffs' Exhibit 60: Homemaking Skills For Everyday Living**

Page 14

"Values are ideals and objects that you think are important and desirable. Most people value honesty, friendship, freedom, happiness, popularity, health, education, nice clothes, new cars and money. The values you have affect your behavior. Consciously or unconsciously, they guide the decisions you make every day. If you value creativity, you might prefer to spend an evening sketching rather than watching TV. If you value adventure, you would probably choose exciting hobbies." (RB–HS 4)

"The values you have were not given to you at birth. You have developed them **on your own.** All of the experiences you have had throughout your life have contributed to your set of values. Your future experiences will also affect your values. Some of your values will become less important. **Your set of values will never be finalized.** Your values change as you change." (RB–HS 5)

Page 16

"When you make a value judgment, you assign a value to a certain thing or action." (RC 18)

"**Values are personal and subjective. They vary from person to person.** You will be able to understand and get along with other people better if you keep an open mind about the value judgments they make. (RB–HS 1; RST 2; RC 18)

"Understanding your own values will help you to set **satisfying goals.**" (RST 5, 15)

Page 18

"The second step is to consider your personal values. Determine what ideas and objects are most desirable to you. Make a list of your most important personal values." (RB–HS 1; RST 5)

"The key to success in setting and achieving goals is knowing yourself, what you want and how to get it." (RST 6)

Page 19

"People's standards are related to their values and goals." (RB–HS 8)

"Knowing your own standards and what you expect from life can help you understand yourself more fully." (RB–HS 8)

Page 21

"Some authorities on human behavior would like to delete the words "success" and "failure" from our language. They think these words create unfair standards which are set **for** a person rather than reasonable standards which are set **by** a person." (RST 4)

Page 26

"As you can see, the steps in decision-making can be applied to something as simple as buying a **new pair of shoes.** They can also be applied to more complex decisions such as those which involve **religious preferences;** education and career choices; the use of alcohol, tobacco and drugs; and **sexual habits.**" (T. 545, Dr. Coulson; RC 13)

Page 80

"Each person is free to choose his or her lifestyle. With this freedom comes responsibility. You are responsible for your own life." (RC 37, 43; Depo. Dr. Rbt. Coles, Pl.Ex. 92 at 83–87)

"You must know **yourself** well enough to do what is right for you, rather than just doing what 'everyone else' is doing." (RC 43; RB–HS 8)

Page 84

"In today's families, members share responsibilities, including decision-making." (T. 2042–2043, Glennell Halpin)

"Sharing values and goals Families share values both directly and indirectly. The direct method is often used by parents. They teach their children what is good or bad and what is right or wrong." (T. 2042, Glennelle Halpin)

"The indirect method of sharing values is described by the old saying, "Values are caught more than taught." (T. 2043, Glennelle Halpin)

"Its fine to acquire values from family members, but people need to learn how to develop their own values too." (T. 2043, Glennelle Halpin)

Page 89

"WHAT LIFE–STYLE IS RIGHT FOR ME? What aspects of this lifestyle appeal to me? Why?" (RB–HS 8, 9)

"Divorce is becoming more common in our society. Many couples are deciding that they have problems and differences they cannot resolve. They believe they would be happier living apart, so they divorce.

"The increased number of divorces is accompanied by a change in public atti-tude. In the past, divorced persons were considered failures and social misfits. Today, society does not look down upon divorced persons. Divorce is viewed as a misfortune that can happen to anyone. Divorce is considered an acceptable way of solving a problem." (RB–HS 12)

**Plaintiffs' Exhibits 61: Contemporary Living**

Page 12

"The fifth stage occurs during adolescence. The central need of this period is to establish a sense of identity. For success in this stage, adolescents need to be guided by good models and inspired by high ideals." (T. 2435, Verdene Ryder)

"Through the process of trial and error, adolescents find a stable role to assume in our society." (T. 2394, Verdene Ryder)

Page 16

"This task is to acquire a set of values as a guide to behavior." (T. 2395, Verdene Ryder)

"You must decide for yourself what role you wish to adopt." (T. 709, Dr. Coulson; RC 43)

"You become free from your childish dependence on your parents." (RB–CL 5)

Page 18

"Then when you are faced with a difficult decision, you will be able to rely upon your values. They will help you choose the alternative that will give you the most satisfaction in life." (RST 6)

"As an adolescent, you need to learn how society expects responsible people to act. You can incorporate this knowledge into your personal behavior pattern. Society will then accept you, and you will be able to participate in the functions of your community, state and country." (RST 8)

Page 37

"But if a woman is already pregnant and has a reason to think the baby may be born with a hereditary defect, she may have an **amniocentesis.** This is a surgical process in which some of the amniotic fluid surrounding the develop-

ing fetus is tested for chromosomal abnormality." (RC 70)

Page 48

"**Peer influence during adolescence** Parents and peers may be contradictory forces during adolescence. In your search for identity, you may find yourself faced with the decision of which group to follow more closely. If you align yourself too strongly with your peers, you might face conflict with your parents. On the other hand, if you follow the guidance of your parents, you might risk criticism of your peers. **The best approach is to try to combine family and peer influences** as you shape your personality and establish your identity." (T. 2398–2399 Verdene Ryder)

Page 49

"You may find that you have to tolerate differences in your peers as you learn to choose your own values because they are right for you." (RST 10; RB–CL 1)

Page 50

"Learn to make your own value choices." (RB–CL 1)

"Your choices should be your own." (RB–CL 1; RST 2)

Page 52

"If you **develop** religious values, ..." (RB–CL 1)

Page 75

"If you decide to accept the demanding role of mother or father, you will face many value choices. And you will be responsible for helping your children form **worthwhile values** for their lives." (T. 2373, Verdene Ryder; RB–CL 2)

"Aging and death are other realities that are easier to face when you have a **dependable value system.**" (RB–CL 2)

"If you can make the right value judgements for your life, you will be able to meet your responsibilities to yourself and your family. If you can develop effective valuing processes, you will be able to handle your own problems as they arise." (T. 2373, Verdene Ryder; RB–CL 2)

"If the value judgments you make are in line with your commitments and responsibilities, they are a true reflection of your personality. If this is the case, you will be able to rely on your value judgments to help you make decisions which will be **right for you.**" (RB–CL 2)

"Some persons cannot set up a dependable value system for themselves. These persons often exhibit inconsistency, overconformity or constant rebellion because they have no self-confidence. They hide their true personalities behind invisible masks and play roles inconsistent with their values and goals. They often become dependent upon family members or social institutions to guide them." (RST 3)

Page 82

"You need to form your own attitudes about alcohol. Your attitudes may differ from those of your friends, but the important thing is that **you must make your own decision.**" (T 533, Dr. Coulson; T. 2255, Corinne Howell; T. 2387, Verdene Ryder; RB–CL 3)

Page 91

"While **smoking is a matter of individual choice,** most authorities now agree that it is preferable never to smoke." (T. 706, Dr. Coulson; RC 26)

Page 92

"The best defense against drug abuse is to develop the ability to make good decisions. If you investigate all available information and follow the five steps in problem solving, you have a better chance to make good decisions." (RST 92)

Page 93

"When you buy drugs illegally, you gamble on what you are getting and on how they will affect you." (T. 534, Dr. Coulson)

Page 94

"**Legal status of marijuana.** You should consider the legal consequences of using marijuana before making a decision about using it. A police record may affect your ability to find a job, to obtain a driver's license, to seek military service

and to take advantage of other opportunities." (RST 40)

Page 95

"You will face many decisions throughout your life. You will have to accept the responsibility of making these decisions. You will not always be able to say, 'They talked me into it,' or 'I couldn't help myself.' You will have to evaluate each situation and make a rational decision." (T. 2376, 2388, Verdene Ryder; RB–CL 4)

Page 96

"What can stop this spread of cheating? The foundation for integrity has to come from **within a person.**" (T. 2389, Verdene Ryder; RB–CL 4)

"Pride and self-respect will prevent a person from cheating. Common sense is also a factor. If you are not prepared for a test, the best way to use your time is to review the material rather than to devise 'cheat notes'. Even if you did cheat, would the result be worth risking your reputation? How does a good score on a test compare will all you have to lose? Could you live with yourself, or would your conscience bother you?" (RST 42)

Page 97

"Shoplifting is a crime. Legal action can be taken against shoplifters. Legal statutes exist in every city, county, and state to control this crime." (T. 2336, Verdene Ryder; RST 42)

"You may feel shoplifting does not concern you. But sometime you may be tempted or you may have a friend who is tempted to shoplift and asks your advice. Someday you may be an employee of a business and have the opportunity to steal merchandise. Or you may be an employer who has to deal with employees and customers who shoplift." (RST 42)

"Whatever your situation, remember that good behavior enchances your well-being. Bad behavior can cause guilt feelings and other mental problems. **You will have to make your own deci-**

sions and live with the consequences." (T. 2253, Corrine Howell, RST 2, 42)

Page 110–111

**"COMMUNICATION THEORIES OF TRANSACTIONAL ANALYSIS** If two people encounter each other, sooner or later one of them will speak or acknowledge the presence of the other. The study of this stimulus and the response of the other person is called **transactional analysis** (T.A.)

"It is based on the assumption that all persons can learn to trust themselves, think for themselves, make their own decisions and express their feelings. The theory contends that each person has three ego states which are distinct sources of behavior: 1. The Parent ego state. 2. The Adult ego state. 3. The Child ego state." (RC 46)

Page 128

"As a result of a 1973 Supreme Court ruling, abortions are legal. This ruling changed the question of abortion from a legal one to a medical one." (T. 2340, Verdene Ryder; RB–CL 10)

"Today the issue of abortion is one which a woman must settle in her own mind. Any decision to use abortion as a method of ending pregnancy will have to be based on the woman's health, attitudes and religious beliefs as well as the attitudes of her partner." (T. 2340, Verdene Ryder)

**Plaintiffs' Exhibit 62: Person To Person**

Page 63

"Values define something of worth which you prize and believe to be beneficial or good." (RB–PP 3)

Page 67

"The things that you **wish** for indicate what you value." (RB–PP 4)

Page 73

"If it has been imposed by someone else, it may guide your actions only when that person is watching." (RB–PP 5)

Page 96

"Making a choice about drug use should reflect the values that are important to you. Will your choice bring you

 **satisfaction** and growth? Will it help you become the best person you can be?" (RB–PP 9)

Page 97

"Through all the steps in the decision-making process runs the theme, 'What is important to you?' The taking of drugs is a very controversial area because people hold such **different values** about drugs." (RB–PP 9)

Page 104

"**MAKING YOUR CHOICE** Making a decision about your sexual behavior before marriage is not easy. It involves your values-what you feel is most important about sex." (RB–PP 9)

Page 141

"In addition, some people think that certain emotions are better than others. Love is better than hate, happiness is better than sadness, and joy is better than anger. Therefore these people deny that they feel the 'bad' emotions. **"There is nothing basically good or bad about any emotion."** (RB–PP 11)

Page 242

"There are four aspects of conjugal love. These are attraction, empathy, companionship, and concern." (RB–PP 12)

Page 300

"**ATTITUDES TOWARD DIVORCE** Divorce is basically a neutral event." (RB–PP 14)

Page 302–303

"Using masking tape, make a line about 9 meters (10 yards) long on your classroom floor.

"Imagine that the line represents all the possible values about divorce. On one end of the line place a sign that says 'Steadfast Stacy-I would never get a divorce, no matter what the circumstances.' At the opposite end of the line, place a sign that says, 'Many-marriage Martin-I sue for divorce after the first fight.'

"On an index card, briefly describe your position on divorce. Tell what circumstances would lead you to divorce. Then, find a place on the line which you feel represents your position." (RB–PP 14)

Page 305

"No-fault divorce is considered an easy fairly conflict-free method of divorce. 'I couldn't believe how simple our divorce was,' says Barbara. 'We had some friends who got divorced several years ago before no-fault was allowed in our state. Their divorce was terrible. They fought over everything. They ended up hating each other, which was very hard on their children. In contrast, our no-fault divorce was very peaceful." (RB–PP 14)

ATTACHMENT C

HEDONISTIC, PLEASURE, NEED–SATISFACTION MOTIVATION

**Plaintiffs' Exhibit 58: Today's Teen**

Page 15

"However, you probably do not feel this way anymore. In adolescence, people begin defining the world for themselves-in their own way. They no longer want to be a unique person. They want to discover life and themselves on their own." (RB–TT 1)

Page 19

" 'No, I won't date you because you want me to. I will date you because **I want to.**' " (RB–TT 3)

Page 30

"Resources which have to do with people are called human resources." (RB–TT 9)

Page 35

"Different decisions occur because people have their own goals and values. They **want** different outcomes. Often, there is not one right answer. Getting advise from elders or friends who have been in the same situation is helpful. However, remember, in the end it is you who must choose." (RB–TT 1)

**Plaintiffs' Exhibit 60: Homemaking Skills For Everyday Living**

Page 39

"In thinking about a career, there are several other points to consider. They are: What you **like** to do. What you can do. What jobs will be available." (RB–TT 9) **family**?

Page 12

"People have two different types of environments: **psychological environment** and **physical environment.** Your psychological environment is composed of attitudes expressed by people around you. In other words, the feelings and beliefs of your family members, teachers, classmates and friends determine your psychological environment."

"**HUMAN NEEDS** All humans share certain needs. These needs cause people to behave as they do. Most behaviors are attempts to either satisfy a need or to remove something that is not needed.

"Abraham Maslow, a famous psychologist, ranked human needs in order of priority. (RC 58; Deposition of Dr. Robert Coles, Plaintiffs' Exhibit 92 at 92–94)

Page 14

"**Self-actualization** is the highest level in Maslow's ranking of human needs." (RB–HS 7)

Page 16

"Understanding your own values will help you set **satisfying** goals." (RST–15)

Page 107

"Divorce is becoming more common in our society. Many couples are deciding that they have problems and differences they cannot resolve. They believe they would be **happier** living apart, so they get a divorce.

"The increased number of divorces is accompanied by a change in public attitude. In the past, divorced persons were considered failures and social misfits. Today, society does not look down upon divorced persons. Divorce is viewed as a misfortune that can happen to anyone. Divorce is considered an acceptable way of solving a problem." (RB–HS 12, 13)

Page 92

"People date to have **fun**." (RB–HS 12)

**Plaintiffs' Exhibit 61: Contempory Living**

Page 18

"They will help you choose the alternative that will give you the most **satisfaction.**" (RB–CL 6)

Page 20

"**Self-actualization** is the highest level of human need." (T. 2396, Verdene Ryder; RC 8; Deposition of Robert Coles, Plaintiffs' Ex. 92 at 113–115)

Page 91

"While smoking is a matter of individual choice, most authorities now agree that it is preferable never to smoke." (T. 707, Dr. Coulson; RC 26)

Page 124–125

"Apart from marriage, the experience of sex is not the complete, satisfying act that it is meant to be." (RB–CL 9)

"The security of marriage allows freer expression of love. Thus sexual experiences between spouses are usually more satisfying." (RB–CL 9)

Page 133

"The major reason for dating is to have fun." (RB–CL 11)

"You will have to make your own decisions and live with the **consequences.**" (T. 2425, Verdene Ryder)

**Plaintiffs' Exhibit 62: Person To Person**

Page 96

"Making a choice about drug use should reflect the values that are important to you. Will your choice bring you satisfaction and growth? Will it help you become the best person you can be?" (RB–PP 9)

Page 99

"**ABSTINENCE Abstinence** means that the partners do not have intercourse before marriage. Abstinence is the standard which American society tries to uphold and which most religious groups support. Most parents and teachers en-

courage teenagers to abstain from intercourse.

"Not having intercourse does not mean that there is no sexual behavior at all. **Most** teenagers who do not have intercourse still have **some form of sex play.** Jake and Wilma do not have intercourse with each other. However, they enjoy kissing and stroking each others' bodies." (T. 1269, Dr. Coulson)

Page 104

"Making a decision about your sexual behavior before marriage is not easy. It involves your values-what you feel is important about sex." (RB–PP 9)

Page 111

"**PURPOSES OF RELATIONSHIPS** People use their relationships for many purposes or goals. Your special needs will determine which purposes are most important as you build relationships." (RB–PP 5)

Page 274

"Instead of providing an atmosphere of growth for both partners, marriage may come to seem like a cage." (RB–PP 13)

Page 299

"Marriage and family life have become so important a source of emotional satisfaction that few people put up with a marriage that does not provide it." (RB–PP 6)

ATTACHMENT D

ANTI–PARENTAL,
ANTI–FAMILY VALUES

**Plaintiffs' Exhibit 56: Teen Guide**

Page 107

"**Parents** do all these things. Yet they are far more than just payers and fixers. **They are people,** too, **very much like you.**" (T. 666; RC 21)

**Plaintiffs' Exhibit 58: Today's Teen**

Page 26

"Most parents want their children to have the same values that they do." (T. 517, Dr. Coulson; RC 8)

"Design a bulletin board showing conflicting values which young people and their parents hold." (T. 517, Dr. Coulson; RC 8; Depo. Dr. Rbt. Coles, Pl.Ex. 92 at 61–69)

"When you were very young, you probably accepted all your family's values without question. As people grow, see more of life, and learn to think on their own, they may choose other values. However, changing a set of values may bring conflict to your life. For example, you may decide that the ideals your friends have will not make you happy. Someday you may be faced with putting your ideals before theirs. Only you can judge your own values." (T. 517, 675, Dr. Coulson; RC 26; T. 2045, Dr. Halpin)

Page 29

"Values and goals influence **what** you do. Another type of decision you make every day concerns **how** you do something. How carefully you do your homework, how often you clean your room, how high you let the grass grow before cutting it-all these decisions depend upon your standards.

"A standard is mental picture of how something should be. It is a measure of what is acceptable to you. Making a grade of C may be all right for one student but not for another. Eating toast and coffee may meet the standards for breakfast for one family. Others prefer a more nutritious breakfast, including cereal or eggs." (T. 692, Coulson)

Page 55

"Generally speaking, a family is a group of people who live together in one house." (RB–TT 10)

Page 57

"A single man or woman who sets up a household can also be called a family." (RB–TT 10)

Page 58

"Who is the 'head' of the family? Who has the most to say about rearing the children? There is no one answer to these questions today." (RB–TT 10)

Page 59

"The roles of children in the family are changing as well. For example, **a trend in family living is the democratic family.** In democratic families, every member has a voice in 'running the family'. Parents and teenagers often decide together about issues such as curfew, study time, chores, allowances, and use of the car." (T. 687, Dr. Coulson)

Page 60

"Right now, you probably have mixed feelings about your parents or guardians. Sometimes you like them. Other times you may not. Chances are that your friends often feel the same about their parents." (T. 687, Dr. Coulson)

"For example, the way your parents were treated as teenagers will probably affect how they treat you now. They may try to protect you from problems they had as children and young adults." (T 687, Dr. Coulson)

"Your parents face a whole new set of decisions. How much freedom should they allow you? .... There seem to be more questions than answers." (T. 687–688, Dr. Coulson)

"Here are some guidelines that can help you to create more harmony in your home:

"Be more dependable. Keep your promises. If you promised to mow the lawn, make certain you do it.

"Be honest. No one likes to be lied to.

"Let your parents know where you are going. People who care for you want to know where you can be found if an emergency should come up.

"Let your parents know you like them. Everyone needs to know this at some time or another. Knowing that your children like you can make parenthood more pleasant.

"Be thoughtful and considerate. Think about your parents needs. Compliment them and thank them when they help you.

"Help your parents to understand you." (T. 688, Dr. Coulson; RC 18; RB–TT 10)

Page 68

"People's personalities also change. However, nothing can guarantee that two people will mature in the same direction. The goals and desires of a married couple may become so different that they cannot live together anymore." (RB–TT 11)

Page 88

"Very few people are taught how to be good parents. Thus classes for parents are provided at some centers. They help parents learn effective ways to rear their children. Soon, certified centers may require parents to take part in the activities center." (T. 2523, Joan Kendall)

**Plaintiffs' Exhibit 59: Caring, Deciding, and Growing**

Page 20

"You have probably learned some fairly traditional ideas about sex roles." (RST 5; RC 43)

"A major influence has been the attitudes and behaviors of your parents ..." (RC 43)

"You may not agree with these ideas about what males and females should or should not do. Many people believe that these **traditional attitudes hinder growth and development** of a person because they limit possibilities." (RC 43)

Page 74

"The need for developing a strong identity separate from the family is part of the growth toward adulthood. Sometimes this causes conflict." (RC 24)

Page 75

"Just as you make mistakes, so do they. They are only human." (T. 658, RC 21)

**Plaintiffs' Exhibit 60: Homemaking Skills For Everyday Living**

Page 82

"The American Home Economics Association (AHEA) defines the family unit as 'two or more persons who share resources, share goals, and have a commitment to one another over time.' This definition emphasizes the functions of

 family members rather than the structure of family units." (RB–HS 9)

Page 84 .

"Sharing responsibility for decisions is a rather new function for family units. In the past, families were often like dictatorships. One person, or two at most, made all the decisions. The other family members were expected to conform." (T. 2042–2043, Glennelle Halpin)

"In the past, families were often like dictatorships. One person, or two at most make all the decisions. The other family members were expected to conform. In today's families, members share responsibilities, including decision-making." (T. 1268, Glennelle Halpin; T. 512, Dr. Coulson; RC 8; Depo. Dr. Rbt. Coles, Pl.Ex. 92 at 66–69)

"There is no typical American family." (RC 17)

Page 87

"**One-parent families** The number of **one-parent families** in the United States is growing. In this family structure, an adult lives with one or more children. The adult may be widowed, separated, divorced or never married.

"A few adults plan this family structure. They do not want to marry, but they want to experience parenthood. So they adopt one or more children.

"The large majority of one-parent families are not planned. They are the result of circumstances. This does not mean, however, that they are inferior. The one-parent family can perform the family functions." (RB–HS 10)

Page 88

"It can perform all the family functions. It is no better or worse than any other family structure; it is just different." (RB–HS 11)

Page 111

"The primary goal of parenthood could be stated this way: 'To help children grow and become mature, independent individuals who can make their own decisions and accept responsibility for their actions.'" (RB–HS 13)

Page 124

"**Teaching independence and responsibility** The primary goal of caregivers is to help children grow and become independent individuals who can make their own decisions and accept responsibility for their actions." (RB–HS 13)

**Plaintiffs' Exhibit 61: Contemporary Living**

Page 16

"You must decide for yourself what role to adopt." (T. 709, Dr. Coulson; RC 43)

"**Task four.** When you fulfill this task, you achieve emotional independence of parents and other adults. You become free from your childish dependence on your parents. You develop a new type of affection for your parents on a more adult level. Likewise, you develop respect for other adults without depending upon them." (T. 2327, Verdene Ryder; RB–CL 6, RST 3)

Page 42

"These basic family functions will continue to change as economic and social pressures change.

"As family functions change, family forms or structures change accordingly." (RC 17)

Page 48

"**Peer influence during adolescence** Parents and peers may be contradictory forces during adolescence. In your search for identity, you may find yourself faced with the decision of which group to follow more closely. If you align yourself too strongly with your peers, you might face conflict with your parents. On the other hand, if you follow the guidance of your parents, you might risk criticism of your peers." (T. 2378, Verdene Ryder)

"**The best approach is to try to combine family and peer influences** as you shape your personality and establish your identity." (T. 2249, Corrinne Howell; T. 2378, Verdene Ryder; RB–CL 7)

Page 103

"Parents often enter parenthood with very little understanding of what is required to develop and maintain good relationships with children and youth. To

make the problem worse, attitudes are changing quickly in today's fast-paced world." (T. 516, Dr. Coulson; RC 8, 17; Depo. Dr. Rbt. Coles, Pl.Ex. 92 at 66–69)

Page 143

"Marriage relationships have changed over the years, but marriage is still the choice of most Americans." (RC 17)

Key to Abbreviations of the Reports of Plaintiffs' Expert Witnesses Attached to Plaintiffs'
Answers to the Second Set of Interrogatories of Defendant-Intervenors
Defendant-Intervenors Exhibit 19

| Key: | Report: |
|---|---|
| RB–CDG. | Report of Dr. Richard Baer, An Analysis of the Textbook Caring, Deciding and Growing by Helen McGinley, Ginn & Company, 1983 |
| RB–CL. | Report of Dr. Richard Baer, Notes on Contemporary Living by Verdene Ryder, Goodheart-Willcox, 1981 |
| RB–HS. | Report of Dr. Richard Baer, Comments on the Textbook Homemaking Skills for Everyday Living by Frances Parnell, Goodheart-Willcox, 1984 |
| RB–PP. | Report by Dr. Richard Baer, Notes on Person to Person by Connie R. Sasse, Bennett Publishing 1981 |
| RB–TT. | Report of Dr. Richard Baer, Notes on Today's Teen by Joan Kelly, Bennett Publishing, 1981 |
| RB–SS. | Report of Dr. Richard Baer, Some Summary Statements |
| RC. | Report of Dr. William Coulson, High School Texts in Psychology and Home Economics: Analysis and Commentary |
| RH. | Report of Dr. James Hunter, A Statement on the Role of Religion in Contemporary American Life and World Order and its Presentation in the Textbooks Used in the State of Alabama Public Schools |
| | Report of Dr. James Hunter, Humanism and Social Theory: Is Secular Humanism a Religion? |
| R.S. | Report of Dr. Timothy Smith, High School History Texts Adopted for Use in the State of Alabama: The Distortion and Exclusion of Religious Data |
| RSP. | Report of Dr. Gordon Spykman, Humanism as a Religious Worldview |
| RST. | Report of Dr. Kenneth Strike, Review of Today's Teen, Contemporary Living, Homemaking Skills for Everyday Living, and Caring, Deciding, and Growing |
| RV. | Report of Dr. Paul Vitz, Bias against Religion in Social Studies and American History Textbooks Approved for Use in the State of Alabama |